UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
THE CITY OF NEW YORK,

                              Plaintiff,

                 -against-

A-1 JEWELRY & PAWN, INC.; ADVENTURE
OUTDOORS, INC.; COLE'S GUN SHOP, INC.,
DUNKELBERGER'S SPORTS OUTFITTERS;
GALLERY DISTRIBUTING INC.; GREG L.
DRIGGERS d/b/a AAA Gun & Pawn Brokers; THE
GUN STORE, INC.; HAROLD W. BABCOCK, JR.
d/b/a Webb's Sporting Goods; JAMES THOMAS
FARMER d/b/a Jim's Guns and Whatever;
MICKALIS PAWN SHOP, LLC; NANCY DAILEY
d/b/a Peddler's Post; OLD DOMINION GUNS &
TACKLE, INC.; PATRIOT SERVICES, INC.;
WELSH PAWN SHOP, INC. d/b/a Big Tom's Pawn
Shop; WOODROW C. HOLMAN III d/b/a Woody's
Pawn Shop,

                              Defendants.

------------------------------------------------------------x
JACK B. WEINSTEIN, Senior District Judge:

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★     AUG 15 2007     ★

P.M.
TIME A.M.

06 CV 2233 (JBW)

MEMORANDUM & ORDER
MOTION TO DISMISS FOR
LACK OF PERSONAL
JURISDICTION

**Table of Contents**                                         **Page**

I.   Introduction..............................................................................7

II.  Sources of Information Available to the City............................8

III. Facts......................................................................................11

    A.  Retailer Factors.............................................................11

        1.  Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to a Defendant..................................11

                a.  Temporal Limitations.............................................12

                b.  Inherent Limitations..............................................12

        2.  Distribution Practices and Their Possible Effects on Crimes in New York...................................................13

                a.  The City's Simulated Straw Purchases.......................13

                b.  Trafficking Prosecutions.......................................14

                c.  Multiple Sales...................................................14

        3.  Time-to-Crime of Retailer's Guns Recovered in New York........15

        4.  Sales Price and Type of Gun........................................16

        5.  Crimes Committed in New York with a Retailer's Handguns....17

        6.  Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets............................................................17

        7.  Actions of Regulatory Authorities Related to the Retailer's Distribution Practices..............................................18

        8.  Defense Reliance on Formal Compliance with Federal and State Retail Sales Requirements..........................................19

    B.  Factors as to Each Moving Defendant......................................21

        1.  Overview..........................................................21

        2.  Factors as to Each Moving Defendant..............................22

                a.  Peddler's Post—Wilmington, Ohio.............................23

                        (1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant..........................24

                        (2) Distribution Practices and Their Possible Effects on Crimes in New York........................................25

(a) Straw Purchases..................................25

    i.    *United States v. Salazar*............25
    ii.   *United States v. Robinson*..........25
    iii.  *United States v. Walker*.............25
    iv.  *United States v. Hancock*...........26
    v.   *United States v. Perkins*............26

(b) Multiple Sales................................27

(3) Time-to-Crime of Retailer's Guns Recovered in New York...................................................28

(4) Sales Price and Type of Gun............................29

(5) Crimes Committed in New York with a Retailer's Handguns.................................................29

(6) Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets .........................29

(7) Actions of Regulatory Authorities Related to Peddler's Post's Distribution Practices...............30

b.  Patriot—Richmond, Virginia................................31

(1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant........................33

(2) Distribution Practices and Their Possible Effects on Crimes in New York.....................................34

    (a) Straw Purchases............................34

    (b) Multiple Sales................................35

    (c) Use of Trace Requests........................35

(3) Time-to-Crime of Retailer's Guns Recovered in New York...................................................35

(4) Sales Price and Type of Gun............................36

(5) Crimes Committed in New York with a Retailer's Handguns.................................................36

(6) Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets .........................37

(7) Actions of Regulatory Authorities Related to Patriot's Distribution Practices......................37

c. Woody's—Orangeburg, South Carolina......................38

    (1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant.........................39

    (2) Distribution Practices and Their Possible Effects on Crimes in New York.......................................40

        (a) Straw Purchases...........................40

            i.    *United States v. Brooks*.............40
            ii.    *United States v. Rutledge*...........40
            iii.    *United States v. Welcome*...........41
            iv.    *United States v. Brown*.............41

        (b) Multiple Sales...........................42

        (c) Trace Requests............................43

    (3) Time-to-Crime of Guns Recovered in New York.................................................43

    (4) Sales Price and Type of Gun...........................44

    (5) Crimes Committed in New York with a Retailer's Handguns.................................................44

    (6) Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets .......................45

    (7) Actions of Regulatory Authorities Related to Woody's Distribution Practices.........................45

d. Adventure Outdoors—Smyrna, Georgia......................46

    (1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant.........................47

    (2) Distribution Practices and Their Possible Effects on Crimes in New York.......................................48

        (a) Straw Purchases...........................48

            i.    *United States v. El-Saddique*......49
            ii.    *United States v. Rose*................49
            iii.    *United States v. Garcia-Diaz*.......50
            iv.    *United States v. Wilson*.............50
            v.    *United States v. Vinson*.............51
            vi.    *United States v. Pray*................51
            vii.    *United States v. Gaddie*.............51
            viii.    *United States v. Hurley*.............51

(b) Multiple Sales....................................51

(3) Time-to-Crime of Guns Recovered in New York....................................................52

(4) Sales Price and Type of Gun............................53

(5) Crimes Committed in New York with a Retailer's Handguns..............................................54

(6) Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets .........................54

(7) Actions of Regulatory Authorities Related to Adventure Outdoors' Distribution Practices........56

e. Mickalis—Summerville, South Carolina....................57

(1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant..........................58

(2) Distribution Practices and Their Possible Effects on Crimes in New York..................................59

(a) Straw Purchases.............................59

(b) Multiple Sales..................................59

(3) Time-to-Crime of Guns Recovered in New York....................................................60

(4) Sales Price and Type of Gun............................60

(5) Crimes Committed in New York with the Retailer's Handguns..............................................61

(6) Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets.........................61

(7) Actions of Regulatory Authorities Related to Mickalis' Distribution Practices......................62

f. Webb's—Madison Heights, Virginia.........................63

(1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant..........................64

(2) Distribution Practices and Their Possible Effects on Crimes in New York.....................................64

(3) Time-to-Crime of Guns Recovered in New York....................................................65

(4) Sales Price and Type of Gun............................65

(5) Crimes Committed in New York with a Retailer's Handguns...............................................65

(6) Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets..........................66

(7) Actions of Regulatory Authorities Related to Webb's Distribution Practices.........................66

IV. Law.................................................................................67

    A. Overview.........................................................................67

    B. Long Arm Jurisdiction Generally...............................67

        1. C.P.L.R. 302(a)(3)(ii).......................................67

            a. Legislative History.....................................68

            b. Cases..........................................................70

            c. Injury Causing Acts as Tortious in Foreign and Forum State......................................73

            d. Burden of Proof........................................75

            e. Reasonable Expectation of Consequences in New York...76

            f. Derives Substantial Revenue from Interstate Commerce..78

        2. Due Process.......................................................79

            a. Minimum Contacts...................................79

            b. Reasonableness.........................................84

            c. State Interest.............................................85

        3. Cumulative Parallel Conduct...........................86

    C. Long Arm Jurisdiction in Gun Cases........................89

V. Application of Law to Facts.........................................91

VI. Conclusion as to Jurisdiction.....................................98

VII. Denial of Certification for Interlocutory Appeal....................99

VIII. Date For Trial.........................................................99

## I.  Introduction

In addition to the usual reasons for asserting personal jurisdiction over defendants, in this case of first impression, their knowing cumulative illegal parallel conduct outside New York causing widespread injury in New York made them amenable to suit in this state. *See* Parts IV.B.3 and V, *infra*.

The City commenced this public nuisance and negligence action in May of 2006, against fifteen retail gun dealers operating from stores in Georgia, Ohio, Pennsylvania, South Carolina and Virginia.  In a companion action, *City of New York v. Bob Moates Sport Shop, Inc.*, 06-CV-6504 (E.D.N.Y. 2006), the City has sued 12 additional retail dealers on similar grounds. Of the 27 defendants sued to date by the City, 12 have entered into voluntary agreements with the City in which, at the City's cost, the retailers' employees will be trained to avoid retail practices that lead to illegal use of guns in New York City and the retailers' sales practices will be monitored for three years.

Complaints were filed against each of the present defendants after the City had assembled data documenting the regular arrival of illegally possessed guns into New York City which had been sold by defendants in other states.  The relevant criteria of inappropriate retail sales practices distinguish defendants from what the City asserts are the 99.4% of retail gun dealers in the United States who conduct their business responsibly. As part of its investigation prior to suing the City allegedly assessed the current willingness of each of the sued retailers to enter into "straw" purchases by apparent buyers standing in for the real buyers, a practice known to speed guns through the illegal interstate market to New York.

The six moving defendants move to dismiss, arguing that New York courts, state or federal, cannot assert personal jurisdiction over them.  In rulings on similar motions defendants'

contentions have been rejected. *See Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 397 (E.D.N.Y. 2004) ("*Johnson*"); *NAACP v. A.A. Arms, Inc.*, No. 99-CV-3999, No. 99-CV-7037, 2003 U.S. Dist. LEXIS 8238 (E.D.N.Y. 2003) ("*NAACP*"); *NAACP v. AcuSport Corp.*, No. 99-CV-7037, 99-CV-3999, 2000 U.S. Dist. LEXIS 17573   (E.D.N.Y. 2000) ("*AcuSport*"); and *Hamilton v. Accu-Tek*, 32 F. Supp. 2d 47 (E.D.N.Y. 1998) ("*Hamilton*").

The motions to dismiss for lack of personal jurisdiction are denied for reasons explained below. Plaintiff has demonstrated, with a high degree of probability, that defendants' knowing parallel conduct in their individual states, relying on interstate commerce, have been responsible for the funneling into New York of large quantities of handguns used by local criminals to terrorize significant portions of the City's population. The City may seek redress in the Eastern District of New York where many of the New York crimes attributable to defendants' activities take place.

## II.   Sources of Information Available to the City

The City has available to it five general sources of information concerning guns sold by the moving defendants:

1) Trace data from the National Firearms Trace Database, provided to the City by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), limited to guns recovered in New York City and New York State from 1994-2002 (the "New York Trace Data"). The numbers of traces in the City's Complaint was based only on New York City traces.  The total number of guns attributed to certain moving defendants differs from those enumerated in the Complaint because of the inclusion of New York State traces.

2) Trace data from the National Firearms Trace Database sold by ATF, through a private vendor, and available to the public until approximately 2001. This trace data includes guns

recovered nationwide, but is limited to recoveries made from 1990 to 1997 (the "National FOIA Data"). ATF did not begin comprehensive tracing of all guns recovered until 1999. *See* Pierce, G.L., Braga, A.A., Hyatt, R.R., and Koper, C.S., *Characteristics and Dynamics of Illegal Firearms Markets*, 21 Just. Q., 391, 398 (2004). Trace data earlier than 1999, including the National FOIA Data, under-represents the actual number of crime guns sold by a particular retailer.

3) ATF trace requests made directly to a moving defendant that, if retained, should have been produced by defendants during the discovery in this action (the "Discovery Traces"). These written requests from ATF to retailers, seeking information on the retail purchaser of the gun being traced, were made available only by moving defendants Adventure Outdoors, Mickalis and Webb's. ATF may also request information of retailers by telephone to help determine the disposition of a particular firearm in the course of a criminal investigation.  18 U.S.C. § 923(g) (7) (2007). It is unclear whether any of the present defendants record and maintain telephone requests. The number of "Discovery Traces" yields a conservative estimate of the actual number of trace requests made by ATF to a particular defendant. Defendants Patriot, Peddler's Post, and Woody's apparently destroyed records of such requests. As to the adverse inference to be drawn against those three moving defendants see *Hamilton*, 32 F. Supp. 2d at 68.

4) Court documents and related information generated in connection with federal criminal prosecutions.

5) *Selling Crime: High Crime Gun Stores Fuel Criminals*, Americans for Gun Safety Foundation (January 2004) (the "AGSF Report"). The AGSF Report uses ATF trace data compiled between 1996 and 2000 analyzed by National Economic Research Associates for the

*NAACP* case. This report is limited to those retail firearms dealers with 200 or more guns traced to them for those years.

The City has made reasonable projections to fill in gaps created by ongoing trace data restrictions. *See City of New York v. Beretta U.S.A. Corp.*, 429 F.Supp.2d 517, 529 (E.D.N.Y. 2006). Moving defendants' failure to retain ATF trace requests may also be considered in assessing the evidence. A reasonable assumption in addressing the years of unavailable data is that the mean number of guns traced to a particular retailer in prior years from *New York City* provides a rough prediction of the yearly recoveries *in the City* for the unavailable years, *i.e.*, 2003 to 2006. The use of such mean numbers of guns traced in prior years to fill in the missing years is a permissible predictor if there is no detectable trend – upwards or downwards – in the number of traces in prior years. Reasonable calculations show that there is no such trend-- *i.e.*, the number of traces was not systematically increasing or decreasing from year to year. The City's table set out below provides mean annual traces and suggests that the number is not systematically increasing or decreasing:

**Mean number of crime gun traces of guns sold by moving defendants that were recovered annually in New York for the period 1994-2002, estimated annual change and probability that there was a linear trend in the number of traces per year.**

| Retailer | mean traces per year (standard deviation) | | estimated annual change (standard error) | | t statistic | Significance (probability that there is no trend) |
|---|---|---|---|---|---|---|
| All 6 retailers | 5.61 | (2.61) | -0.06 | (0.30) | -.22 | .829 |
| Mickalis | 6.89 | (3.37) | -0.20 | (0.46) | -0.44 | .676 |
| Woody's | 15.44 | (5.05) | 0.33 | (0.69) | 0.49 | .642 |
| Webb's | 2.22 | (1.48) | -0.50 | (0.20) | -0.25 | .813 |
| Patriot | 2.89 | (1.62) | 0.28 | (0.20) | 1.45 | .191 |
| Peddler's | 3.11 | (3.62) | -0.75 | (0.41) | -1.82 | .111 |
| Adventure | 3.11 | (1.69) | 0.00 | (0.23) | 0.00 | 1.00 |

10

For the four years (2003 to 2006) for which New York Trace Data is unavailable, the number of expected traces for each moving defendant can be projected with sufficient accuracy for this motion by multiplying the mean number of traces per year by four years. The result is, 12 additional gun traces for Peddler's Post, 11 additional gun traces for Patriot, 61 additional gun traces for Woody's, 12 additional gun traces for Adventure Outdoors, 27 additional gun traces for Mickalis, and 8 additional gun traces for Webb's (hereafter, "Projected Traces").

It can be assumed for purposes of this motion that moving defendants have not changed their practices so as to be likely to have had fewer traces in more recent years because: (i) for the three moving defendants who have provided Discovery Traces, the number of annual traces has increased, not decreased, over what it was in the earlier period of time captured in the National FOIA Data; and (ii) every moving defendant's sales have increased annually since 2000. Moreover, the deposition testimony of representatives of Adventure Outdoors and Patriot confirm that there has been no relevant change in sales practices. *See* Wallace Tr. at 239-41, 260, Pl. Ex. U; Jarrett Tr. at 120-21, Pl. Ex. N.

The information available provides more than enough data to support the City's factual claims on the present motions.

### III. Facts

#### A. Retailer Factors

##### 1. Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to a Defendant

The number of "crime guns" purchased from a gun retailer recovered in New York State is the foundation for of any determination that the retailer is properly subject to jurisdiction in New York. "Crime gun" is a term of art coined by the ATF for a gun that has been submitted for tracing. "The [ATF] traces firearms at the behest of law enforcement officials, and it seems safe

to assume that law enforcement officials do not generally opt to have traces conducted out of idle curiosity." *J&G Sales, Ltd. v. Truscott*, 473 F.3d 1043, 1052 (9th Cir. 2007). Notwithstanding the impediments that have been placed in the way of the City's acquisition of relevant trace data, it has been able to compile sufficient information from the sources described in Part II, *supra,* to derive a conservative estimate of the number of crime guns for which each moving defendant is responsible. The City's estimates are sufficiently reliable for deciding jurisdiction in view of (i) the temporal limitations on the data available to the City, and (ii) the inherent limitations on trace data as a quantitative measure of recovered guns. Both of these limitations are discussed below.

### a. Temporal Limitations

The ATF trace data available to the City ends in 1997 for the National FOIA Data and in 2002 for the New York Trace Data. While the City also has in its possession national data containing traces through the end of 2005, it is presently foreclosed from using that information under the terms of the protective order entered in *City of New York v. Beretta U.S.A.*, 00-CV-3641 (E.D.N.Y. 2006), as a result of federal legislation. The numbers of gun recoveries calculated by the City are derived from that data and, for the three moving defendants that did not destroy trace requests, from the Discovery Traces. For the three moving defendants that destroyed their records of ATF trace requests — Patriot, Peddler's Post and Woody's — "[s]ince the necessary [jurisdictional] information is in the exclusive control of defendants, where they have failed to provide the information, plaintiffs have satisfied their burden...." *Hamilton*, 32 F. Supp. 2d at 61.

### b. Inherent Limitations

The number of traces per moving defendant probably under-represents the actual number of their crime guns recovered in New York because it is likely that not all guns recovered from illegal purchasers were entered into the Trace Database during the years for which trace data is

12

available. Many guns identified in federal prosecutions as having been acquired from a moving defendant by traffickers in straw purchases do not appear in the trace data. *See, e.g.,* Calvin Walker and Brian Hancock cases (Peddler's Post). (Pl. Ex. L). It may be assumed, of course, that many illegal guns trafficked into New York are never recovered and therefore not traced back to their source.

### 2. Distribution Practices and Their Possible Effects on Crimes in New York

#### a. The City's Simulated Straw Purchases

This action for public nuisance was commenced, the City says, against each defendant only after it demonstrated a willingness to engage in what the plaintiff construes as an obvious straw purchase, a high-risk sales practice that is a well-recognized source of illegally trafficked guns. *See* Compl. ¶¶ 56-57. An ATF investigation of gun-trafficking showed straw-purchasing to be involved in half of ATF's trafficking investigations, and in two-thirds of ATF's trafficking investigations in the Northeast. Straw purchasing accounted for the movement of 26,000 guns in the two-year period of the study. *Following the Gun – Enforcing Federal Laws Against Firearms Traffickers* (ATF, Washington DC 2000), at ix, 13, 18. The simulated straw purchase program conducted by City testers strongly suggests that federally-licensed firearms retailers ("FFLs") are able to recognize, and decline to participate in, straw purchases, as evidenced by the fact that approximately one-third of the retailers approached declined such sales, explaining that completing the sale would constitute (from their perspective) an illegal straw purchase. *See, e.g.,* Compl. ¶¶ 93, 234. By contrast, each moving defendant sold a gun in the course of a simulated straw purchase, permitting an inference that it will engage in straw purchases, negligently or deliberately, when presented with the opportunity to do so.

### b. Trafficking Prosecutions

The City has assembled direct evidence of illegal trafficking from some of the moving defendants' retail stores to the City, as evidenced by prosecutions of moving defendants' customers. *See* Pl. Exs. W, L, R (documenting trafficking from Adventure Outdoors, Peddler's Post, and Woody's to New York City). For these moving defendants, participation in the City's simulation confirms evidence, in the form of prior prosecutions, that they repeatedly facilitated straw purchasing. Whether there have been at least eight such prior prosecutions, as for Adventure Outdoors; five prior prosecutions, as for Peddler's Post; or four prior prosecutions, as for Woody's; the evidence of gun trafficking from these moving defendants' stores is substantiated. Compilations of prosecutions such as those presented here present a conservative basis for estimating actual trafficking. Relevant prosecutions can be located in federal court files only on the basis of their lead charge. Thus, if the lead charge in a case is something other than gun trafficking, the case cannot readily be associated with guns. Additionally, ATF estimates that prosecutors are able to charge these violations in less than 45 percent of the straw purchasing cases. *Following the Gun* at 43. In fact, "most federal laws controlling guns result in almost no prosecutions; this is particularly true of prosecutions for smuggling guns across state boundaries...." *NAACP v. AcuSport,* 271 F. Supp. 2d 435, 501 (E.D.N.Y. 2003).

### c. Multiple Sales

Sales of multiple handguns at one time, to one purchaser, is an established indicator of gun trafficking. "Multiple sales in some states to the same person at the same or almost the same time result in many guns being diverted to criminal elements." *NAACP v. AcuSport,* 271 F. Supp. 2d at 502; *see Inspection of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives,* Rpt. I (USDOJ July 2004), at iii-iv. There is a well-known relationship between straw purchasing and multiples sales: straw purchasers are likely to buy

14

multiple guns. *Crime Gun Trace Reports: National Report* (2000) (ATF, Washington, DC, 2002) at ix, 52; *Commerce in Firearms in the United States*, (2000) (ATF, Washington, DC) at 21-22.

### 3. Time-to-Crime of Retailer's Guns Recovered in New York

"Time-to-crime is the time from the retail sale of a firearm to the time it is recovered at a crime scene or is traced. The average time-to-crime [for guns recovered nationwide] is six years." *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 285 (4th Cir. 2004), *cert. denied*, 543 U.S. 1052 (2005). According to ATF, a short time-to-crime suggests that a firearm was recently and illegally diverted from a retail outlet. *Crime Gun Trace Reports: National Report* (2000) at ix, 30. As to what constitutes a "short" time-to-crime:

> [T]hree years is considered a short time to crime, and is considered an important trafficking indicator, suggesting rapid movement to the illegal gun market. Thus, by identifying those dealers that have ten traces or more per year with a short time to crime of three years or less, ATF can obtain a sense of which dealers tend to sell guns that are ultimately used in crimes.

*Blaustein & Reich v. Buckles*, 220 F. Supp. 2d 535, 540 (E.D. Va. 2002) (citations omitted), *aff'd*, 365 F.3d 281 (4th Cir. 2004), *cert. denied*, 543 U.S. 1052 (2005).

Short times-to-crime of a retailer's recovered guns are relevant from a jurisdictional perspective for two reasons. First, the shorter the time-to-crime in New York, the more likely that the retailer is in fact *directly* serving the New York market. Short times-to-crime are especially telling when the recovery time in the retailer's home state is comparable to, or even longer than, the recovery time in a foreign state —strengthening the inference that the retailer is engaged in *direct* out-of-state commerce with the foreign state. As shown below, for each moving defendant, *the time-to-crime of their guns is faster in New York, or only slightly longer, than in their immediate home state.*

Second, "straw purchasing is a pattern of trafficking that is likely to result in crime guns with relatively short time-to-crimes." Pierce, G.L., Braga, A.A., Hyatt, R.R., and Koper, C.S., *Characteristics and Dynamics of Illegal Firearms Markets*, 21 Just. Q., 391, 399 n.2 (2004).

### 4. Sales Price and Type of Gun

Certain brands of cheap handguns are more likely to give rise to public nuisance and public danger when they are in the hands of prohibited purchasers. Sales of such guns is a factor to be weighed for jurisdictional purposes. *See NAACP,* 2003 U.S. Dist. LEXIS 8238 at *27 (noting, for jurisdictional purposes, defendant's advertising of "lower-end" guns costing less than $100).

The term "Saturday Night Special" is generally used to refer to the cheap, poorly-made handguns that are favored by some criminals. *See id.* at *35-36. Saturday Night Specials are more likely to have shorter times-to-crime, more likely to have been purchased by a straw purchaser or other illegal purchaser, and more likely to have defaced serial numbers. For example, of the 780,000 guns recovered in crimes and contained in the National FOIA Data, well-known Saturday Night Special brands — such as Bryco, Lorcin, and Hi-Point — were found to be recovered in crimes far more quickly than more expensive brands, *e.g.,* Colt, Beretta or Smith & Wesson:

| Manufacturer | Time-to-crime |
|---|---|
| Colt | 9.4 years |
| Beretta | 8.9 years |
| Smith & Wesson | 6.3 years |
| Lorcin | 2.9 years |
| Bryco | 2.8 years |
| Hi-Point | 2.0 years |

Of the 32,000 crime guns recovered by the New York Police Department ("NYPD") contained in the database of the NYPD Firearms Analysis Section, Saturday Night Special brands are more likely to be recovered with a defaced serial number than more expensive brands:

| Manufacturer | Percent defaced |
|---|---|
| Smith & Wesson | 6.4% |
| Colt | 8.3% |
| Beretta | 8.6% |
| Hi-Point | 16.9% |
| Bryco | 23% |
| Lorcin | 23% |

ATF has reported that a defaced or obliterated serial number is an indication of an intent to traffic the gun at the time it was purchased. *Commerce in Firearms* at 30; *Following the Gun* at 26 ("Serial number obliteration is a clear indicator of firearms trafficking").

### 5. Crimes Committed in New York with a Retailer's Handguns

Crimes committed with guns sold by the moving defendants have been identified by matching the complaint number provided in either the National FOIA Data or the New York Trace Data with the matching complaint number in the NYPD's On-line Complaint System. Guns traced to the moving defendants by means other than trace data, *i.e.*, through the Discovery Traces, are, after further analysis, matched to crimes as well.

### 6. Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets

New York City's strong gun control laws create a scarcity, thus providing a profitable market for moving guns to the City. The ease with which guns may be purchased in the Southeast, in particular, means that "dealers have long been able to make a profit by buying guns in Virginia or points south and running them northward to the street markets of northeastern

cities." *United States v. Cavera*, Nos. 05-4591-CR (L), 05-5210-CR (CON), 2007 U.S. App. LEXIS 13003, at *29 (June 6, 2007) (Calabrese, J., concurring) (quoting Philip J. Cook, et al., *Guns and Violence Symposium: Regulating Gun Markets*, 86 J. Crim. L. & Criminology 59, 72 (1995)).

### 7. Actions of Regulatory Authorities Related to Retailer's Distribution Practices

In 1999, ATF determined that 1.2% of FFL retailers — approximately 1,000 of the then more than 80,000 retailers — accounted for more than half of all crime guns traced nationally. *Commerce in Firearms in the United States*, at 23-24. ATF determined that approximately 450 retailer FFL's were each the source of ten or more crime guns with times-to-crime of three years or less. Based on this data, ATF began to demand additional sales information from the 450 FFL retailers identified by those criteria. *See Blaustein & Reich*, 365 F.3d at 285. The demands, now known as "ATF Demand Letters," imposed additional record-keeping requirements on these retailers. *See* 18 U.S.C. § 923(g)(5)(A) (2007). The threshold for a Demand Letter was raised to 15 traced guns in 2002. *See J&G Sales, Ltd.* 473 F.3d at 1052.

A retailer's receipt of a Demand Letter – or the simple fact that a retailer has met the criteria for receipt of a Demand Letter – is a determination by an administrative agency with expertise in the subject area that the retailer's practices are associated with the recovery of a disproportionate number of crime guns. As the ATF Demand Letters themselves explain, "[ATF's] research ha[s] demonstrated that a high volume of gun traces with a short time-to-crime may indicate illegal firearms trafficking by an FFL dealer." *Blaustein & Reich*, 365 F.3d at 291.

A Demand Letter is significant for personal jurisdictional analysis because the Letter itself evidences suspect marketing and sales practices; it permits an inference that the retailer is

tied-to interstate second hand gun sales. For reasons intrinsic to the tracing process ATF trace data does not include second-hand guns sold by retail gun dealers. *See Blaustein & Reich*, 220 F. Supp. 2d at 540.  This is an additional reason for concluding that the number of guns attributable to each moving defendant is probably larger than shown in the various sources of trace data. "Focusing exclusively on new guns likely underestimates the true extent of gun trafficking." *Following the Gun* at 25. ATF requires retailers in receipt of a Demand Letter to also turn over their second-hand gun information because:

> The [ATF] reasonably deduced that since this small group of dealers was the original source of a disproportionate share of the new firearms that were traced, this same group might also be the source — through illegal or legal means — of a substantial percentage of secondhand firearms that are traced.

*Blaustein & Reich*, 365 F.3d at 291; *accord J&G Sales*, 473 F.3d at 1053 ("We can think of no reason, and J&G has not offered one, to believe that an FFL retailer who sells a large number of new firearms that end up being traced would not similarly sell a large number of used firearms that also end up being traced."); *Blaustein & Reich,* 220 F. Supp. 2d at 540-41 (dealers that sell significant numbers of new guns that quickly become crime guns are likely also to sell a significant number of used guns that eventually are used in crime).

Receipt of a Demand Letter or meeting the requirement for receipt of one is a relevant factor weighing in favor of the exercise of long-arm jurisdiction.

### 8. Defense Reliance on Formal Compliance With Federal and State Retail Sales Requirements

It is defendants' contention that they comply with the whole array of federal and state laws applicable to sales by licensed retailers of firearms, viz: each of them obtains and reviews government issued photographic identification from the prospective purchaser, which, in the case of a handgun sale must demonstrate that the prospective purchaser is a resident of the state. In

addition, the prospective purchaser is required to complete a form 4473 and affirm, under penalties of perjury, that he: (1) is the actual buyer of the firearm; (2) is not presently under indictment or information in any court for a felony or any other crime for which the judge could imprison him for more than one year; (3) has not been convicted of a felony or any other crime for which the judge could imprison him for more than one year; (4) is not a fugitive from justice; (5) is not an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance; (6) has never been adjudicated mentally defective nor ever been committed to a mental institution; (7) has not been discharged from the Armed Forces under dishonorable conditions; (8) has not been the subject of a court order restraining him from harassing, stalking, or threatening his child or an intimate partner or child of such partner; (9) has not been convicted in any court of a misdemeanor crime of domestic violence; (10) has never renounced his United States Citizenship; (11) is not an illegal alien in the United States; and (12) is not a non-immigrant alien, or if so, falls within any of the exceptions mentioned on the form. Once the retailer has reviewed the prospective purchaser's government issued photographic identification and responses on the form 4473, it contacts the Federal Bureau of Investigation ("FBI") to determine whether the prospective purchaser is legally entitled to purchase a firearm based on the results of an inquiry to the National Criminal Background Check System ("'NICS").

Assuming that all these formal protective steps are taken before each sale, they are rendered completely nugatory if the transaction is a straw sale to a person who is standing in for another—the real purchaser. Fraud by the seller, the formal purchaser and the actual purchaser constitutes a tortious act in the state in which the sale takes place. *See* Part IV.B.1.c, *infra*

## B. Factors as to Each Moving Defendant

### 1. Overview

Moving defendants' principal jurisdictional argument is that they sell only to residents of their home state, and not in interstate commerce. Because Federal law only permits handgun sales to persons resident in the state in which the retailer is located, each claims compliance with that law, and denies receiving any revenue from goods used in New York or in interstate commerce.

Whatever movants may say that they do *de jure,* the central issue on this motion is whether they *de facto* serve an out-of-state market, including New York, through their illegal sales practices. The City has assembled substantial evidence that each of the moving defendants in fact serves an interstate market, through regular sales to straw purchasers, through multiple gun sales, or through internet sales. These practices permit moving defendants effectively to operate as if they were selling guns directly in New York.

The City's evidence confirms that moving defendants' wares regularly, and rapidly, arrive in New York via criminal channels. Three of the moving defendants have histories of selling guns to customers who engage in interstate gun-trafficking, as evidenced by the federal prosecutions of their customers. The three other moving defendants have histories of engaging in sales of guns that are relatively rapidly recovered out-of-state, confirming that these retailers also engage in sales practices that fuel the substantial interstate gun market. For both sets of movants, the evidence shows repeated illegal sales of firearms in a manner that has direct consequences in New York.

While the moving defendants argue that their allegedly modest sales volumes should weigh against any assertion of jurisdiction, discovery has established that they in fact sell guns in volumes comparable to distributors over whom jurisdiction was previously deemed appropriate

in *NAACP*. *See NAACP*, 2003 U.S. Dist. LEXIS 8238 at *31-32 (asserting jurisdiction, for example, over Brazas Sporting Arms with sales of 2,000 guns per year). Moreover, the number of traces to New York from the moving defendants is comparable to, or exceeds, the number of traces to New York deemed sufficient for jurisdiction over distributors in *NAACP*. *See id* at *35, *38, *43, *45 (Excel Industries, 34 handguns traced to New York; Bill Hicks, 59 traced guns; Riley's Inc., 23 traced guns; William's Shooter's Supply, 35 traced guns).

### 2. Factors to Each Moving Defendant

### a.  Peddler's Post — Wilmington, Ohio

| | | | | | |
|---|---|---|---|---|---|
| ▪ 218 of Δ's guns were recovered in crimes nationwide (National FOIA Data). <br><br>▪ Most of the 218 were recovered in crimes in states other than Ohio (National FOIA Data). <br><br>▪ 12% of the 218 were recovered in New York State crimes from 1990-97 (National FOIA Data). <br><br>▪ 28 of Δ's guns were recovered in New York State (New York Trace Data). <br><br>▪ At least 27 more guns have been trafficked to New York City since 2002 (Pl. Ex. J; see also Pl. Ex. L). | ▪ Δ sold at least 238 guns to straw purchasers who trafficked them to New York City and elsewhere (Pl. Ex. L). <br><br>▪ Repeated instances of multiple purchases; up to 21 handguns at one time, and 41 in a two-week period (Pl. Ex. L). | ▪ Average time for 218 guns = 2.35 years (National FOIA Data). <br><br>▪ 2.35 years to New York (New York Trace Data). <br><br>▪ At least 4 guns were recovered in New York City less than a year after sale (New York Trace Data). <br><br>▪ Nearly 70% of the 28 crime guns sold by Δ and recovered in New York were recovered in less than three years. (New York Trace Data). | ▪ Approx. one-third of guns Δ sells are Sat. Night Specials (Pl. Ex. M). <br><br>▪ Many of guns sold by Δ and identified in straw-purchase prosecutions were Sat. Night Specials. <br><br>▪ More than 37% of guns recovered in New York City were Sat. Night Specials (New York Trace Data). | ▪ At least one homicide, several drug crimes, and many unlawful possession offenses (New York Trace Data). | ▪ 8,000 guns sold in US from 2000-06 (Pl. Ex. M), of which an estimated 2% to 7.8% were recovered in crimes (See National FOIA Data; see also Pl. Ex. L). <br><br>▪ Δ meets criteria for ATF Demand Letter. |

As documented in five straw purchase prosecutions from 1994 to 2005, the Central Ohio location of Peddler's Post's permits it to operate as a high-volume center for interstate gun trafficking, supplying such Midwest cities as Chicago and Detroit, as well as cities in the Northeast, including New York, Boston, Rochester and Buffalo.

### (1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant

The National FOIA Data (1990-1997) documents at least 218 guns sold by Peddler's Post that were recovered in crimes nationally. Because Peddler's Post apparently discards trace requests received from the ATF – it has produced none here – it is impossible to determine the national volume of its post-1997 traces.

The interstate nature of Peddler's Post's business is demonstrated in the National FOIA Data: only about 7% of Peddler's Post's traced guns were recovered in its home state of Ohio; 93% of its crime guns were recovered outside of Ohio. This includes recoveries in California, Canada, Illinois, Michigan, Puerto Rico, Nevada, New York and elsewhere. Approximately 53% of Peddler's Post's guns are recovered in Michigan (nearly all in Detroit); approximately 12% were recovered in New York State, and 11% were recovered in Illinois (principally Chicago).

According to the New York Trace Data, 28 guns sold by Peddler's Post were recovered in New York State between 1994 and 2002. Nine were recovered in New York City; nineteen were recovered elsewhere in New York State – in Buffalo, Rochester and Albany. Including information obtained from a 2004 gun-trafficking case, in which a convicted trafficker admitted bringing 27 guns purchased from Peddler's Post into New York City, (Pl. Ex. J; *see Salazar*, described below; *see also* Pl. Ex. L), Peddler's Post accounts for a total of 55 crime guns traced to New York State. Including the 12 Projected Traces, *see* Part II, *supra*, Peddler's Post accounts for a total of 67 crime guns traced to New York State.

24

**(2) Distribution Methods and Their Possible Effects on Crimes in New York**

**(a) Straw Purchases**

The City's "successful" straw purchase at Peddler's Post on April 12, 2006, supports the City's contention that there has been a long history of straw purchasing there, evidenced by at least five prosecutions of straw-purchasing rings between 1994 and 2005:

(i)    *United States v. Salazar*, 1:04-CR-00452 (S.D.N.Y.).  Between February 2002 and June 2004, straw purchasers working as part of a gun and drug trafficking conspiracy organized by Ohio resident Noah O'Brien and New York resident Manny Salazar, bought approximately 49 guns from Ohio firearms retailers, including 27 from Peddler's Post, obliterated the serial numbers, and transported them to New York City, principally to the Mott Haven housing project in the Bronx.  (O'Brien Tr. 16, Pl. Ex. J).  The details of the O'Brien/Salazar purchases establish that Peddler's Post knew, or should have known, that the guns were purchased for subsequent re-sale out of state.  (O'Brien Tr. 14-15, 29-30, Pl. Ex. J).

In April 2004, Kristen Campbell straw-purchased three Hi-Points 9mm pistols for O'Brien.  (O'Brien Tr. 26, 42-45, Pl. Ex. J).

(ii)    *United States v. Robinson*, 1:05-CR-0033 (S.D. Ohio).  On September 9, 2002, Rowena Robinson straw-purchased four handguns from Peddler's Post.  On November 10, 2002, she straw-purchased an additional four handguns from Peddler's Post.  Robinson was subsequently convicted for both transactions.  Several of the firearms she purchased were recovered at crime scenes in Boston.  (*See* Pl. Ex. L).

(iii)    *United States v. Walker*, 3:98-CR-096 (S.D. Ohio).  Between February and September 1994, Calvin Walker straw-purchased approximately 50 handguns from Peddler's Post.  (*See* Pl. Ex. L).  Of the 50 guns, at least seven were subsequently recovered in New York.

25

(iv)    *United States v. Hancock*, **3:95-CR-16 (S.D. Ohio)**.  Between October 1993 and February 1994, Brian Hancock straw-purchased, on behalf of three individuals, 117 handguns from Peddler's Post.  The guns were purchased in 21 multiple purchases over just a four-month period.  The guns were trafficked to Michigan, Washington, D.C. and a third location (not specified in the available documents) outside of the State of Ohio.  (*See* Pl. Ex. L).  The *Hancock* exhibit (Pl. Ex. L) demonstrates how court documents do not always provide complete information on the full number of guns purchased.  The criminal complaint in *Hancock* documents the purchase of 117 guns, while the indictment charges only 11.  Those trafficking cases for which only indictments are available may therefore under-represent the number of guns actually trafficked.

(v)    *United States v. Perkins*, **3:95-CR-18 (S.D. Ohio)**.  In March and April 1993, Daniel Perkins straw purchased 33 handguns from Peddler's Post.  Five were purchased on March 25, 1993, including two identical Lorcins and two identical Cobray pistols.  On April 18, 1993, Perkins purchased two identical Lorcins.  The indictment charges the purchase of 33 guns between these two dates, the number of multiple purchases by Perkins is likely much higher.  (*See* Pl. Ex. L).

These five straw purchase prosecutions establish the interstate nature of Peddler's Post's business, even as Peddler's Post's own records appear to reflect sales only to Ohio residents.

26

### (b) Multiple Sales

The straw purchasing cases illustrate the common relationship between straw purchasing, multiple gun sales and gun trafficking.   In each of the Peddler's Post straw purchase prosecutions, the straw purchasers bought multiples of the same brand of handgun, on the same day, and on repeat visits.

Plaintiff's exhibit K, an analysis from the National FOIA Data, shows Peddler's Post's multiple sales for a period of time prior to 2000, indicating that multiple sales account for a large proportion of Peddler's Post's crime guns.  By sorting Peddler's Post's recovered guns according to purchase date, brand, and place of recovery, the National FOIA Data reveals frequent purchases of multiple guns of the same brand, purchased on the same day, which are then later recovered in the same out-of-state city.  When guns purchased as part of a multiple sale are recovered in crimes in the same city, the inference that the guns were purchased for purposes of trafficking is especially strong.  For example, on November 24, 1993, five identical Lorcins were purchased at Peddler's Post, all of which were subsequently recovered in Chicago.  That same day, two Brycos were purchased, both of which were later recovered in Detroit.  A January 19, 1994, purchase of two Hi-Points was similarly followed by the recovery of both guns in Detroit. (*See* Pl. Ex. K).  These multiple sales support the conclusion that multiple sales by Peddler's Post helped support its interstate trade in crime guns.  Peddler's Post's discovery responses confirm that, between 2000 and 2006, it sold 720 guns in multiple sales.  (Peddler's Post's Supp. Resp. to City's (First Set of) Interrogs at 13-14, Pl. Ex. M).

Peddler's Post's high volume of traces and straw purchasing prosecutions evidences a specific intent to serve an interstate market.  By comparing Peddler's Post with other nearby retailers, as shown below, it can be inferred that most such retailers have far fewer traces, and far

fewer prosecutions, than Peddler's Post. This comparison suggests that retailer conduct is a significant factor in fueling interstate trafficking.

| Name of Retailer (30 mile radius) | # NY Traces | # National FOIA Traces | # Straw Purchase Prosecutions |
|---|---|---|---|
| PEDDLER'S POST | 28 | 220 | 5 |
| Bill's Gun Shop | 0 | 0 | 0 |
| Jim's Guns & Whatever | 25 | 35 | 2 |
| Rich's Pawn Shop | 0 | 0 | 0 |
| Hall's Guns | 0 | 0 | 0 |

Jim's Guns & Whatever was named as a defendant in the present action. Subsequently it settled and agreed to independent monitoring of its sales practices.

### (3) Time-to-Crime of Retailer's Guns Recovered in New York

The average time-to-crime for all of the Peddler's Post guns in the National FOIA Data is 2.35 years, a notably short interval — since ATF deems recoveries in less than 3 years to be an indicator of trafficking. *See Blaustein & Reich,* 365 F.3d at 285. By sorting Peddler's Post guns according to the state in which a traced gun was recovered, the time-to-crime data also confirms that Peddler's Post guns are moving rapidly into interstate commerce. (*See* Pl. Ex. K).

The time-to-crime for Peddler's Post's guns is only 1.95 years for New York and 1.72 years for Michigan, versus 2.43 years for Ohio, where Peddler's Post is located. As measured by the New York Data, Peddler's Post's time to crime is 3.26 years, a time that differs from the National FOIA Data because the two data sets measure a different sample of guns, with the New York Data including five additional years of traces.

A Peddler's Post gun was recovered in New York City as soon as four months after the sale; four guns were recovered less than one year from sale. Nearly 70% of the 28 crime guns sold by Peddler's Post and recovered in New York were recovered in less than the three-year threshold that ATF sets for guns suspected of being trafficked.

### (4) Sales Price and Types of Guns

Approximately one-third of Peddler's Post sales between 2000 and 2006 consisted of Saturday Night Specials. (*See* Peddler's Post's Supp. Resp. to City's (First Set of) Interrogs. at 13, Pl. Ex. M). The percentage of Saturday Night Specials among the Peddler's Post guns recovered in New York City is even higher, 37%. Of the 238 handguns purchased from Peddler's Post by gun traffickers and for which the brand was identified in court documents (106), 92% were Saturday Night Specials. (Pl. Ex. K).

### (5) Crimes Committed in New York with a Retailer's Handguns

Of the guns sold by Peddler's Post that have been recovered in New York State, one (in New York City) was recovered in a homicide; several were recovered in connection with drug crimes; and others were seized from prohibited possessors. (Compl. ¶ 238).

### (6) Total Number of Handguns the Retailer Sold in the United States and its Total Revenue from the United States and New York Markets

Peddler's Post's interrogatory responses document the sale of 8,080 guns between 2000 and 2006, an average of 1,154 guns per year. (Pl. Ex. M). The National FOIA Data indicates that, between January 1994 and June 2002, 220 guns sold by Peddler's Post were recovered in crimes, an average of 26 crime guns per year. Assuming Peddler's average yearly sales of 1,154 guns applied to the period in which the National FOIA Data recoveries were made, some 2% of Peddler's Post's annual gun sales involved guns subsequently recovered in crimes. This percentage may be recognized as conservative, reduced both by significant under-reporting of identified crime guns, and by the fact that many crime guns are never recovered. The firearms trafficking cases, *Walker* (53 guns), *Hancock* (117 guns) and *Perkins* (33 guns), represent purchases in 1993 and 1994 alone of more than 200 guns identified as trafficked (Pl. Ex. L), yet the Peddler's Post traces in the National FOIA Data total only 220 between 1994 and 2002. Only

a few of the guns listed in the *Perkins* and *Walker* indictments can be located in the National FOIA Data, confirming that the trace data does not contain all that have been straw purchased.

Based on Peddler's Post average annual sales volume, the straw sales made by Peddler's Post in the *Walker*, *Hancock* and *Perkins* cases alone comprised more than 7.8% of Peddler's total annual sales volume for those two years.

### (7) Actions of Regulatory Authorities Related to Retailer's Distribution Practices

Peddler's Post meets the ATF requirements for issuance of a Demand Letter, having more than the fifteen traces in one year with a time-to-crime of less than three years.

## b. Patriot — Richmond, Virginia

| | | | | | | |
|---|---|---|---|---|---|---|
| ■ 50 of Δ's guns were recovered in New York City crimes (New York Trace Data).<br><br>■ [redacted] recovered in crimes nationwide (AGSF Report) (Pl. Ex. D). | ■ Δ sells at gun shows, using underage volunteers.<br><br>■ Δ sold of inventory via internet auction and internet classified ads accessible to customers in other states (Pl. Ex. N). | ■ Average time for 22 guns = 3.43 years (New York Trace Data).<br><br>■ [redacted] than 6 months after sale (New York Trace Data).<br><br>■ More than 50% of Δ's guns were recovered in the City in less than three years after sale. (New York Trace Data). | ■ More than one-third of guns sold by Δ and recovered in New York were Sat. Night Specials (New York Trace Data).<br><br>■ Δ admits to selling guns under $300 (Pl. Ex. N).<br><br>■ More than one-third of the guns recovered in New York City had defaced serial numbers (New York Trace Data). | ■ Multiple unlawful drug and weapon possession offenses (New York Trace Data). | ■ 36,700 guns sold 1990-2006 in US (Pl. Ex. P). | ■ Δ has reported to ATF, pursuant to Demand Letter II Program, since 2000 (Pl. Ex. N). |

Patriot has not produced any documents in this case.   Discovery suggests that, immediately after receiving notice of this lawsuit, Patriot's owner, James Jarrett, deliberately took steps to dispose of Patriot's documents and hide Patriot's assets in a "new" business in order to avoid this court's jurisdiction and any ultimate finding of liability.  Claiming that he was acting in accordance with "ATF policies," Patriot sent 40 boxes of records to the ATF, (*see* Jarrett Tr. at 30, Pl. Ex. N), kept no copies, and then continued conducting its same business at the same location, with the same phone number, under a different name: Virginia Firearms & Transfers (VF&T). *Id.* at 21-24.  Jarrett admits that VF&T has the same owner as Patriot, the same sales help, and the same distributors.  VF&T also attends the same gun shows as Patriot. (*See* Jarrett Tr. at 21-24, Pl. Ex. N).

Having taken these steps to try to put Patriot, and Patriot's records, beyond the reach of this court, Jarrett has done nothing to retrieve copies of anything from ATF, even after receiving the City's document requests. *Id.* at 31.  He claims ATF, not Patriot, now has all of Patriot's records concerning:  (1) possible sales of guns to dealers in New York; (2) sales of inexpensive guns; and (3) multiple guns sales.  He also claims he is unable to testify about what the "now-missing" records show. *Id.* at 34, 49-51. Records relevant to this case were also delivered to Patriot's bankruptcy attorney, Leonard Starr, as part of Patriot's attempt to stay this lawsuit or move it to Virginia. (*See* Jarrett Tr. at 55, Pl. Ex. N)  ("If we filed [for bankruptcy] in the 4th Circuit then the lawsuit would be stayed and it would be tried in the 4th Circuit and not the 2nd Circuit.").  Mr. Jarrett has not attempted to retrieve copies of those documents either. *Id.* at 54. A subpoena to Mr. Starr remains outstanding and unresponded to.

Jarrett's strategy to conceal Patriot's records after this lawsuit was commenced creates an adverse inference supporting the decision that the facts demonstrate that this court has personal

jurisdiction over Patriot. *See generally In re Holocaust Victim Assets Litig.*, 319 F. Supp. 2d 301, 317 (E.D.N.Y. 2004) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) ("It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction."); *Hamilton*, 32 F. Supp. 2d at 68 ("Since the necessary [jurisdictional] information is in the exclusive control of defendants, where they have failed to provide the information, this Court finds that plaintiffs have satisfied their burden, and the case should proceed.").

Even absent any adverse inference from spoliation, the City has assembled sufficient evidence to independently establish that this court has jurisdiction over Patriot:

### (1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant

According to the National FOIA Data, 118 guns sold by Patriot were recovered nationwide between 1990 and 1997. The AGSF Report (reporting on traces from 1996 to 2000) indicates that 210 guns sold by Patriot were recovered in connection with crimes nationwide, gaining Patriot a place on AGSF's list of the 120 gun retailers with the highest number of traces nationwide (out of a U.S. total of over 80,000 retailers). (Pl. Ex. D).

The interstate nature of Patriot's business is confirmed by the National FOIA Data: 25% of the guns sold by Patriot and recovered in crimes were recovered outside of Virginia, including recoveries in California, Maryland, New York and Wisconsin, with one gun recovered as far afield as Ecuador. (Pl. Ex. O).

The New York Trace Data shows that at least 22 guns sold by Patriot were recovered in New York City through October 2001. (New York Trace Data). Additional data available to the City from the NYPD shows at least 28 more Patriot guns were recovered between October 2001

and December 2005, bringing the total number of Patriot's guns recovered in the City to 50, or

seven per year. (NYPD tabulation produced at NYC 003038, Pl. Ex. O).

### (2) Distribution Methods and Their Possible Effects on Crime in New York

Patriot is a "kitchen table" retailer without a storefront location. It makes most of its sales

at gun shows (Jarrett Tr., Pl. Ex. N), which, according to the ATF, are particularly significant

sources of crime guns.   (*See* ATF, "*Following the Gun: Enforcing Federal Laws Against*

*Firearms Traffickers*," at 12 (explaining that gun shows are the second leading source of

firearms recovered in illegal gun trafficking investigations).

#### (a) Straw Purchases

Based on direct observation by City testers, Patriot is willing to tolerate straw purchases.

(*See* Compl. ¶ 209). Patriot's typical staffing practice and procedures at gun shows — with one

salesperson assisting the customer and a second filling out the necessary paperwork, without

even seeing the manner in which the transaction was conducted — readily facilitates straw

purchases.  Moreover, Patriot relies on "volunteers" who are often young and inexperienced, to

complete the federal documentation required to accompany gun sales.  Jarrett explained that

Melanie Smith, the 17-year old female Patriot cashier appearing in the City's test scenario, "was

just helping out.  She's not a responsible person as far as ATF is considered." (Jarrett Tr. at 105,

Pl. Ex. N). In order to become a "responsible" person, the ATF requires that an individual be at

least 21 years of age, and that there be a written certification that the person "is familiar with and

understands all published State laws and local ordinances . . . . " 27 C.F.R. § 55.49(b)(2).  In

addition to Ms. Smith, Jarrett acknowledged that another teenager also frequently worked for

Patriot at gun shows.  *Id*. at 112.  Although Jarrett first claimed that all persons who worked for

Patriot at these shows were "authorized to sell firearms," and had gone through protective steps

(such as providing fingerprints and photographs to the Virginia State Police) to obtain "seller

numbers", he later admitted that Patriot employed people at these shows who did not have seller numbers. *Id.* at 71-72, 111, 117.

### (b) Multiple Sales

Patriot has engaged in numerous multiple sales of identical guns. (Pl. Ex. O).  For example, on February 1, 1993 Patriot sold three identical Lorcins, subsequently recovered in the Bronx, New York, Camden, New Jersey and Norfolk, Virginia.  An October 7, 1996 purchase of two Lorcins resulted in subsequent recoveries in Washington D.C. and Reston, Va.  (National FOIA Data, Pl. Ex. O).

### (c) Use of Trace Requests

Jarrett confirmed that Patriot did receive trace requests which Patriot no longer has in its possession.  He could not recall whether any such requests came as a result of firearms recovered in New York City or from authorities in New York.  (Jarrett Tr. at 98, Ex N).

### (3) Time-to-Crime of Retailer's Guns Recovered in New York

Guns sold by Patriot were recovered in crimes in New York City as soon as 66 days after sale.  (New York Trace Data).  Seven of Patriot's guns were recovered in the City less than 2 years after purchase, and in three instances, less than six months after purchase.  The average time-to-crime for the 22 recovered guns in the New York Trace Data is 3.43 years, compared to a 6 year time-to-crime for all crime guns recovered in New York City, with more than 50% of the Patriot guns recovered in the City recovered in less than the three-year threshold ATF sets for guns suspected of being trafficked.  (New York Trace Data).

### (4) Sales Price and Types of Guns

More than one-third of the guns sold by Patriot and traced to New York City are cheap Saturday Night Specials. (New York Trace Data).  While Jarrett claims an inability to comply with this Court's February 6, 2007 Order to "disclose by year and make the number of Bryco, Hi-Point, Lorcin and Taurus firearms that were sold" by Patriot, (Jarrett Tr. at 49, Pl. Ex. N), he acknowledged that, even after learning in 2004 that Patriot was on the Americans for Gun Safety Foundation's list of "High Crime Dealers," Patriot deliberately continued to sell "inexpensive guns." (*See* Jarrett Tr. at 106-08, Pl. Ex. N).  Moreover, more than one-third of the guns sold by Patriot that were recovered in New York City were found with defaced serial numbers. (New York Trace Data).

### (5) Crimes Committed in New York with a Retailer's Handguns

Reported crimes in New York City involving Patriot guns include the following:

- In June 2001, the arrest of a 16-year-old boy in possession of a Lorcin .380-caliber handgun purchased from Patriot along with 16 envelopes of heroin, and some marijuana in Manhattan;

- In February 2002, the arrest of a parolee in Queens in possession of two .380-caliber handguns purchased from Patriot;

- In November 2001, at least six shots fired on the streets of Manhattan with a gun purchased from Patriot;

- In April 2002, at least eight shots fired from a rooftop in the Bronx from a Lorcin 9mm handgun purchased from Patriot; and

- In January 1997 and February 1998, separate arrests of two 16-year-old boys found to be in possession of handguns, one of which was a Ruger 9mm purchased from Patriot.

Compl. ¶ 219.

### (6) Total Number of Handguns the Retailer Sold in the United States and it's Total Revenue from the United States and New York Markets

Patriot's interrogatory responses establish that it sold 36,700 guns between 1990 and 2006, or an average of 2,158 guns per year. (*See* Patriot's Interrog. Resps. at 13, Pl. Ex. P). Between 1996 and 2000, 210 guns sold by Patriot – or 42 per year – were recovered in connection with crimes. (*See* ACSF Report, Pl. Ex. D). Based even on this necessarily incomplete data, at least 2% of Patriot's guns sold annually are recovered in crimes.

Jarrett's testimony confirmed Patriot's participation in an interstate market. While claiming that he could not recall how many guns were sold to out-of-state dealers through online auctions on the websites GunBroker.com and Auction-Arms.com, Jarrett admitted to regularly using these sites to sell guns. (*See* Jarrett Tr. at 74, 84, Pl. Ex. N). After deciding to "shut down" Patriot to avoid this lawsuit, Patriot sold at least 25% of its inventory through auctions on GunBroker.com and through classified ads on Auction-Arms.com. (*Id.* at 74, 83-84). Jarrett must have known that these websites permitted out-of-state dealers to participate in the auctions. (*Id.* at 84). Jarrett also acknowledged selling gun-related products, including magazines and accessories, on the website e-bay.com. (*See* Patriot's Interrog. Resps. at 16, Pl. Ex. P; Jarrett Tr., Pl. Ex. N.)

While Jarrett admitted that it was possible he had sold guns to New York dealers, he could not recall how many. (*Id.* at 98).

### (7) Actions of Regulatory Authorities Related to Patriot's Distribution Practices

Patriot met the 1999 criteria for receipt of an ATF Demand Letter and received such a letter. Jarrett acknowledged that Patriot was required to send quarterly reports to the ATF because Patriot "had ten traces of handguns that were less than three years time to crime." (*Id.* at 65-66).

## c. Woody's – Orangeburg, South Carolina

| | | | | | | Demand Letter. |
|---|---|---|---|---|---|---|
| • nationwide (National FOIA Data). <br><br> • 93% of the 122 were recovered in crimes in states other than South Carolina (National FOIA Data). <br><br> • 55% of the 122 were recovered in New York crimes from 1990-97 (National FOIA Data). <br><br> • At least 98 of Δ's guns were trafficked into New York from 1994-2002 (New York Trace Data). | • purchases who trafficked them to New York City and elsewhere from 1994-2005 (Pl. Ex. R). <br><br> • Repeated instances of multiple purchases; up to 7 Hi-Points at once (National FOIA Data). | • (New York Trace Data). <br><br> • Four guns recovered within 30 days of sale (New York Trace Data). <br><br> • One-third recovered in less than a year (New York Trace Data). <br><br> • Two-thirds recovered in less than 3 years (New York Trace Data). <br><br> • Approximately 45% of the guns recovered in New York City had defaced serial numbers (New York Trace Data). | • Specials (Pl. Ex. S). <br><br> • 75% of guns sold by Δ and recovered in New York City were Sat. Night Specials (New York Trace Data). <br><br> • 91% of guns sold by Δ and identified in straw-purchase prosecutions were Sat. Night Specials (Pl. Ex. R). | • rapes, and multiple unlawful possession offenses (New York Trace Data). | Ex. S), of which 1.1% were estimated recovered in crimes (See National FOIA Data). | |

38

Woody's appears to serve an interstate gun trafficking market, encompassing much of the Northeast, and apparently specializing in New York City, where more than half of Woody's traced guns are recovered. A Woody's employee has been quoted as stating that "he was not surprised that [Woody's] was the third-ranking active dealer" on a list of retailers with high numbers of guns traced to New York City. "You got some people that come from up north and get South Carolina ID. They may come down here and buy a gun and sell it to someone else." *See New York Dealers Are Prominent on Court Case's List of Guns Tied to Crime*, The N.Y. Times, Apr. 18, 2003, at D3, Pl. Ex. Q. The same Woody's employee stated that ATF "calls down here for a gun trace probably twice a day." *Id.* Woody's turned over no ATF trace requests in discovery.

### (1) Number of Traced Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant

The National FOIA data charts 122 traced guns sold by Woody's, the second highest number of traced guns sold by any retail dealer in South Carolina. The South Carolina retailer with the highest number of traces was Rooks Sales & Service ("Rooks"), a retailer sued by New York City in *City of New York v. Bob Moates Sport Shop, Inc.*, 06-CV-6504 (E.D.N.Y. 2006). Rooks has agreed to have its sales practices monitored by the City. The interstate nature of Woody's business is evidenced by the fact that only about 7% of guns sold by Woody's and recovered in crimes were recovered in South Carolina. 93% of Woody's guns involved in crime were recovered out-of-state, including recoveries in New York, Maryland, Michigan, Washington, D.C. and elsewhere. Fifty-five percent of Woody's traced guns are recovered in New York State. That total rises to 62% if recoveries of Woody's guns in New York and New Jersey are combined.

39

The New York Trace Data indicates that, between January 1994 and June 2002, 139 guns were traced to New York from Woody's. Including Projected Traces, Woody's accounts for a total of 200 crime guns traced to New York State.

### (2) Distribution Methods and Their Possible Effects on Crime in New York

#### (a) Straw Purchases

Woody's employees who observed the City's investigative team had no trouble identifying the signs of a straw purchase. (Compl. ¶ 256). Instead, however, of refusing the sale, they simply counseled the testers on how to evade the law. Despite knowledge that an apparently illegal purchase was contemplated, the employees assisted the testers in conducting the purchase so that it would appear to be legal. (Compl. ¶¶ 255-57).

Since 2003, Woody's has been identified as the retailer in at least four federal straw purchasing prosecutions: *United States v. Welcome* 05-CR-175 (D.S.C. 2005), *United States v. Rutledge*, 05-CR-1316 (D.S.C. 2005); *United States v. Brooks*, 04-CR-1085 (D.S.C. 2004), and *United States v. Brown*, 03-CR-836 (D.S.C. 2003) (Pl. Ex. R):

    (i)    *United States v. Brooks*, 5:04-CR-1085 (D.S.C. 2004). Brooks involved two prohibited purchasers straw purchasing three firearms in a single transaction at Woody's on June 1, 2004. The guns purchased, two Hi-Points and a Leinad, were used in connection with drug-trafficking. Woody's asserts in its interrogatory responses that it made no multiple sales in 2004. (Woody's Second Supp. Resp. to City's First Set of Interrogs at 12, Pl. Ex. S).

    (ii)    *United States v. Rutledge*, 5:05-CR-1316 (D.S.C. 2005). Rutledge involved a straw purchasing ring operating from February 2002 until December 2005. Its members transported at least eleven guns to New Jersey, four of which were recovered by New Jersey police. At least three of the guns, two Hi-Points and an Intratec 9mm, were straw

purchased from Woody's. The indictment is unclear as to whether the remaining eight guns – seven Hi-Points and one shotgun – were purchased at Woody's.

   **(iii)**   *United States v. Welcome* **5:05-CR-175 (D.S.C. 2005).** *Welcome* involved straw purchasing criminals that trafficked handguns between South Carolina and New York and New Jersey between December 1994 and August 2000. The "principal" of the group was a convicted felon residing in Brooklyn, New York; the "straws" were South Carolina residents. A total of 23 guns purchased by the conspirators were recovered by law enforcement in New York and New Jersey; given the five-and-a-half year lifespan of the ring, it seems likely that many more guns were trafficked. The publicly available information identifies one gun, a Hi-Point, as purchased at Woody's. This gun was recovered in New York City.

   **(iv)**   *United States v. Brown*, **5:03-CR-836 (D.S.C. 2003).** Between 1998 and 2001, Tyshawn Anthony Brown recruited nine straw purchasers to buy a total of 46 guns from various South Carolina FFL's. Twenty-five of those guns – 24 identical Hi-Points and one Lorcin, bought over the course of 16 purchases – were bought at Woody's, and trafficked to New York City. Fourteen of those guns were subsequently recovered in connection with crimes in the City, including two homicides.

  In connection with the *Brown* straw purchasers, on March 18, 2000, Scottie Sharay Porter straw purchased a Hi-Point 9mm pistol from Woody's for Tyshawn Brown. Brown then trafficked that gun to New York City. On November 11, 2001, that Hi-Point gun was recovered in the City in connection with a homicide. According to the relevant Complaint Report, police responding to a radio run of a male shot in Brooklyn North arrived at 1123 Broadway to find the victim lying against a door with multiple gunshot wounds. He was pronounced dead at the

scene. It was unclear whether the Hi-Point belonged to the victim or the shooter. (NYPD Complaint Report, at NYC 000704 – 00705).

On July 27, 2000, Mary English Butler straw purchased a Hi-Point 9mm pistol for Tyshawn Brown from Woody's. He trafficked the gun to New York City. On January 31, 2001, that Hi-Point was recovered in the City in connection with a shooting death. A review of a press report of the shooting indicates that the victim, a fugitive, was confronted by undercover officers who attempted to arrest him during a drug transaction. He drew the Hi-Point, struggled with officers for that gun, and was shot when the weapon was fired. (NYPD Complaint Report, produced at NYC 000701).

### (b) Multiple Sales

Plaintiff's Exhibit T, derived from the National FOIA Data (as evidenced in the *Brown* case), shows that Woody's engages in repeated multiple sales of identical guns. Multiple guns of the same brand, purchased at Woody's on the same day, are recovered in crimes, often in the same city or state. Exhibit T thus shows i) a March 29, 1995 purchase of seven Hi-Points, four of which were recovered in New York City, with the others recovered in Newark, Washington D.C. and DeKalb Georgia; ii) an April 12, 1996 purchase of four Hi-Points, all of which were subsequently recovered in New York City; and iii) a July 17, 1995, purchase of three Hi-Points, subsequently recovered in Philadelphia, New York City and Massachusetts. This history strongly suggests that the trafficker had a distribution route up the East Coast. Such multiple sales are a strong indication of purchases by gun traffickers, providing evidence of Woody's interstate gun sales.

In its discovery responses, Woody's claims that it makes virtually no multiple sales. (Woody's Supp. Resps. to City's Interrogs. at 12, Pl. Ex. S). This claim is belied by the extensive history of multiple sales prior to 2000, as shown in Plaintiff's Exhibit S. Woody's

representation that it made no multiple sales in 2004 is directly contradicted by the *Brooks* indictment, stating that, on or about June 1, 2004, Roderick Brooks straw-purchased three guns in a single visit from Woody's.

### (c) Trace Requests

Woody's has failed to produce any ATF trace requests. *Cf. NAACP*, 2003 U.S. Dist. LEXIS 8238 at *27 (taking into account, for jurisdictional purposes, the fact that "trace requests received are not tracked"). Woody's high volume of traces and straw-purchasing prosecutions suggests a specific intent to serve an interstate market. Comparing Woody's with nearby retailers, as shown below, it can be seen that most such retailers have far fewer traces and far fewer prosecutions than Woody's. That comparison suggests that retailer conduct is a significant factor in fueling interstate trafficking:

| Name of Retailer (30 mile radius) | # NY Traces | # National FOIA Traces | # Straw Purchase Prosecutions |
|---|---|---|---|
| **WOODY'S PAWN** | **139** | **122** | **4** |
| Broughton Pawn Shop | 19 | 41 | 0 |
| Gaston Jewelry & Pawn Inc. | 0 | 0 | 0 |
| Holly Hill Pawn Shop | 2 | 0 | 0 |
| Harrison's Sports Store | 0 | 0 | 0 |

### (3) Time-to-Crime of Retailer's Guns Recovered in New York

In the sample provided by the National FOIA Data, guns sold by Woody's have been recovered in New York City as soon as three days after sale; others have been recovered in the City in less than one month. The time-to-crime of Woody's guns traced to New York is 1.70 years, much faster than Woody's 3.52 year time-to-crime in its home state of South Carolina. (Pl. Ex. T).

In the larger sample offered by the New York Trace Data, the average time-to-crime for Woody's guns for which time-to-crime data is available is 2.71 years, compared to a time-to-crime of 6 years for all crime guns recovered in New York City. One-third of the guns sold by Woody's that were recovered in New York City were recovered less than one year from the sale, with about two-thirds recovered in less than the three-year threshold that ATF sets for guns suspected of being trafficked. *See Blaustein & Reich,* 220 F. Supp. 2d at 540.

### (4) Sales Price and Types of Guns

26% of the guns sold by Woody's are Saturday Night Specials. (Woody's Supp. Responses to City's Interrogatories at 12). Consistent with the observation that Saturday Night Specials are favored by criminals, the National FOIA Data shows that 54% of the guns recovered in crimes nationally that were sold by Woody's are of this variety. (*See* Pl. Ex. T). That number is even higher for Woody's guns recovered in the City; 75% of those guns are Saturday Night Specials, according to the New York Trace Data. (*See* Pl. Ex. T). One-third of the Woody's guns recovered in New York had their serial numbers defaced.

In the gun trafficking prosecutions of Woody's customers, in which 32 straw-purchased handguns are identified, of the 30 identified by brand, 91% were Saturday Night Specials. (Pl. Ex. T).

### (5) Crimes Committed in New York with a Retailer's Handguns

Reported New York City crimes involving guns purchased at Woody's include five homicides, four robberies, two rapes, and numerous illegal possession offenses:

- In November 1999, a vehicle stop in Manhattan of a 16-year-old, 21-year-old and 22-year-old turned up a .22-caliber revolver purchased at Woody's;

- In August 2000, a man opening his check-cashing store in Brooklyn was approached by a man with a .45-caliber gun purchased at Woody's and told to go inside and open the safe. The

suspect said, "You know what I want.  If someone comes I'm going to shoot you";

- In September 2000, a man in the Bronx was shot "possibly twice" with a gun purchased at Woody's. The suspects were two 16-year-old boys and a 21-year-old man; and

- In November 2001 in Brooklyn, police found a 31-year-old man lying dead in front of a building with multiple gun shot wounds from a gun purchased at Woody's.

Compl. ¶ 263.

### (6) Total number of the Retailer's Handguns Sold in the United States and its Total Revenue from the United States and New York Markets.

Based on Woody's interrogatory responses, Woody's sold 10,450 guns between 2000 and 2006, an average of 1,492 guns per year.  The New York Trace Data indicates that, between January 1994 and June 2002, 98 guns were traced to the City from Woody's, an average of 16 guns per year.  Assuming Woody's average yearly sales of 1,492 guns applied to the earlier period in which these recoveries were made, 1.1% of Woody's annual gun sales were subsequently recovered during crimes in New York City.  This is a conservative assumption, since annual sales from the period before 2000 are likely to be less than 1,492, based on the increasing yearly sales shown between 2000 and 2005 for all of the retailers being sued.  Moreover, Woody's annual sales reflect handguns and long guns, although only handguns are included in the trace data.

### (7) Actions of Regulatory Authorities Related to Woody's Distribution Practices.

Woody's Pawn meets the criteria for an ATF Demand Letter.

45

d.   Adventure Outdoors – Smyrna, Georgia

| ▪ 212 of Δ's guns were recovered [blacked] FOIA Data). | ▪ Δ sold at least 65 guns [blacked] and purchased and trafficked them to New York City and | ▪ Average time for 28 guns is 3.17 years (New York Trace Data). | ▪ Δ sold over 3,000 Sat. Night Specials (Pl. Ex. V). | ▪ Numerous unlawful [blacked] | ▪ 38,424 guns sold 2000-06 in US (Pl. Ex. V). | ▪ Δ has received ATF Demand Letter (Pl. Ex. U). |
|---|---|---|---|---|---|---|
| ▪ 254 of Δ's guns were recovered in crimes nationwide from 1996-2000 (AGSF Report) (Pl. Ex. D). | elsewhere from 1994-2005 (Pl. Ex. W). | ▪ Some recovered less than 4 months after sale (New York Trace Data). | ▪ Approx. 25% of Δ's guns traced nationwide are Sat. Night Specials (National FOIA Data). | | ▪ ... of which 288 – i.e., twice the # of trace requests AO has disclosed between 9/03 and 8/06 – (0.7%) recovered in crimes. | |
| ▪ 28 of Δ's guns were recovered in New York City crimes from 1994-2001 (New York Trace Data). | ▪ Repeated instances of multiple purchases (Pl. Ex. W; see also Pl. Ex. X). | ▪ Approx. 20% recovered in less than a year (New York Trace Data). | ▪ 45% of Δ's guns traced to New York City are Sat. Night Specials (New York Trace Data). | | | |
| ▪ Δ received at least 141 trace requests between Sept. 2003 and Aug. 2006 (Discovery Traces). | ▪ Δ offers products to, and initiates transactions with, out-of-state customers via interactive Internet website. | ▪ More than 50% recovered in less than 3 years (New York Trace Data). | ▪ Approx. one-third of guns recovered had defaced serial numbers (New York Trace Data). | | | |
| ▪ Approx. 40% of crime guns sold by Δ were recovered in states other than Georgia (National FOIA Data). | ▪ Δ sells long guns interstate (Pl. Ex. U). | | ▪ 88% of guns sold by Δ and identified in straw-purchase prosecutions were Sat. Night Specials (Pl. Ex. W). | | | |

46

Adventure Outdoors serves as a preferred destination for straw purchasers in the Atlanta area, with at least eight gun trafficking prosecutions of its customers initiated between 1999 and 2007. Adventure Outdoors has brought a "retaliatory action" against New York City and others in Cobb County, Georgia, Adventure *Outdoors, Inc. v. Bloomberg*, 06-cv-2897 (N.D. Ga.).

### (1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant

Trace request evidence from Adventure Outdoors is limited to the period September 15, 2003 to August 2006, owing to earlier document destruction and defendant's failure to comply with discovery requests. Jay Wallace of Adventure Outdoors testified that he received trace requests prior to 2003, but discarded them. (Wallace Tr. at 159, Pl. Ex. U). He testified that Adventure Outdoors also received trace requests between September 2006 and December 2006, but Adventure Outdoors has inexplicably failed to produce any of these to the City, despite the City's multiple requests. (Wallace Tr. at 160, Pl. Ex. U).

The National FOIA data shows 212 guns sold by Adventure Outdoors that were recovered in crimes nationally during the period 1990 to 1997, or nearly 30 per year. The AGSF Report, covering a period of time in which tracing was more comprehensive, shows 254 Adventure Outdoors guns recovered in connection with crimes nationwide between 1996 and 2000, or 50 per year. (Pl. Ex. D). This history earned Adventure Outdoors the rank of 82nd on the AGSF list of the 120 gun retailers (out of a U.S. total of over 80,000 retailers) with the highest number of traces nationally. (AGSF Report, Pl. Ex. D). The Discovery Traces show a total of 141 requests from ATF received between September 15, 2003 and August 2006, nearly 50 per year.

The National Trace Data confirms the interstate nature of Adventure Outdoors' business. Approximately 40% of the Adventure Outdoors guns recovered in crimes were recovered in

47

states other than Georgia, including New York, California, Connecticut, Illinois, Michigan, and the Virgin Islands.

New York Trace data indicates that 28 guns sold by Adventure Outdoors were recovered in New York between 1994 and 2001. Based on the trace requests received from Adventure Outdoors itself, two additional guns were recovered in the City, bringing the total to 30. These guns are traced by entering their serial numbers into the database of the NYPD Firearms Analysis Section. Based on the trafficking cases discussed below, an additional six guns can be traced from Adventure Outdoors to New York State (three from *El-Saddique* and three from *Rose*), for a total of 36. Including Projected Traces, Adventure Outdoors has nearly 50 crime guns found in New York.

### (2) Distribution Methods and Their Possible Effects on Crimes in New York

#### (a) Straw Purchases

The April 8, 2006, simulated straw purchase conducted by testers for New York, permit an inference that Adventure Outdoors either negligently or intentionally permits straw purchasing, This evidence confirmed a fact for which there was already abundant existing information. Between 1995 to 2005, there have been at least eight federal prosecutions for straw or multiple purchasers in which Adventure Outdoors was a source of the illegal guns: *United States v. El-Saddique*, 1:06-CR-289 (N.D. Ga.); *United States v. Rose*, 1:06-CR-127 (S.D.N.Y.); *United States v. Garcia-Diaz* et al., 1:05-CR-271 (N.D. Ga.); *United States v. Wilson*, 1:04-CR-543 (N.D. Ga); *United States v. Vinson* et al., 1:04-CR-112 (N.D. Ga.); *United States v. Pray*, 1:03-CR-669 (N.D. Ga.); *United States v. Gaddie*, et al. 99-CR-430 (N.D. Ga.); and *USA v. Hurley*, 1:95-CR-00453 (N.D. Ga.). (Pl. Ex.W). These cases demonstrate Adventure Outdoors' substantial involvement in interstate commerce, and the employment of sales practices that contribute to the interstate flow of illegal weapons, including weapons later recovered in the

48

City. At his deposition, Adventure Outdoors owner Jay Wallace sought to explain certain of these prosecutions by claiming Adventure Outdoors had cooperated with, or even alerted ATF to the illegal activity in *El-Saddique*, *Pray* and *Garcia-Diaz*. This after-the-fact claim does nothing to alter the fact that Adventure Outdoors appears to be a popular location for straw purchasers, with eight prosecutions to its credit, more than any other moving defendant.

       (i)    *United States v. El-Saddique*, **1:06-CR-289 (N.D. Ga.)**. This case involves a single individual attempting to traffic three guns to Buffalo, New York. The purchases in *El-Saddique* took place after the instant suit had been filed against Adventure Outdoors.

       (ii)    *United States v. Rose*, **1:06-CR-127 (S.D.N.Y.)**. Rose involved a classic straw purchase, very much like the simulated purchase staged by the City, in which a female "straw" accompanied by a male prohibited buyer openly purchases guns paid for by the male.

       Adrian Rose, a resident of the City of New York, purchased guns through a straw purchaser, Shanika Davis ("Davis"). Rose informed Davis that he wanted two 9mm handguns, and wired her the money from Bronx, New York. Davis went to Adventure Outdoors in October 2004, and a salesman approached and offered to help. After informing the salesman that she wished to buy two 9mm handguns, the salesman asked what brand she wanted, and she replied that she did not know. In front of the Adventure Outdoors salesman, Davis called Rose by cell phone to determine what type of guns to buy. Davis relayed that information to the salesman, who took the guns to the cash register, where another employee was working as cashier. Davis completed the paperwork identifying herself using a Georgia driver's license with an outdated address. (Shanika Davis Aff. ¶¶ 9-11, Pl. Ex. V).

Approximately two days later, Rose and Davis entered Adventure Outdoors together to purchase another handgun. The same salesperson who had assisted with the purchase days earlier acknowledged Davis, but Rose was assisted by a different salesperson on this occasion, while Davis browsed around the store. After Rose selected a gun, he called Davis over to the cash register to complete the paperwork. The cashier was the same person who had been working as cashier for Davis' prior purchases. On this occasion, he asked whether the address on her driver's license was current. Upon being informed that it was not, the cashier told her that identification with a current address was required. When Davis responded that she had no such identification on her, the cashier obligingly sold her a fishing license, on which she put her new address, which she then used as current identification for the handgun purchase. Rose took cash from his pocket, counted it, and placed it on the cash register to pay for the handgun. Davis also counted it, determined it was not enough and informed Rose, who reached into his pocket again, took out additional money, and handed it directly to the cashier. This happened in full view of the Adventure Outdoors cashier, who had dealt with Davis in the prior purchase of two guns. The cashier then handed Rose the receipt, and a bag containing the gun. (*Id.* at ¶¶ 12-16).

      (iii)    *United States v. Garcia-Diaz*, 1:05-CR-271 (N.D. Ga.). Garcia-Diaz involved four individuals who straw purchased guns at several Atlanta-area gun retailers, including Adventure Outdoors. The guns were subsequently trafficked to Puerto Rico. Two of the defendants in *Garcia-Diaz* had previously been convicted of purchasing guns in Atlanta and shipping them to Puerto Rico.

      (iv)    *United States v. Wilson*, 1:04-CR-543 (N.D. Ga). Wilson involved a single individual who engaged in multiple purchases and was arrested for shipping the purchased guns overseas.

(v)     *United States v. Vinson*, 1:04-CR-112 (N.D. Ga.).  Vinson involved a single individual straw-purchasing guns and providing them to a juvenile.

(vi)     *United States v. Pray*, 1:03-CR-669 (N.D. Ga.).  Pray involved two individuals trafficking guns from several Atlanta area gun stores, including Adventure Outdoors, to Maryland.

(vii)     *United States v. Gaddie*, 1: 99-CR-430 (N.D. Ga.).  Gaddie involved four individuals trafficking firearms from several Atlanta-area gun retailers, including Adventure Outdoors, to Philadelphia.  From November 1994 to November 1996, these individuals straw-purchased at least 143 firearms in Georgia, of which eleven were purchased at Adventure Outdoors.

(viii)     *United States v. Hurley*, 1:95-CR-00453 (N.D. Ga.).     Timothy Southerland and Robert Hurley straw purchased five identical Century 9mm pistols on August 17, 1992.

### (b) Multiple Sales

Multiple sales data provided by Adventure Outdoors in discovery demonstrates that, between 2000 and 2006, Adventure Outdoors sold 2,243 guns in multiple sales, or an average of 400 guns per year.  As detailed above, some of those multiple sales were made in connection with straw purchase prosecutions:  the *Garcia-Diaz* prosecution (nine Hi-Points in a single purchase); the *Wilson* prosecution (seven Hi-Points in a single purchase); the *Rose* prosecution (two unidentified 9mm pistols in a single purchase); the *Kemph* prosecution (three Hi-Points), the *Gaddie* prosecution (three purchases of three unidentified handguns); the *Vinson* prosecution (three Hi-Points); the *Peeples* prosecution (three purchases of three guns each);   the *Pray* prosecution (four Hi-Points); the *El-Saddique* prosecution (three guns); and the *Hurley* prosecution (five identical guns).

51

Plaintiff's exhibit X, prepared using the National FOIA Data, illustrates Adventure Outdoors' multiple sales of identical guns prior to 2000. A June 14, 1994 transaction, for example, involved the purchase of two Brycos, both of which were subsequently recovered in New York City; a January 17, 1994 transaction involved the purchase of two Brycos, one of which was later recovered in Atlanta and the other in Chicago; and a December 21, 1992 purchase of two Rugers resulted in recoveries in Bridgeport, Connecticut and New York City.

### (3) Time-to-Crime of Retailer's Guns Recovered in New York

Guns sold by Adventure Outdoors have been recovered in New York City as soon as 113 days after the sale, with approximately 20% recovered less than one year from sale and more than 50% recovered in less than the three-year threshold that ATF sets for guns suspected of being trafficked. (New York Trace Data). The New York Trace Data average time-to-crime for the guns from Adventure Outdoors recovered in New York City is 3.17 years, compared to an average time-to-crime of 6 years for all crime guns recovered in New York City. The times-to-crime of Adventure Outdoors' guns obtained in the National FOIA Data is *shorter* for guns recovered in New York (3.04 years) than for guns recovered in Georgia (3.65 years), where Adventure Outdoors is located.

Adventure Outdoors' high volume of traces and straw-purchasing prosecutions is not typical of its neighboring retailers, and suggests a specific intent to serve an interstate market. The comparison of Adventure Outdoors with other nearby FFL's shown below demonstrates a marked difference in number of traces and prosecutions:

| Name of Retailer (20 mile radius of Adventure Outdoors) | # NY Traces | # National FOIA Traces | # Straw Purchase Prosecutions |
|---|---|---|---|
| ADVENTURE OUTDOORS | 35 | 214 | 7 |
| Hot Shots | 29 | 201 | 4 |
| Deer creek Gun Shop | 0 | 0 | 0 |
| Dixie Gun & Pawn | 6 | 138 | 2 |
| Chuck's Firearms Inc. | 0 | 15 | 0 |
| Harold's Pawn Shop | 0 | 0 | 0 |
| Easy Street Pawn | 0 | 0 | 0 |
| Pannell's Firearms & Range Inc. | 2 | 0 | 0 |
| Douglasville Pawn Shop | 1 | 0 | 0 |
| Cherokee Coin & Pawn | 1 | 11 | 0 |
| Gwinnett Pawn Shop | 15 | 42 | 5 |
| Forest Park Army-Navy Store | 4 | 51 | 2 |

Hot Shots is named as a defendant in *The City of New York v. Bob Moates' Sport Shop, Inc.*, 06-CV-6504 (E.D.N.Y. 2006). Gwinnett Pawn Shop is named as a defendant in *The City of New York v. Bob Moates' Sport Shop, Inc.*, 06-CV-6504 (E.D.N.Y. 2006).

### (4) Sales Price and Types of Guns

Compared to the other moving defendants, Adventure Outdoors sells fewer Saturday Night Specials as a percentage of its total sales, averaging about 8% of its yearly sales volume in this category. (*See* Adventure's Supp. Interrog. Resps. at 13, Pl. Ex. Y). Despite this relatively low volume of Saturday Night Special sales, however, 25% of the Adventure Outdoors guns represented in the National Trace Data are Saturday Night Specials. Significantly, for the Adventure Outdoors guns recovered in New York City, 45% are Saturday Night Specials. Approximately one-third of the Adventure Outdoors guns recovered in New York City had defaced serial numbers. (New York Trace Data). The percentage increases in a sample of known trafficked guns: of the 65 handguns straw-purchased from Adventure Outdoors in case

53

prosecutions for which brand information is available, 88% were Saturday Night Specials. (Pl. Ex. X).

### (5) Crimes Committed in New York with a Retailer's Handguns

Reported crimes involving guns purchased at Adventure Outdoors include the following:

- In March 1996, a man was shot in the face in Manhattan by another man using a 9mm handgun purchased at Adventure Outdoors;

- In April 1996, a Manhattan store was robbed by two men, one of whom used a 9mm Jennings purchased at Adventure Outdoors to threaten the store clerk and to pistol-whip him, causing heavy bleeding in his face and head;

- In August 1998 in the Bronx, the arrest of a man who fled the police after threatening another man with a 9mm Bryco purchased at Adventure Outdoors;

- In August 2001, the arrest of a man in Queens for firing into the air a Glock handgun purchased at Adventure Outdoors; and

- In September 2001, following reports of at least four gun shots fired, police arrested a man in Queens for possession of a loaded .380 Bryco handgun purchased at Adventure Outdoors.

Compl. ¶ 98.

### (6) Total Number of the Retailer's Handguns Sold in the United States and its Total Revenue from the United States and New York Markets.

Adventure Outdoors owner Jay Wallace confirms that Adventure Outdoors serves an interstate market. He testified that Adventure Outdoors sells long guns to customers in other states, Wallace Tr. at 175, 224-25, and that Adventure Outdoors has sold guns to residents of Indiana, Florida, Louisiana, and Tennessee. (Wallace Tr. at 218, 220, 224, 228, Pl. Ex. Z). Wallace has also admitted that, through its online dealer, Davidson's Inc., a New Yorker can "purchase a long gun *from New York*" sold by Adventure Outdoors. (Wallace Tr. at 174, Pl. Ex. Z). Adventure Outdoors claims that its web-originated sales (through its own sites, as well as the Davidson's website) are not interstate transactions. It contends that, since the sales are

completed in Georgia when the purchaser picks up the firearm, such sales are Georgia sales. (Wallace Tr. at 211-13, Pl. Ex. Z).

Wallace testified that Adventure Outdoors has three websites, including "advout.com," all electronically linked to a website maintained by Davidson's, Inc. ("Davidson's"). This system allows individuals in other states to initiate purchases of firearms from Adventure Outdoors. (Wallace Tr. at 174, Pl. Ex. Z). Using the Davidson's website, "someone can put a deposit down, come into the store, and make the sale." (Wallace Tr. at 173, Pl. Ex. Z). Thus, Adventure Outdoors effectively maintains a web store, via the Davidson's website, that offers its products to customers nationwide. Hundreds of guns, including Glocks and Tauruses, are available for purchase. (*See* Wallace Tr. at 196, Pl. Ex. Z).

No information on the dollar amount of interstate sales facilitated by the Adventure Outdoors and Davidson's websites has yet been produced to the City. In unit terms, Adventure Outdoors' sales through the Davidson's website are increasing, from 20 in 2002, to 23 in 2003, 46 in 2004, 103 in 2005, and 105 in 2006. (*See* Adventure's Supp. Interrog. Resps., Pl. Ex. Y, at 20). These may be considered as "Adventure Outdoors sales" rather than "Davidson's sales," because Davidson's sends the deposit placed on all Adventure Outdoors online orders directly to Adventure Outdoors, which cashes the check and retains the money, regardless of whether the customer picks up the firearm purchased. (Wallace Tr. at 188-90, Pl. Ex. Z).

The level of customer interaction permitted by Adventure Outdoors' websites is significant. If an individual is purchasing more than one firearm, he can place his weapons in a virtual "shopping cart" as he browses through the vast inventory of guns on the website. (Wallace Tr. at 197, Pl. Ex. Z). Guns are stored in this virtual shopping container, and may be added to or deleted, until the individual is ready to check out. (Wallace Tr. at 197, Pl. Ex. Z).

Davidson's website takes the credit card information and the address information for Adventure Outdoors' customers. (Wallace Tr. at 178-79, 199-200, Pl. Ex. Z). When customers enter their order information on the Davidson's website, and "they're making a purchase, it sends it to sales@advout.com. It sends it to it, notifying us we have a shipment coming." (Wallace Tr. at 200, Pl. Ex. Z). Adventure Outdoors admits that the Davidson's website permits a New Yorker to purchaser guns from Adventure Outdoors. (Wallace Tr. at 174, Pl. Ex. Z.) This email address, sales@advout.com, is also on Adventure Outdoors' website www.advout.com, used to communicate with Adventure Outdoors customers.

Adventure Outdoors' responses to the City's interrogatories establish that it sold 38,424 guns (including both long guns and handguns) between 2000 and 2006. (*See* Adventure's Supp. Interrog. Resps. at 13, Pl. Ex. Y). This amounts to an average of 5,489 guns per year.

Between 1996 and 2000, 254 guns sold by Adventure Outdoors – or an estimated 64 per year – were recovered in connection with crimes. (*See* AGSF Report, Pl. Ex. D). Based solely on this incomplete data at least 1.2% of the guns sold by Adventure Outdoors were recovered in crimes.

### (7) Actions of Regulatory Authorities Related to the Adventure Outdoors' Distribution Practices.

Adventure Outdoors meets the criteria for receipt of an ATF Demand Letter. It received such a letter. (Wallace Tr. at 235-36, Pl. Ex. Z).

### e.  Mickalis – Summerville, South Carolina

| | | | | | | |
|---|---|---|---|---|---|---|
| • 98 of Δ's guns were recovered in crimes nationwide (National FOIA Data).<br><br>• 70% of the 98 were recovered in crimes in states other than South Carolina (National FOIA Data).<br><br>• 48% of the 98 were recovered in New York City crimes (National FOIA Data).<br><br>• 62 of Δ's guns were recovered in New York State crimes (New York Trace Data).<br><br>• Δ received at least 143 trace requests from 2000-06 (Discovery Traces). | • Repeated instances of multiple sales; up to 6 at one time (National FOIA Data). | • Average time for 62 guns recovered in New York City = 3.33 years (New York Trace Data).<br><br>• One gun recovered in New York City 18 days after sale. Six other guns were recovered within less than 6 months (New York Trace Data).<br><br>• 20% recovered in New York City less than a year after Δ's sale (New York Trace Data).<br><br>• Over 50% recovered in New York City less than 3 years after Δ's sale (New York Trace Data). | • At least 43% of guns Δ sells are Sat. Night Specials, mostly Hi-Points (Pl. Ex. AA).<br><br>• 50% of Δ's guns traced nationwide are Sat. Night Specials (National FOIA Data).<br><br>• 70% of Δ's guns traced to New York City are Sat. Night Specials (New York Trace Data).<br><br>• More than 28% were recovered with defaced serial numbers (New York Trace Data). | • Burglary, armed robbery, armed assault, menacing, and unlawful possession (New York Trace Data). | • 3,571 guns sold in US from 2000-06, of which an estimated 1.4% were recovered in New York City crimes (Pl. Ex. AA; see also National FOIA Data).<br><br>• An estimated 4% of guns that Δ sold were the subject of trace requests nationwide (See National FOIA Data). | • Δ meets criteria for ATF Demand Letter. |

Mickalis can be characterized as a major interstate supplier of Saturday Night Specials to New York City. Half of Mickalis' traced guns are recovered in New York. The great majority of its handguns sold are Saturday Night Specials. Mickalis has initiated a "retaliatory action" against New York City and others in Berkeley County, South Carolina, *Mickalis Pawn Shop, LLC v. Bloomberg, Court of Common Pleas, Berkeley Co., Case* 2:06-cv-02794.

### (1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant

The National FOIA Data illustrates that, between 1990 and 1997, 98 guns sold by Mickalis were recovered in crimes nationally. The interstate nature of Mickalis' business is evidenced by the fact that 76% of Mickalis' guns recovered in crimes were recovered outside of South Carolina. The single largest recovery site for Mickalis' guns is New York City, where nearly 50% of Mickalis' traced guns – 47 guns – have been recovered. (National FOIA Data). Mickalis' guns were also recovered in Maryland, New Jersey, and Virginia. The Mickalis Discovery Traces, although incomplete, establish that between 2000 and 2006, 143 guns sold by Mickalis were the subject of inquiries from ATF. (*See* MP 00280 – 00432).

The New York Trace Data documents 62 Mickalis guns traced to New York State. In addition, by running the serial numbers provided by Mickalis in the Discovery Traces, an additional 10 guns sold by Mickalis can be identified as recovered in the City. (Pl. Ex. AA). Thus, Mickalis accounts for a total of 72 crime guns traced to New York State.

### (2) Distribution Methods and Their Possible Effects on Crime in New York

#### (a) Straw Purchases

Based on direct observation by City testers, Mickalis is willing to engage in straw purchases (*see* Compl. ¶ 186), a distribution practice that is well-known to result in interstate trafficking of guns. The simulated straw purchase by City testers at Mickalis Pawn provides an example of Mickalis' poor practices. The male buyer in Mickalis entered and asked to see Hi-Points. He chose a gun after glancing at it and asked to buy it and ammunition. When the clerk asked the buyer if he had a driver's license, and the buyer responded "no," the clerk then said "she's going to have to get it" (referring to the female "straw"). The man then responded, "that's fine, she'll do the paperwork." The clerk then brought the paperwork over and stated "she's buying this for herself" and the male buyer said "right".

#### (b) Multiple Sales

Mickalis' discovery responses confirm the sale of at least 74 guns in multiple sales from 2000-2006. (Mickalis' Second Supp. Resp. to City's First Set of Interrogs., at 12). Such multiple sale guns are often recovered in crimes outside of South Carolina, frequently in the same city. For example, Pl. Ex. BB shows an August 6, 1993 purchase of six Hi-Points, one recovered in Charleston, SC, one in Atlanta, one in Philadelphia and three in New York City. An October 2, 1995 purchase of two Lorcins from Mickalis led to the recovery of both guns in New York City.

### (3) Time-to-Crime of Retailer's Guns Recovered in New York

The average time-to-crime data in the National FOIA Data for guns sold by Mickalis is 2.18 years, compared with a mean recovery time of six years for all guns traced by ATF. The time-to-crime of the larger sample of guns sold by Mickalis that appear in the New York Data is 3.33 years, a more rapid recovery time than the six year mean for all guns traced by ATF. Consistent with the fact that Mickalis is directly serving the New York market, Mickalis' guns recovered in New York have virtually the same time-to-crime as Mickalis' national average. The time-to-crime for Mickalis' guns recovered in its home state of South Carolina is shorter (1.92 years) than for New York recoveries.

The individual times-to-crime of the Mickalis guns recovered in the City provide evidence of trafficking: a gun sold by Mickalis was recovered in New York City as soon as 18 days after the sale; six guns were recovered less than a year after purchase. Twenty percent were recovered in less than one year and more than 50% were recovered in less than the three-year threshold that ATF sets for guns suspected of being trafficked. (New York Trace Data).

### (4) Sales Price and Types of Guns

43% of the guns sold by Mickalis between 2000 and 2006 are Saturday Night Specials, with the great majority being Hi-Points. (Mickalis' Second Supp. Resp. to City's First Set of Interrogs., at 12, Pl. Ex. AA). The National FOIA Data establishes that approximately 50% of the Mickalis guns traced are Saturday Night Specials. In the Discovery Traces, 68% of the guns are Saturday Night Specials, half of them Hi-Points. Examining only Mickalis' guns recovered in New York City, 70% of the guns sold by Mickalis are Saturday Night Specials. More than 28% of the Mickalis guns recovered in the City have defaced serial numbers, confirming Mickalis' role in supplying an interstate crime gun market.

### (5) Crimes Committed in New York with a Retailer's Handguns

Crimes committed in New York with handguns purchased from Mickalis Pawn include:

- In June 1996, police arrested five suspects who were apparently burglarizing an apartment in Manhattan. The suspects had two loaded guns, an Uzi and a Glock 9mm, one of which was purchased from Mikalis;

- In June 1997, during a shooting in front of a shoe store in the Bronx, a bystander was hit by a bullet fired from a Mickalis gun that went through a window;

- In April 1998, a man was arrested when he pulled out a loaded .380-caliber semi-automatic handgun during a verbal dispute in a Brooklyn apartment. The gun was purchased at Mickalis;

- In May 1998, a semi-automatic gun purchased at Mickalis was used to rob a grocery store in Brooklyn, and was fired during a struggle;

- In January 2001, a 12-year-old boy in Manhattan was playing with a semi-automatic handgun purchased at Mickalis and accidentally shot someone in the chest; and

- In July 2001, a 24-year-old used a gun purchased at Mickalis to shoot an 18-year-old in the upper thigh in a dispute over the suspect's former girlfriend, who was present at the shooting.

Compl. ¶ 191.

### (6) Total Number of the Retailer's Handguns Sold in the United States and its Total Revenue from the United States and New York Markets.

Based on Mickalis' interrogatory responses, Mickalis sold 3,571 guns between 2000 and 2006, an average of 510 guns per year. The New York Trace Data indicates that between January 1994 and June 2002, 62 guns were traced to New York from Mickalis, an average of 7 guns per year. Assuming Mickalis' average yearly sales of 510 guns applies to the period (1994-2002) in which the recoveries were made, 1.4 % of Mickalis' annual gun sales are subsequently recovered in crimes New York. This is a conservative assumption since annual sales from the period before 2000 are likely to be less than 510, based on the increasing yearly sales shown

between 2000 and 2005 for all of the retailers sued.  Moreover, Mickalis' annual sales reflect handguns and long guns, although only handguns are included in the trace data.

The Discovery Traces provided by Mickalis indicate that, for the seven-year period from 2000 to 2006, 143 trace requests were made to Mickalis, or 21 requests per year.  In light of Mickalis' annual sales of 510 guns, 4% of Mickalis' annual gun sales are eventually recovered in circumstances requiring that the gun be traced.

### (7) Actions of Regulatory Authorities Related to Mickalis' Distribution Practices.

Mickalis meets the criteria for issuance of an ATF Demand Letter.

f.   Webb's — Madison Heights, Virginia

| | | | | | | |
|---|---|---|---|---|---|---|
| ■ Repeated instances of multiple handgun purchases (National FOIA Data). | ■ Average time for 20 guns = 3.26 years (New York Trace Data).<br><br>■ Some guns recovered only 2 months after sale (New York Trace Data).<br><br>■ 25% recovered less than a year after sale (New York Trace Data).<br><br>■ More than 50% recovered in less than 3 years after sale (New York Trace Data). | ■ More than 20% of guns Δ sells are Sat. Night Specials (Pl. Ex. DD).<br><br>■ 55% of guns traced to New York State were Sat. Night Specials (New York Trace Data).<br><br>■ 57% of guns traced nationwide were Sat. Night Specials (National FOIA Data).<br><br>■ Approx. 25% of guns recovered in New York City had defaced serial numbers (New York Trace Data). | ■ Armed robbery, assault and unlawful possession (New York Trace Data). | ■ 856 guns sold in US from 2000-06 (Pl. Ex. DD), of which an estimated 5.5% to 6.6% were recovered in crimes (See National FOIA Data). | ■ Δ meets the criteria for ATF Demand Letter. |
| ■ 20 of Δ's guns were recovered in New York State crimes (New York Trace Data).<br><br>■ 51 of Δ's guns were recovered in crimes nationwide (National FOIA Data).<br><br>■ 35% of the 51 were recovered in crimes in states other than Virginia (National FOIA Data).<br><br>■ 51 of Δ's guns were recovered in crimes nationwide from 2000-06 (Discovery Traces). | | | | | |

63

### (1) Number of Trace Handguns Linked to Criminal Investigations in New York and Elsewhere that are Attributable to the Defendant

Based on the National FOIA Data, 51 guns sold by Webb's were recovered in crimes nationally during the period 1990 to 1997. The interstate nature of Webb's business is evidenced by the fact that approximately 35% of the guns sold by Webb's appearing in the National FOIA Data were recovered outside of Virginia, principally in Washington, D.C. and New York City. Webb's Discovery Traces, which overlap with, but do not duplicate, the National FOIA traces, also show 51 trace requests to Webb's for the period 2000 to 2006.

During the period from March 1994 through October 2001, the New York Trace Data shows that 20 guns sold by Webb's were recovered in New York State. Two additional guns sold by Webb's were located by running the Discovery Traces provided by Webb's through the database of the NYPD Firearms Analysis Section. Including Projected Traces, Webb's accounts for a total of 34 crime guns traced to New York State.

### (2) Distribution Methods and Their Possible Effects on Crime in New York

Plaintiff's Exhibit CC illustrates that Webb's engages in multiple sales of identical guns, a sales pattern that is particularly significant at Webb's, because the retailer has a relatively low sales volume. Thus, a May 21, 1992 purchase of two Ruger pistols led to the recovery of one in New York City and the other in Lynchburg, Virginia; a September 1993 purchase of two Lorcins led to the recovery of one in New York City and the other in Richmond, Virginia; as did a November 20, 1993 sale of two Lorcins, one recovered in New York City and the other in Lynchburg, Virginia

### (3) Time-to-Crime of Retailer's Guns Recovered in New York

Consistent with the notion that the Webb's guns recovered in New York City are trafficked guns, they have a *shorter* time-to-crime – 3.26 years (New York Trace Data) – than the six-year average for all ATF trace requests. *See Blaustein & Reich*, 365 F.3d at 285. Guns sold by Webb's were recovered in New York City as soon as 64 days after the sale. Twenty five percent of Webb's guns recovered in New York City were recovered less than one year from sale, and more than 50% were recovered in less than the three-year threshold that ATF sets for guns suspected of being trafficked. (New York Trace Data).

The National FOIA Data shows that time-to-crime for Webb's guns recovered in New York City (2.6 years) is comparable to that for Webb's home state of Virginia (2.28 years).

### (4) Sales Price and Types of Guns

Based on Webb's interrogatory responses, more than 20% of Webb's sales are Saturday Night Specials. (Pl. Ex. DD). Yet over 46% of the guns from the Discovery Traces issued to Webb's are Saturday Night Specials, as are 57% of the Webb's guns documented in the National FOIA Database, and 55% of the Webb's guns documented in the New York Trace Data. (Discovery Traces; National FOIA Data; New York Trace Data). One-quarter of the guns sold by Webb's that are recovered in the City have defaced serial numbers.

### (5) Crimes Committed in New York with a Retailer's Handguns

Some of the reported crimes involving firearms sold by Webb's include the following:

- In June 2000, three teenagers used a Lorcin .380-caliber gun purchased at Webb's to attempt to shoot a man before beating and robbing him in Queens;

- In April 1998, a 23-year-old man accidentally and fatally shot himself in the head in the Bronx with a gun purchased at Webb's; and

65

- In March 2000, a 22-year-old man in the Bronx was shot in the back with a gun purchased at Webb's when he went outside to investigate shots being fired.

Compl. ¶ 249.

### (6) Total Number of the Retailer's Handguns Sold in the United States and its Total Revenue from the United States and New York Markets.

Webb's sold a total of 856 guns between 2000 and 2006, an average of 122 guns per year. (Webb's Interrog. Resps. at 13, Pl. Ex. DD). The Discovery Traces provided by Webb's indicate that, for the period from 2000 to 2006, 45 trace requests were made to Webb's, or 6.4 per year. Thus, 5.5 % of Webb's sales are eventually recovered in circumstances requiring that the gun be traced. The National FOIA Data similarly shows 51 guns traced to Webb's over a 7 year period (1991-1997), or 7.7 per year. Assuming Webb's annual sales were comparable for the earlier years, this data indicates that 6.6% of Webb's sales are eventually recovered in circumstances requiring that the gun be traced.

The New York Trace Data indicates that, between January 1994 and June 2002, 20 guns were traced to New York from Webb's, an average of 2.4 guns per year. Assuming Webb's average yearly sales of 116 guns applied to the earlier period in which these recoveries were made, 2.0% of Webb's guns sold annually are subsequently recovered in crimes in New York. This is a conservative assumption, since annual sales from the period before 2000 are likely to be less than 122, based on the increasing yearly sales shown between 2000 and 2005 for all of the retailers sued.

### (7) Actions of Regulatory Authorities Related to Webb's Distribution Practices.

Webb's meets the criteria for issuance of a Demand Letter.

## IV.  Law

### A. Overview

New York Civil Practice and Rules (CPLR) section 302(a)(3) confers long arm personal jurisdiction over a non-resident defendant who (1) commits a tortious act outside New York, which (2) causes injury in New York. In addition, the plaintiff must show that the moving defendant (3) expects or should reasonably expect the act to have adverse consequences in the state and (4) derives substantial revenue from interstate commerce." CPLR 302(a)(3). Elements (1) and (2), tortious acts committed outside New York causing injury within the state, are fully alleged and supported. *See* Part III. A. 8, *supra*. The critical issues are whether (3) the defendant would reasonably expect that its activities outside the state would cause adverse consequences in New York, and (4) it obtains substantial revenue from interstate commerce.

In addition, under the United States constitution, the plaintiff "must...establish that an exercise of jurisdiction would comport with federal due process," which "requires that (1) the defendant has sufficient 'minimum contacts' with the state of New York..., and (2) the assertion of jurisdiction is reasonable under the circumstances." *NAACP*, 2003 U.S. Dist. LEXIS 8238 at *13.

### B. Long Arm Jurisdiction Generally

1.      **C.P.L.R. 302(a)(3)(ii)**

Personal jurisdiction in diversity cases is determined in accordance with the law of the forum state, subject to federal due process constraints. *See, e.g., Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir. 1990); *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963) (en banc); *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986).

Jurisdiction in this case is asserted under section 302 of the New York Civil Procedure Law and Rules, the New York long arm statute. Section 302(a)(3)(ii) provides:

> [A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state . . . if he...
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

In order to assert jurisdiction under section 302 (a)(3)(ii) plaintiff must show, as already noted, that: (1) the defendants committed a tortious act outside New York; (2) defendants' tortious activity caused injury to person or property inside New York; (3) defendants should have reasonably expected the act to have consequences in the state; and (4) defendants derive substantial revenue from interstate commerce.

### a. Legislative History

There is no useful legislative history on the issue of which state's law defines what is a "tortious act without the state." In New York the most useful legislative history is usually found in the Governor's bill jacket. The jacket contains material gathered by the Governor's Counsel to assist the Governor in deciding whether to sign a bill passed by the legislature. In the present case, the jacket for Chapter 590 of 1966, approved June 14, 1966, the relevant provision, reveals great interest in the overall provision, but silence on the issue of the applicable state tort law. It contains:

1. The bills itself with the language already quoted;

2. A memorandum from the State Department of Law raising constitutional questions;

3. A letter from the New York County Lawyer's Association with an attached analysis;

4. A memorandum from the State Bar Association ( David D. Siegel, Esq., Scrivener) on the bill and a competing measure;

5. A letter from the New York Law Revision Commission with attached memorandum;

6. A letter and memorandum from the State Administration of the New York Judicial Conference;

7. A letter and memorandum from the American Insurance Association opposing the bill;

8. An excerpt from commentary by Vincent C. Alexander;

9. Excerpts from the Second (1958) Preliminary Report of the Temporary Commission on the Courts;

10. An Advance Copy of the Fourth Preliminary Report of the Advisory Committee on Practice and Procedure;

11. Excerpts from the Sixth Report in the Senate Finance Committee Relative to the Revision of the Civil Practice Act;

12. Excerpts from the extensive Report of the New York Law Revision Commission for 1959 where the general provision recommended is broader than the one adopted since it reads (p. 71): "Commission of any act resulting in this state in death or in injury to person or property, if the corporation expected or should reasonably have expected that the act would have consequences in this state"; and

13. Excerpts from the Report of the Administrative Board of the Judicial Conference of the State of New York, July 1, 1964 through June 30, 1965, with an extensive Study of CPLR 302 in Light of Recent Judicial Decisions by Willis L.M. Reese, Professor of Law, Columbia University School of Law (p. 132), recommending that the state not "extend its jurisdiction as far as the constitution permits" (p.136), but that it adopt the language of the present provision.

The article by Willis M. Reese and Nina Galston, Doing An Act or Causing Consequences As Bases of Judicial Jurisdiction, 44 Iowa L. Rev. 249, 260 (1959), while generally supportive of the result reached in the instant case, is not helpful on the precise issue now presented. *See also,* 2 Harold L. Korn, et al, New York Practice, CPLR 3-151 (2d ed. 2007).

### b. Cases

On the issue of which states' definition of tortious should apply there are few cases that are helpful. The New York Court of Appeals in 2006, writing on a blank slate, required an analysis under section 302(a)(3), since a necessary condition to enforcement of a default judgment by a New York court is a determination that the rendering court had acquired personal jurisdiction over the defendant. *Sung Hwan Co., Ltd, v Rite Aid Corp.,* 7 N.Y.3d 78 (2006). *Sung Hwan* presented the question whether the Korean court had personal jurisdiction over Rite-Aid, the defaulting defendant, consistent with the law of personal jurisdiction as applied by New York courts.

The Court of Appeals noted that New York courts asked to enforce foreign judgments "typically looked to the framework of CPLR 302, New York's long-arm statute, using it as a

70

parallel to assess the propriety of the foreign court's exercise of jurisdiction over a judgment debtor." 7 N.Y.3d at 83. As the Court explained,

> The specific inquiry here is whether Korea's exercise of jurisdiction over Rite Aid was consistent with New York law. For purposes of this inquiry, Korea is "the state referenced in CPLR 302 (a)(3) and the issue turns on whether Sung Hwan sufficiently alleged that Rite Aid committed "a tortious act" outside Korea, causing injury within Korea.

*Id.* at 84.

Because Korea was "the state" for purposes of CPLR 302 (a)(3), the *Sung Hwan* court's holding that the *law of the forum may serve as the law defining an act as tortious*, even when the law of the place where the act occurred does not, establishes as a permissible basis for jurisdiction: 1) a "tortious act" as defined by New York's (i.e., the forum's) local law, without regard to the law of the state where the act was committed; and that 2) (what is conceded) *the law of the place where the complained of act occurred* may also serve as the law defining an act as tortious, so long as that definition is not contrary to New York policy. Neither definition may violate federal due process.

Rite-Aid, the defendant in *Sung Hwan*, argued that CPLR 302 (a)(3) would not have subjected it to Korean jurisdiction because there could be no "tortious act," where New York law (under which Rite-Aid acted), did not recognize the tort sued on by the Korean plaintiff. *Id.* at 84-85. The Court of Appeals rejected that argument:

> The Korean court ruled in favor of Sung Hwan *and found that the conduct was tortious under Korean law.... For* purposes of establishing long-arm jurisdiction, a tort should be broadly defined to encompass one that causes economic injury. Here, although Korean law appears more expansive than New York law in imposing liability for economic loss under a tort theory, we see no reason to foreclose the use of CPLR 302 (a) (3) as a basis for Korea's exercise of personal jurisdiction over Rite Aid merely because of this difference in the substantive tort law of the two jurisdiction.

*Id.* (emphasis added).

71

For purposes of establishing long-arm jurisdiction, it was held sufficient under CPLR 302 (a)(3) that the act was deemed tortious under the law of the forum jurisdiction (Korea), and irrelevant that the act was not tortious under the law of the state in which the act took place (New York). Accordingly, in the present case, as long as the alleged acts of the defendants are tortious under New York law, *see NAACP v. AcuSport*, 271 F. Supp. 2d at 486-87, then CPLR 302 (a)(3) is satisfied, regardless of whether the acts are also tortious under the laws of each defendant's jurisdiction. In fact, as demonstrated in Part IV.B.1.c, *infra*, the acts complained of are tortious in both the forum and the actors' states.

According to the Second Circuit Court of Appeals, which has construed *Sung Hwan* (in *dicta*), New York allows considerable freedom in defining what is tortious under CPLR 302 (a)(3). *See Ehrenfeld v. Mahfouz*, 489 F.3d 542 (2d Cir. 2007). In *Ehrenfeld*, the plaintiff argued that any "wrongful" act can serve as the "tortious" act required for 302 (a)(3). The Second Circuit rejected that position as overly broad, but used the term "pertinent jurisdiction" as appropriate for analysis.

> We recognize the possibility that the claim brought in New York need not be a tort under New York law to justify invocation of § 302 (a)(3) to confer jurisdiction. *Nonetheless, there must be some basis for considering the defendant's actions to be tortious, either under the law of New York or some other pertinent jurisdiction.* In this case, plaintiff has shown no basis for considering the defendant's actions to be tortious. Therefore, the District Court properly found that it could not exercise personal jurisdiction over defendant under § 302(a)(3).

*Id.* at 551(citing *Sung Hwan*, 7 N.Y.3d at 84-85) (emphasis added).

Thus, even in circumstances in which New York law is not violated, foreign law of a pertinent jurisdiction can suffice to supply the "tortious act" on which CPLR 302 (a)(3) jurisdiction is predicated. This result is consistent with the statutory language, which includes nothing that would preclude the assertion of jurisdiction even where the injury-causing act is

"tortious" only under the law of the foreign state. It can be assumed that for purposes of this rule the characterization of an act as tortious must not be so outlandish as to violate New York's public policy or due process of law.

### c.   Injury Causing Acts as Tortious in Foreign and Forum State

As to the first two elements necessary for jurisdiction to be exercised under section 302(a)(3)(ii), plaintiff alleges that the defendants' have sold guns in other states contributing to a public nuisance within the City of New York, causing harm to the City and its residents. The City contends that the sales practices discussed in Part II and III, *supra,* are designed to allow firearms to be knowingly diverted from the retailer's legal primary local state market to the illegal secondary interstate market ending in New York and are therefore tortious in both defendants' states and the forum state.

As noted in Part IV.B.1.b, *supra,* a New York court could properly exercise jurisdiction over defendants pursuant to CPLR 302 (a)(3) whether the tortious character of the acts alleged in the complaint is determined under New York law or the laws of the defendants' home states. The complaint alleges that defendants' sales practices violate both federal law and common law duties of reasonable care, and, separately, that defendants have created conditions that endanger the health and safety of the public at large in New York City. Georgia, Ohio, South Carolina and Virginia all recognize a cause of action for public nuisance, either under statute or common law. *See* Ga. Code. Ann. § 41-1-1 *et seq.* (2005); *Home Sales Inc. v. North Myrtle Beach,* 299 S.C. 70, 81(S.C. CT. App. 1989); *City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 418-419 (Ohio 202); *Breeding by Breeding v. Hensley,* 258 Va. 207, 213-14 (Va. 1999).

Richard Gardner, attorney for Patriot Services (Tr. Hr. July 30, 2007, p. 18), argues that violating a federal statute causing injury in Virginia (or apparently outside of that state) would

not constitute a tort under CPLR 302. (*Id.* at 19). The court finds to the contrary, that within the meaning of CPLR 302, a violation of federal gun laws in Virginia causing injury inside or outside of that state would be a tort committed in that state.

A hypothetical illustrates the point. If X, in state A, fires a gun from state A into state A and also across the border into state B, negligently harming Y in state A, and Z in state B, X has committed a tort in state A against Y, and in state A *and* state B against Z. The acts now alleged to have been committed by defendants in their home states, A, by analogy can be compared to this hypothetical shooting of someone in state B, the forum state.

State and federal statutes and regulations set forth standards by which many products are manufactured, marketed and sold. Violation of such requirements is generally treated as negligence per se. This doctrine relieves the plaintiff of establishing specific common law negligence elements that the defendant owed a duty to the plaintiff and that the defendant breached a duty to the plaintiff. *See generally*, Restatement (Second) of Torts §§ 282-288B (1965).

United States jurisdictions, including those where the defendants and plaintiff reside, adhere to the rule that the violation of an applicable statutory provision constitutes negligence per se. *See e.g., Decker v. Gibson Prods Co.*, 679 F.2d 212, 213 (11th Cir. 1982) (applying Georgia law); *Amick v. BM &KM, Inc.*, 275 F. Supp. 2d 1378, 1381 (N.D. Ga. 2003); *Scott v. Ford Motor Co.*, 2000 U.S. App. LEXIS 20956 at *5-6 (4th Cir. 2000) (quoting *Baxley v. Fischer*, 134 S.E.2d 291, 295 (Va. 1964); *O'Neil v. Windshire Copeland Associates, L.P.*, 197 F. Supp.2d 507, 510 (E.D. Va. 2002); *Williams v. Hill Mfg. Co.*, 489 F. Supp. 20, 22 (D.S.C.1980); *Whitlaw v. Kroger Co.*, 644 S.E.2d 808, 252 (S.C. 1991); *Austin v. Specialty Transp. Servs.*, 594 S.E.2d 867, 876 (S.C. Ct. App. 2004); *Sikora v. Wenzel*, 727 N.E.2d 1277, 1280 (Ohio 2000);

*Chambers v. St. Mary's School*, 697 N.E.2d 198, 201 (Ohio, 1998); *Elliott v. City of New York*, 95 N.Y.2d 730, 734 (N.Y. 2001); *Capital Management Co. v. Brown*, 813 A.2d 1094, 1099 (Del. 2002); *Kauffman v. Schroeder*, 568 P.2d 411, 414 (Ariz. 1977). Violations of federal and state gun control laws causing injury amount to negligence per se. *See e.g.*, *Hetherton v. Sears, Roebuck & Co.*, 593 F.2d 526, 529-30 (3d Cir.1979); *West v. Mache of Cochran, Inc.*, 370 S.E.2d 169, 171 (S.D.Ga.1988); *Spires v. Goldberg*, 106 S.E. 585, (Ga. Ct. App. 1921); *Coker v. Wal-Mart Stores, Inc.*, 642 So.2d 774, 776 (Fla.Dist.Ct.App.1994); *Rubin v. Johnson* 550 N.E.2d 324, 329 (Ind. Ct. App. 1990); *Lundy v. Hazen*, 411 P.2d 768, 770 (Idaho 1966). The complaint's allegations regarding defendants' unlawful and unreasonable sales practices are sufficient to satisfy the "tortious act" requirement of CPLR 302 (a)(3) under New York Law, in the first instance, or alternatively, under the laws of defendants' home states.

In view of the unanimity of the American courts' views on the issue of what constitutes a tort, there is no conflict in the laws of the relevant states that needs to be considered. In any event, the matter presents a question of statutory interpretation, not of possible conflicts of laws. There is no need in the instant case to determine CPLR 302's reach were the New York law of torts significantly different from those of the states where the alleged primary tortious acts occurred.

### d. Burden of Proof

Plaintiff need not present conclusive evidence of tortious conduct outside the state and harm in the state for jurisdictional purposes. *Cf. Longines-Wittnauer Watch Co. v. Barnes & Reinecke Inc.*, 15 N.Y.2d 443, 460 (N.Y.1965) ( "[I]t cannot be made too clear that we are concerned solely with the problem of the court's jurisdiction over the person of a nonresident defendant and not with the question of his ultimate liability to a particular plaintiff; that issue is

to be considered only after it is decided, on the basis of section 302, that the defendant is subject to the in personam jurisdiction of our courts."); *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 204 (N.Y.1978) ("The issue at this juncture is only whether the action should die."); David D. Siegel, New York Practice, 169 (4[th] ed. 2005) ("the degree of proof needed to sustain jurisdiction is not as heavy as that needed to sustain a recovery on the merits").

The plaintiff's burden on a motion to dismiss for lack of jurisdiction is to establish the substantial likelihood that all the elements of jurisdiction can be proven by a preponderance of evidence at trial. *See, e.g., Peterson v. Spartan Industries, Inc.*, 33 N.Y.2d 463, 354 N.Y.S.2d 905 (N.Y. 1974) (burden to obtain discovery on jurisdictional facts); *Edelman v. Taittinger, S.A.*, 298 A.D.2d 301, 751 N.Y.S.2d 171(1st Dep't 2002) (same); 2 Harold L. Korn et al, New York Civil Practice, ¶ 302.12 (2d ed. 2005) ("the plaintiff has the burden ultimately of proving beyond a preponderance of the evidence that jurisdiction over the defendant's person...has been properly obtained"). This burden has been more than met by the City after extensive discovery on the point.

### e.    Reasonable Expectation of Consequences in New York

The requirement that defendants reasonably expect their conduct to cause harm in New York is intended to ensure that "it is reasonable to require a defendant to come to New York to answer for tortious conduct committed elsewhere." *Ingraham v. Carroll*, 90 N.Y.2d 592, 598 (1997). But the consequences foreseen need not be those that are the precise subject of the lawsuit. *See In re DES Cases*, 789 F.Supp. at 570 (citing *Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 357 N.Y.S.2d 547, 550 (3d Dep't 1974)). Foreseeability requires "a discernible effort to directly or indirectly serve the New York market." *Schaadt v. T.W. Kutter, Inc.*, 169 A.D.2d 969, 970 (3d Dep't 1991).

In the *DES Cases* the drug at issue, Diethylstilbestrol (DES), was found to be a generic, fungible consumer item. As a consequence of the interchangeable nature of the product and the nature of the market, "all DES manufacturers knew that their acts were having forum consequences in New York." *In re DES Cases,* 789 F.Supp. at 572. *Hamilton* held that for jurisdictional purposes handguns were also fungible and therefore the reasoning of *In re DES* applied to cases involving the manufacture and sale of handguns. 32 F.Supp.2d at 52.

The conclusion of the court in *In re DES Cases* was approved in *In re New York County DES Litigation,* 202 A.D.2d 6 (1st Dep't 1994). The court in *In re New York County DES Litigation* held that "[a] consonant interpretation of C.P.L.R. § 302(a)(3)(ii) supports the conclusion that any manufacturer of DES, by its participation in the national marketing of a generic drug, should 'reasonably expect' its act of selling in the national market 'to have', as C.P.L.R. § 302(a)(3)(ii) puts it, 'consequences in the state.'" *Id.* at 11.

A retailer is less likely to be engaged in interstate commerce than a manufacturer or wholesaler. But, where, as here, a particular retailer in effect does engage in interstate commerce there is no need to differentiate it from a manufacturer or wholesaler for jurisdictional purposes.

A defendant's marketing of its products via the Internet has also been found particularly cogent in the CPLR 302(a)(3)(ii) jurisdictional analysis. *See Roberts-Gordon, LLC v. Superior Radiant Prods., Ltd.,* 85 F. Supp. 2d 202, 217 (W.D.N.Y. 2000) (finding jurisdiction over out-of-state defendant under CPLR 302(a)(3)(ii)); *NAACP,* 2003 U.S. Dist. LEXIS 8238 at *36- 37 (same); *American Network, Inc. v. Access America/Connect Atlanta, Inc.,* 975 F. Supp. 494, 498 (S.D.N.Y. 1997) (nondomiciliary Internet service provider's statement on electronic home page that it could help customers "across the U.S." supported section 302(a)(3)(ii) long-arm jurisdiction); Shari Claire Lewis, *Long Arm Jurisdiction Through the Web,* New York Law

Journal, August 7, 2007, at 5. In *NAACP*, the fact that a defendant "marketed its products directly to the public ... through its website" was specifically found to be "another marketing practice which allegedly increases the risk of inappropriate gun acquisition. 2003 U.S. Dist. LEXIS 8238, at \*36.

### f.    Derives Substantial Revenue from Interstate Commerce

In order to be subject to New York long arm jurisdiction under section 302(a)(3)(ii) a defendant must also derive "substantial revenue from interstate or international commerce." There is no specific dollar threshold at which revenue becomes "substantial" for purposes of CPLR 302(a)(3)(ii).  Instead, courts look either to the percentage of a party's overall revenue derived from interstate commerce, or to the absolute amount of revenue generated by a party's activities in interstate commerce, with each case to be decided on its own facts. *Pariente v. Scott Meredith Literary Agency, Inc.*, No. 90-CV-0547 1991 U.S. Dist. LEXIS 1607 (S.D.N.Y. 1991); *Ronar, Inc. v. Wallace*, 649 F. Supp. 310, 316-17 (S.D.N.Y. 1986).  Substantial revenue from interstate commerce may be shown by detailing extensive interstate recoveries of a defendant's guns and its repeated involvement in interstate gun trafficking.

Under section 302(a)(3), "[d]ismissal is inappropriate even where there is *no proof* that a defendant 'derives substantial revenue from interstate or international commerce,' where that knowledge is peculiarly under the control of the defendant,' and may come to light in the course of subsequent discovery." *Mfg. Tech., Inc. v. Kroger Co.*, 06-CV-CV-3010, 2006 U.S. Dist. LEXIS 90393 at \*10 (S.D.N.Y. 2006) (quoting *Tonelli v. Chase Manhattan Bank, N. A.*, 49 A.D.2d 731, 372 N.Y.S.2d 662, 663 (1st Dep't 1975)) (emphasis added) (brackets and quotation marks omitted).  Where the precise magnitude of each moving defendant's interstate revenues is "peculiarly in their control," and also likely to have been concealed, given the illegal nature of

the commerce in question, jurisdiction is more readily established. *See NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d at 508 ("Diversion of firearms typically involves criminal behavior that the persons involved are trying to conceal").

    2.    **Due Process**

    Due process analysis requires that: (1) the defendant have sufficient "minimum contacts" with the forum state to justify the exercise of personal jurisdiction, and (2) the assertion of jurisdiction is reasonable under the circumstances. *See International Shoe Co. v. Washington*, 326 U.S. 310 (1945); *Helicopteros de Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984); *Metropolitan Life Insurance Co. v. Robertson-Ceco Corp*, 84 F.3d 560 (2d Cir. 1996). "A court deciding whether it has jurisdiction over an out-of-state defendant under the Due Process Clause must evaluate the 'quality and nature' of the defendant's contacts with the forum state under a totality of the circumstances test." *Best Van Lines, Inc., v. Walker*, 2007 WL 1815511, at *3 (2d Cir. 2006) (internal citations omitted).

    "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-472 (1985) (internal citations omitted). Individuals must be afforded fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign. This requirement allows "potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.*

    a.  **Minimum Contacts**

    Strict "territorial jurisdiction," *see Pennoyer v. Neff*, 95 U.S. 714 (1877), is no longer as strong a principle as it once was. Boundaries are increasingly fluid and trading borders are

determined more through the conduct and agreement of individuals, organizations, and governments than by lines that are drawn on maps. *See Simon v. Phillip Morris, Inc.*, 86 F.Supp.2d 95, 131 (E.D.N.Y.2000) (notice and fair warning rather than strict territorial nexus governs); Harold L. Korn, *The Development of Judicial Jurisdiction in the United States: Part I*, 65 Brook. L.Rev. 935, 937 (1999) (current "challenges . . . to . . . traditional jurisdictional . . . thinking"); Harold L. Korn, *Rethinking Personal Jurisdiction and Choice of Law in Multistate Mass Torts*, 97 Colum. L. Rev. 2183, 2184 (1997) ("[T]he Supreme Court must . . . disavow the doctrine that . . . the United States Constitution requires a territorial nexus between forum and defendant . . . for the exercise of in personam jurisdiction"); Harold L. Korn, *The Choice of Law Revolution: A Critique*, 83 Colum. L. Rev. 772, 782 ff. (1983); Comment, *Mass Tort Jurisdiction and Choice of Law in a Multinational World Communicating by Extraterrestrial Satellites*, 37 Willamette L. Rev. 145 (2001) ("fair venue controls in personam jurisdiction"). State lines are meaningful, but they are only one element to be taken into consideration when determining whether exercise of jurisdiction over a particular defendant is appropriate in particular circumstances.

Jurisdictional criteria used to measure a defendant's "presence" are, on the whole, not clear cut, and cannot be enforced in a mechanical fashion. *See Int'l Shoe Co. v. Washington*, 326 U.S. at 319 ("It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative"). In addition to technical limitations, exercise of jurisdiction involves discretionary determinations based on practical considerations, burdens, and tactics. The realities of economic relationships cannot be ignored. See *Bulova Watch Co. v. K. Hattori & Co.*, 508 F.Supp. 1322 (E.D.N.Y.1981).

An inflexible application of a traditional jurisdictional analysis that fails to take account of unique practical commercial factors does not effectively insure the fair and orderly administration of the law. *Cf. Babcock v. Jackson,* 12 N.Y.2d 473, 481 ("Justice, fairness and the best practical result, may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation") (internal quotation marks and citation omitted"); *cf. Hamilton,* 47 F.Supp.2d at 340 ( "The points of distribution involved many states and vary from company to company; if the significant contact was the state of distribution, so many states' laws would be involved that consolidation of defendants would be impractical"). A reality-based pragmatic jurisdictional analysis is required.

"[T]o subject a defendant to a judgment in personam . . . he [must] have certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. at 316 (internal citations omitted). A defendant's conduct establishing minimum contacts must be purposefully directed toward the forum state, *see Burger King Corp. v. Rudzewicz,* 471 U.S. 462, and its connection with the state should lead it to "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S.286, 297 (1980). "A foreign corporation 'purposefully avails' itself of a particular forum where the corporation places its products into interstate commerce and reasonably foresees that those products will be delivered into that forum." *Kernan v. Kurz-Hastings, Inc.,* 997 F.Supp. 367, 374 (W.D.N.Y. 1998).

In *World Wide Volkswagen v. Woodson* plaintiff, a New York resident, purchased a car in New York State and was involved in an accident while driving through Oklahoma. Plaintiff then filed a products liability action in Oklahoma against the New York sellers. The regional

distributor and local retailer moved to dismiss for lack of personal jurisdiction. The Supreme Court held that a fortuitous accident in Oklahoma involving a car sold in New York to a local consumer did not provide sufficient contacts between the moving defendants and the forum state.

In dictum the *Volkswagen Court* made clear that jurisdiction could be asserted over the international and national distributors of a product if the sale of the product was not "an isolated occurrence" but arose "from the efforts of the manufacturer or distributor to serve directly or indirectly the market for its product in" the forum state. 444 U.S. at 297-298.

On the basis of the language in *World Wide Volkswagen* "numerous courts in deciding whether the exercise of personal jurisdiction over an out of state defendant is appropriate have distinguished between retailers, who restrict their sales to a local market, and manufacturers and upstream distributors who seek a broader market for their product." *Taylor v. Uniden Corp. of America*, 622 F.Supp. 1011, 1014 (E.D.Mo. 1985); *see also Lichon v. Aceto Chemical Co., Ltd.*, 182 Ill.App.3d 672 (Ill.App. 1 Dist, 1989); *Violet v. Picillo*, 613 F.Supp. 1563 (D.R.I., 1985); *Hedrick v. Daiko Shoji Company, Ltd., Osako*, 715 F.2d 1355 (9th Cir.1983); *Nelson by Carson v. Park Industries Inc.*, 717 F.2d 1120 (7th Cir.1983).

"[C]ourts developing this pivotal distinction have explained, the key factors justifying a different jurisdictional rule are twofold." *Violet v. Picillo*, 613 F.Supp. at 1576. First, interstate distributors and manufacturers "place their products into the stream of commerce with either the subjective intention, or objective reason to know, that their products will be sold 'to a nation-wide market, that is, in any or all states." *Id.* (internal citations omitted). "[T]he fact that these manufacturers or distributors place their products in a stream of commerce destined for sale through a broad interstate market, and reap the attendant benefits, renders them properly subject to suit in one of the states comprising that market." *Id.*

82

Second, local merchants serve a self circumscribed market and ordinarily have no control over where the buyer takes their product after sale. *See id.* Interstate manufacturers and distributors, however, can "act to limit the states in which their products will be sold thus structuring their primary conduct to provide "some minimum assurance as to where that conduct will and will not render them liable to suit" *World-Wide Volkswagen v. Woodson,* 444 U.S. at 297.

The nature of the product may have a bearing on the issue of minimum contacts. "[W]here a defendant deals in [] inherently dangerous products, a lesser showing than is ordinarily required will support jurisdiction." *Violet v. Picillo,* 613 F.Supp. at 1577; *see also Poyner v. Erma Werke GMBH,* 618 F.2d 1186, 1192 (6th Cir.1980); *Velandra v. Regie Nationale Des Usines Renault,* 336 F.2d 292, 298 (6th Cir.1964). "[A] commercial defendant who deals in handguns should expect to be held accountable on a lesser showing than one who sells something as harmless as rubber bands. It is the type of product in which the state will have an inherent interest. " *Delahanty v. Hinkley,* 686 F.Supp. 920, 925 (D.D.C. 1986).

"[T]he scope of 'foreseeability' broadens when the enterprise giving rise to the action is subject to pervasive federal regulation." *Allied Towing Corp. v. Great Eastern Petroleum Corp.,* 642 F.Supp. 1339, 1356 (E.D.Va.1986); *see also O'Neil v. Picillo,* 682 F.Supp. 706, 718 (D.R.I.1988); *cf. Marshall v. Barlow,* 436 U.S. 307, 314 (1978) ("businessmen engaged in [] federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade . . . The businessman in a regulated industry in effect consents to the restrictions placed upon him"); *United States v. Biswell,* 406 U.S. 311 (1972) (finding the sale of firearms to be an industry of the type discussed in *Barlow*); *Delahanty v. Hinkley,* 686 F.Supp. 920 (personal jurisdiction could be properly exercised over the nonresident manufacturer and distributor of a

83

crime gun that illegally entered the District of Columbia even though neither the manufacturer nor the distributor had agents or offices in the District of Columbia and neither was licensed to do business in the District of Columbia).

Delahanty held that printouts from the Bureau of Alcohol, Tobacco and Firearms and from the District of Columbia Metropolitan Police Department, which indicated the extent to which the defendants' products were illegally trafficked and used by criminals, as well as defendants knowledge of these events, if they could be authenticated, would support a finding that "defendants' nationwide distribution scheme [had] been successful in indirectly distributing large numbers of their handguns in the District of Columbia." 686 F. Supp. at 921. The court rejected defendants' argument that it had not 'purposefully availed' itself of the District of Columbia market. It held that it did not "matter that defendants' product reached the jurisdiction indirectly, so long as they [had] not sought to curtail their access to this market." Id. at 923.

### b. Reasonableness

In assessing whether an assertion of jurisdiction is reasonable, five factors will be evaluated: (1) the burden on defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of individual states and the interstate or international community in furthering their appropriate substantive social policies. Asahi Metal Indus. v. California, 480 U.S. 102, 113 (1987).

Due process criteria are interrelated. Assuming that a constitutional threshold of contacts has been demonstrated, fewer contacts may be necessary where the "reasonableness" factors weigh heavily in favor of an exercise of jurisdiction. See Metropolitan Life Insurance Co. v.

*Robertson-Ceco Corp*, 84 F.3d at 569 ("Thus, in assessing whether it may exercise jurisdiction over a particular defendant, a court must weigh the relative strengths and weaknesses of each requirement – that is, depending upon the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional test may have a greater or lesser effect on the outcome of the due process inquiry.") (*citing Burger King Corp. v. Rudzewicz*, 471 U.S. at 477).

### c. State Interest

In the *DES Cases* the state interest standard was stressed. 789 F.Supp. at 576. Strong state interest as well as territorial contacts may provide the basis for exercise of constitutional in personam jurisdiction. Those interests need to be balanced against hardship of defendants. DES is a generic fungible consumer item. The DES market is "a common economic pond that knows no state boundaries. Substantial interjection of products at any point of the national market has ripple effects in all parts of the market." *In re DES Cases*, 789 F.Supp. at 576. For jurisdictional purposes handguns are also fungible and therefore the reasoning of *In re DES Cases* applied to litigations involving the manufacture and sale of handguns. *Hamilton*, 32 F.Supp.2d at 52.

In order to assert personal jurisdiction under the state interest standard

> I. The court must first determine if the forum state has an appreciable interest in the litigation, i.e., whether the litigation raises serious issues whose resolution would be affected by, or have a probable impact on the vindication of, policies expressed in the substantive, procedural or remedial laws of the forum. If there is an appreciable state interest, the assertion of jurisdiction is prima facie constitutional.

> II. Once a prima facie case is made, the assertion of jurisdiction will be considered constitutional unless, given the actual circumstances of the case, the defendant is unable to mount a defense in the forum state without suffering relatively substantial hardship.

*In re DES Cases*, 789 F. Supp. at 587.

If principle I is satisfied the assertion of jurisdiction is *prima facie* constitutional unless the exercise of jurisdiction is found to cause such substantial hardship to the defendant under principle II as to make exercise of jurisdiction unfair. "Although the test under Principle II does not shift the burden of persuasion to defendants, the court will . . . assume fairness unless the defendant informs it of potential litigation burdens and the desirability of transfer or dismissal." *Id.* at 589. The extent of the interest must be balanced against the burden.

Evidence to be considered in determining the defendant's relative hardship includes, (1) the defendant's available assets; (2) whether the defendant has or is engaged in substantial interstate commerce; (3) whether the defendant is being represented by an indemnitor or is sharing the cost of the defense with an indemnitor or co-defendant; (4) the comparative hardship defendant will incur in defending the suit in another forum; and (5) the comparative hardship to the plaintiff if the case were dismissed or transferred for lack of jurisdiction. *See id.* at 587. An additional factor (6) is whether the activity of the defendant is illegal or against public interest.

### 3.    **Cumulative Parallel Conduct**

The illegal out-of-state activities of a single defendant alone may not suffice to establish jurisdiction. When, however, many individuals act through knowing parallel conduct, the extent of the combined harm may provide a basis for jurisdiction over each one. This is particularly true when each is, or should be, aware of the actions of the others. For example, one out-of-state upstream polluter may have insignificant impact on an in-state down stream land owner. But the combined effect of many independent polluters on the owner or community could be devastating. "Each standing alone might amount to little or nothing. But it is when all are united...that they become important, as factors, in producing the mischief complained of." *U.S. v. Luce*, 141 F. 385, 412 (C.C.D. Del. 1905) (citation omitted).

In *Luce* the government had established a quarantine station whose inmates were discomforted by the foul intermingled odors wafted from a number of independently operated factories manufacturing fertilizer from fish refuse. Each enterprise's activities might not have been alone sufficiently offensive to warrant an injunction. But an injunction was called for against each of the factories to eliminate the total stench of the noxious parallel operations which together constituted a nuisance.

Where multiple actors contribute to a nuisance, equity can reach each one even though their conduct standing alone would not be actionable. *See, e.g., Warren v. Parkhurst*, 92 N.Y.S. 725 (N.Y.Sup.Ct.1904), aff'd 105 A.D. 239, 93 N.Y.S. 1009 (1905), aff'd 186 N.Y. 45, 78 N.E. 579 (1906). A common fact pattern is the discharge of waste or other substances into a stream by independently acting multiple upstream entities resulting in significant pollution or obstruction downstream. *See, e.g., Warren v. Parkhurst*, 92 N.Y.S. 725; *Chipman v. Palmer*, 77 N.Y. 51, 55 (1879). As the court noted in *Parkhurst*, "the only injury to the plaintiff is caused by the noxious smells arising from the '*combined*' *sewage of all the defendants*." *Warren v. Parkhurst*, 92 N.Y.S. at 725-726 (emphasis supplied). It went on to point out:

> Each defendant... knows that his continuous drainage, and the continuous drainage of each of the other defendants, at the same time and in the manner, causes a "combined" stench which destroys the usefulness of the plaintiff's property. Still each persists in contributing his part to the general stench.

*Id.* at 726. It noted that one defendants' discharge alone "might not be unreasonable," but "here, while each defendant acts separately, he is acting at the same time in the same manner as the other defendants, knowing that the contributions by himself and the others acting in the same way will result necessarily in the destruction of the plaintiff's property." *Id.* at 727.

Where multiple actors contribute to a nuisance and have knowledge of the others' conduct and of the effect of their actions in the aggregate, relief will be granted despite the fact

that each defendant has acted independently. "If, necessary, in order to get at them, a court of equity may infer a unity of action, design, and understanding, and that each defendant is deliberately acting with the others in causing the destruction of plaintiff's property." *Id.*; *see also Hillman v. Newington*, 6 P.C.L.J. 88 (Cal. 1880) (en banc) (independent diversion of water flow combining to constitute a serious problem for plaintiff).

"There is cooperation in fact in the production of the nuisance." *Parkhurst v. Warren*, 93 N.Y.S. at 1010; *see also Woodruff v. North Bloomfield Gravel Mining Co*, 16 F. 25, 28 (C.C.D. Cal. 1883) (discharge of debris from various mines). "The question is whether there is a sufficient common bond among the . . . similarly situated persons . . . to authorize the court to interfere and give complete relief . . . against them all in one proceeding and thus avoid a multiplicity of suits." *Parkhurst v. Warren*, 93 N.Y.S. at 1010.

While deliberate concert of action or common design may be necessary in some instances to allow for jurisdiction over smaller defendants in a foreign jurisdiction, "passive concert or passive community is, in certain circumstances, enough." *Town of Sharon v. Anahma Realty Corp.*, 123 A. 192, 192 (Vt. 1924) (combination of acts raising ice level when each defendant's acts would have been innocuous but for the acts of others). Defendants in such cases can not be allowed to avoid liability by contending that their isolated acts are not sufficient for the court to gain jurisdiction when they act with knowledge that others are acting in the same way. *See, e.g., Warren v. Parkhurst*, 92 N.Y.S. at 725; *Sloggy v. Dilworth*, 36 N.W. 451, 453 (Minn. 1888) (flooding of lands). "One drop of poison in a person's cup may have no injurious effect. But when a dozen, or twenty or fifty, each put in a drop, fatal results may follow. It would not do to say that neither was to be held responsible" *United States v. Luce*, 141 F. at 412; *Cf. Agatha*

Christie, *Murder on the Orient Express* (Berkley Books 2004) (1934) (many independent murders of the same person, but the defendants were in concert).

Where the defendants reside in different jurisdictions the plaintiff would be without effective recourse in any jurisdiction without aggregation of the defendants' acts so all could be sued together in one place. "In such a case, all who act must be held to act jointly." *Hillman v. Newington*, 6 P.C.L.J. at 64.

> No undue hardship will result to the defendants ... from being joined with others, who also contribute to the ... nuisance by ... independent action...but ultimately, cooperat[e] to produce the nuisance... [I]t is convenient to dispose of it in one case... and the administration of justice is... facilitated. In fact it is the only adequate mode of proceeding in cases like this.

*Woodruff v. North Bloomfield Gravel Mining Co.*, 16 F. at 30. *Cf.* The American Law Institute, *Intellectual Property: Principles Governing Jurisdiction, Choice of Law, And Judgments in Transnational Disputes*, § 206 *Personal Jurisdiction over Multiple Defendants* (Proposed Final Draft 2007) (expanding the personal jurisdiction of the courts in cases with multiple out-of-state defendants from different states where there is sufficient connection between the case and the forum state, noting that such expansion is warranted when it avoids the risk of inconsistent judgments and the forum state is closely related to the entire dispute).

### C. Long Arm Jurisdiction in Gun Cases

Ten factors were recognized in *NAACP* as bearing on prudential aspects of personal jurisdiction analysis applicable to gun manufacturers and distributors. These factors (the "*NAACP* Factors") are:

> 1) crimes committed in New York with the defendant's handguns;

89

2)   total number of handguns the defendant manufactured or sold in the United States;

3)   number of handguns sold by the defendant in New York;

4)   value of gun-related products sold by the defendant in New York;

5)   number of "trace" handguns linked to criminal investigations in New York that are attributable to the defendant;

6)   sales price of the defendant's handguns (*e.g.*, very high priced collectors' guns not designed for use);

7)   type of gun and its intended use (*e.g.*, very large handguns used in hunting large game such as heavy weapons requiring two hands or a stand);

8)   connection with the defendant's related companies;

9)   distribution methods and their possible effects on crimes in New York; and

10)  the defendant's total revenue from the United States and New York markets.

*NAACP*, 2003 U.S. Dist. LEXIS 8238 at *17-18. Among the ten criteria, the "total number of handguns ... sold and traced in New York ... and distribution practices with a possible effect on crime in New York ... [are] 'particularly salient.'" *Id.* at *18-19.

The following seven "Retailer *NAACP* Factors" are those most relevant to retail gun establishments:

1)   Number of "trace" handguns linked to criminal investigations in New York and elsewhere that are attributable to the defendant;

2)   Distribution practices and their possible effects on crimes in New York;

3)   Time-to-crime of the retailer's guns recovered in New York (a critical factor not considered in *NAACP*);

90

4)   Sales price, type of gun and the intended use of the retailer's handguns (e.g., very high priced collectors' guns not designed for use or very large handguns used in hunting large game such as heavy weapons requiring two hands or a stand) (combining *NAACP* factors 6 and 7);

5)   Crimes committed in New York with the retailer's handguns;

6)   Total number of handguns the retailer ... sold in the United States and retailer's total revenue from the United States and New York markets; and

7)   Actions of regulatory authorities related to the retailer's distribution practices (a factor not considered in *NAACP*).

## V.  Application of Law to Facts

Under New York general long arm jurisdiction jurisprudence and its application in gun cases, as set out in Part IV, *supra*, and the facts found for purposes of this motion in Parts II and III, *supra*, exercise of personal jurisdiction under CPLR 302(a)(3)(ii) is warranted. The City has made a persuasive showing as to personal jurisdiction with its jurisdictional allegations and supporting data. Its averments of credible facts are sufficient to establish jurisdiction over each moving defendant. *NAACP*, 2003 U.S. Dist. LEXIS 8238 at *11-12.

Four aspects of the City's claims differentiate the instant case from the garden variety long-arm jurisdiction cases addressing one-time personal injuries or one-time commercial disputes between private parties:

First, the City has assembled, as to each moving defendant, strong evidence of a continuous, long-standing course of conduct having adverse effect here. This evidence documents, for each defendant, a decade-long, if not longer, practice of facilitating the illegal sale of guns for movement into the New York City market. Whether through specific federal prosecutions of gun trafficking, or through gun traces and trace requests that year after year

follow from straw purchases, the City has demonstrated that each moving defendant has maintained a long and profitable commercial relationship with citizens of the State of New York.

Second, personal jurisdiction is sought here not simply to vindicate an individual right or to resolve an individual commercial dispute. Rather, it is sought to protect the safety of an entire community.

Third, the necessarily clandestine nature of the particular commerce at issue — with moving defendants aware that their participation in interstate gun sales could potentially subject them to criminal and civil prosecution — means that the evidence of that interstate commerce is unlikely to be openly displayed. Examination of defendants' financial statements and other records will seldom tell the full story. Rather, proof of interstate commerce requires reliance upon sound inferences drawn from frequently fragmented information.

Fourth, the parallel conduct, which each moving defendant knew about, jointly constitutes a major aspect of interstate commerce and has particularly harmful effect on the safety of New Yorkers. It is well known in the industry that local retail straw sales send guns into other states where they are used in crimes.

The only published decision to date to analyze the exercise of personal jurisdiction over an out-of-state gun *retailer* in a New York public nuisance case has held that the requisite *prima facie* case could be established inferentially through "allegations that there have been crimes committed in New York with the defendant's guns; that there are a significant number of traces linked to criminal investigations in New York that are attributable to the defendant's conduct; and that defendant's distribution practices have a substantial effect on crime in New York." *Johnson*, 304 F. Supp. 2d at 401. The City's Complaint rests on such allegations. *See, e.g., Complaint* at ¶¶ 91-101 (detailing for each defendant the number of traces, particular crimes

92

connected, and indicia of trafficking); Parts II and III, *supra*. Those allegations, as supplemented with extensive evidence, provide more than sufficient basis for finding each moving defendant subject to New York long-arm jurisdiction — a basis stronger than that presented in *Johnson*.

Moving defendants argue unconvincingly that plaintiff has not established that each defendant committed a tortious act without the state. To satisfy the first element of CPLR 302 (a) (3) the "plaintiff need not make a prima facie case in tort." *Feinberg v. Deloitte & Touche,* 1993 WL 330508 (S.D.N.Y. 1993). The plaintiff need only establish that the out-of-state conduct attributable to each defendant gives rise to a claim in tort. *See Evans v. Planned Parenthood of Broome County Inc.,* 352 N.Y.S.2d 257, 257 (3rd Dept. 1974). As defendants conceded on argument "[If] I know I violated federal law. Is it a tort? It's a tort." (Tr. Hr. July 30, 2007, p 13. *See also* p. 14). *See* discussion in Part IV.B.1, *supra.*

Despite the fact that counsel argued that there was no "knowing" violation, (*id.* at 13-15), the court finds that there was evidence sufficient to find a knowing violation of federal law and therefore there was a tort committed by each of the defendants in its home state.

Moving defendants further contend that they had no reason to expect that their sales of handguns outside of New York would produce lethal consequences in New York. (*See, e.g.,* Adventure Outdoors, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("AO Mot.", at 7, 8)). That same argument was rejected nearly ten years ago in *Hamilton*: "[T]here is significant publicly available evidence such that any firearms distributor, by virtue of being in that business, should know of or foresee the existence of an underground market which transports guns from the Southeast to states in the Northeast, including New York." 32 F. Supp. 2d at 63. In light of the facts and analysis in *Hamilton* it should come as no surprise to any one participating in gun marketing that

93

jurisdiction in New York might lie for illegal gun sales in other states. Moreover, at least three of the moving defendants – Adventure Outdoors, Peddler's Post and Woody's — have each personally been aware of *multiple* prosecutions of their customers for illegally moving guns interstate, including to New York. (*See* Pl. Exs. L, R, W).

The City's allegations and proof demonstrate the kind of "purposeful availment" that was absent in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286. Alleged, with abundant factual confirmation, are the facts that: (i) each moving defendant has engaged in straw sales, (ii) it knew, or should have known, that the apparent purchaser was acting on behalf of a prohibited purchaser, and (iii) it knew, or should have known, that many of the guns it had sold illegally would be, and were, trafficked to New York and thereafter recovered in crimes here. (Compl. ¶¶ 58, 267-70).

Moving defendants assert that they should not be subject to New York long arm jurisdiction because they do not derive "substantial revenue from interstate or international commerce." (*See, e.g.,* AO Mot. at 8). The City has provided an ample factual basis for concluding that each moving defendant earns substantial revenue from interstate commerce – revenues more than sufficient to subject them to suit in New York.

Unfounded is defendants contention that this court's exercise of personal jurisdiction over them would somehow offend Constitutional Due Process. (*See, e.g.,* AO Mot. at 10). First, defendants' long-standing contacts with New York – supplying guns over the course of more than a decade to individuals who traffic these guns to New York for criminal purposes – are far more than "minimal." Second, case law establishes that fewer contacts with New York are required when, as here, the cumulative weight of the factors set forth in Part IV.C, *supra*, favor jurisdiction in this State. *NAACP*, 2003 U.S. Dist. LEXIS 8238 at *15-16.

94

The evidence analyzed under applicable jurisdictional criteria, *see* Part IV, *supra*, satisfies both New York's long-arm statute and federal due process. Given the information available to firearms retailers concerning straw purchases and the illegal traffic in guns, along with defendants' alleged sales practices, defendants' should have reasonably expected their acts to have serious adverse consequences in New York.

While the defendants in the present case are retailers, and not manufacturers like the defendants in *In re DES Cases* and *Hamilton,* they are participating in what is effectively a national market, subject to national as well as state statutory control. The nature of the firearms market, especially the secondary illegal firearms market, ensures that sales made in one part of the country will impact other areas of the nation. *See* Philip J. Cook et al., *Guns and Violence Symposium: Regulating Gun Markets,* 86 J. Crim. L. & Criminology 59, 71 (1995) (noting that the "primary and secondary markets [for guns] are closely linked, like the analogous market[] for... prescription drugs"). The fact of gun trafficking and the imbalance in the restrictions placed on guns from state to state facilitates a flow of guns from states without major restrictions on firearms to states, like New York, that have stricter regulation. *See* Richard Lacayo, *Running Guns up the Interstate*, TIME, Feb. 6, 1989, at 24 ("the driving force behind domestic arms smuggling is the discrepancy among state laws").

It is appropriate to analogize the defendants in this case to interstate distributors. The factual circumstances present indicate that each defendant should have known—as in fact they likely did know from their knowledge of out-of-state trace requests-- that their sales practices were funneling guns into a stream of commerce broad enough to include New York. Unlike the retailer involved in *World Wide Volkswagen,* these defendants did not serve a self circumscribed market; they essentially adopted the role of distributors in the illegal interstate secondary gun

95

market. Whereas the car retailer in *World Wide Volkswagen* was not enhanced in his economic posture by the consumer's travel through Oklahoma, the defendants in this case do benefit from the gun traffickers' crossing of state lines since it enables them to sell more guns. Here, the nature of the relationship between the buyer and seller as well as the nature of the product dictated that defendants' guns would be likely to end up in other states including New York. *See Hall v. Zambelli* 669 F.Supp. 753 (S.D.W.Va. 1987).

Like interstate distributors, these defendants could have structured their conduct to provide themselves "minimum assurance as to where that conduct [would] and [would] not render them liable to suit." "[H]aving failed to structure their primary conduct to provide themselves with minimal assurance as to where they would be compelled to defend . . . litigation, defendants may not now reasonably claim unfair surprise or undue burden in being called to answer in a state where their products are alleged to have caused harm." *Violet v. Picillo,* 613 F.Supp. at 1578. When a firearms retailer knows that due to its inappropriate sales practices its product will be "transferred from hand to hand and transported from state to state, [it] cannot reasonably claim that [it is] surprised at being held to answer in any state for the damages the product causes." *Poyner v. Erma,* 618 F.2d at 1189 (*quoting Keckler v. Brookwood Country Club,* 248 F.Supp. 645, 649 (N.D.Ill.1965)).

In this case, while the defendants have no officers or agents in New York and are not licensed to do business in New York, they knowingly serve the New York market.

The Supreme Court has questioned whether simply placing a product in the stream of commerce is, by itself, sufficient to establish the minimum contacts with a forum state. *See Asahi Metal,* 480 U.S. at 112; *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286. But defendants here have done more than simply place handguns in the stream of commerce. The

96

illegal long-standing sales conduct of the defendants is sufficient to provide the minimum contacts necessary for an exercise of personal jurisdiction by the State of New York.

All "reasonableness" factors strongly support this court's exercise of personal jurisdiction:

(1)    "The interests of the forum state in adjudicating the case," which here strongly favors proceeding in New York, where substantial and widespread injury is being suffered;

(2)    Plaintiff's "interest in obtaining convenient and effective relief," here strongly favors a single litigation in New York, rather than piecemeal litigation in Georgia, Ohio Pennsylvania, South Carolina and Virginia. *See City of New York v. Cyco.net, Inc.*, 383 F. Supp. 2d 526, 545 (S.D.N.Y. 2005) ("Were this Court to order transfer, Plaintiff would be forced to litigate this action in four, perhaps five, judicial districts across the country. The Court will not engage in such a waste of resources");

(3)    "The interstate judicial system's interest in obtaining the most efficient resolution of the controversy," here favors a single forum in New York, rather than piecemeal litigation in other states;

(4)    "The shared interest of the states ... in furthering appropriate ... substantive social policies," here favors enforcement by a New York court of the vital policy of preventing sales of firearms to unauthorized persons, and thus reducing risk of gun-related crime in New York;

(5)    The "burden on defendant" is the only factor that arguably favors proceeding in moving defendants' home states. But here it is overwhelmed by the other relevant factors. In any event, since all defendants have the same defenses it will be more convenient to all defendants, plaintiff and the courts to try the case in one district at one time.

There is no evidence that these defendants would suffer undue hardship from defending this suit in New York. From the proceedings so far it is apparent that competent New York counsel are available to litigate this suit on all the defendants' behalf. Modern communications and transportation methods ease the burden of litigating in another state. *See e.g., Hanson v. Denckla*, 357 U.S. 235, 251 (1958).

"In the absence of an indication that the defendant[s] [are] without adequate resources, there is no basis for concluding that defendant[s] will be excessively burdened by a New York trial and, *a fortiori*, no reason to believe that defendant[s'] burden will exceed the burden on plaintiff[] of a dismissal." *In re DES Cases*, 789 F. Supp. at 594.

New York has a strong interest in the safety its residents and territory from handgun violence as well as in regulating the illegal flow of handguns into its territory. By enacting strong gun control laws to protect its citizens from gun-related crimes New York has expressed a special public policy interest in the subject matter of this litigation. The activities which the defendants' are alleged to be involved in are illegal and against the public interest in all states. Their alleged illegal practices hinder the ability of New York and the federal government to regulate the sale and ownership of firearms in accordance with extant statutes.

## VI.    Conclusion as to Jurisdiction

The motions to dismiss for lack of personal jurisdiction by defendants Adventure Outdoors, Inc.; Harold W. Babcock, Jr. d/b/a Webb's Sporting Goods; Mickalis Pawn Shop, LLC; Nancy Dailey d/b/a Peddler's Post; Patriot Services, Inc.; and Woodrow C. Holman III d/b/a Woody's Pawn Shop, are denied.

## VII.   Denial of Certification for Interlocutory Appeal

Defendants request a certification for interlocutory appeal pursuant to section 1292(b) of title 28 of the United States Code. That section provides as follows:

§ 1292. Interlocutory decisions . . . (b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

The court does not find that there is a controlling question of law as to which there is substantial ground for difference of opinion. The trial should be completed substantially before an appeal would be heard. A certificate is denied.

## VIII.   Date For Trial

Trial is set for January 7, 2008, at 10:00 A.M. The magistrate judge shall expedite any necessary remaining discovery. The parties shall arrange with Case Coordinator June Lowe for a conference in early December of 2007 for *in limine* rulings.

SO ORDERED.

Jack B. Weinstein

Dated:   August 15, 2007
         Brooklyn, New York

99