UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

THE CITY OF NEW YORK,

Plaintiff,

-against-

A-1 JEWELRY & PAWN, INC.; ADVENTURE OUTDOORS, INC.; COLE'S GUN SHOP, INC.; DUNKELBERGER'S SPORTS OUTFITTERS; GALLERY DISTRIBUTING INC.; GREG L. DRIGGERS d/b/a AAA Gun & Pawn Brokers; THE GUN STORE, INC.; HAROLD W. BABCOCK, JR. d/b/a Webb's Sporting Goods; JAMES THOMAS FARMER d/b/a Jim's Guns and Whatever; MICKALIS PAWN SHOP, LLC; NANCY DAILEY d/b/a Peddler's Post; OLD DOMINION GUNS & TACKLE, INC.; PATRIOT SERVICES, INC.; VIRGINIA FIREARMS & TRANSFERS, INC.; WELSH PAWN SHOP, INC. d/b/a Big Tom's Pawn Shop; WOODROW C. HOLMAN III d/b/a Woody's Pawn Shop,

06-CV-2233(JBW)(CLP)

Defendants.
------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF THE CITY OF NEW YORK'S MOTION FOR ENTRY OF A DEFAULT JUDGMENT <u>AGAINST DEFENDANT MICKALIS PAWN SHOP, LLC</u>**

MICHAEL A. CARDOZO
Corporation Counsel of the
City of New York
100 Church Street, Room 20-99
New York, New York 10007
(212) 788-1324

PILLSBURY WINTHROP
SHAW PITTMAN LLP
1540 Broadway
New York, New York 10036
(212) 858-1000
Attorneys for Plaintiff

Plaintiff The City of New York (the "City"), by its attorneys, Michael A. Cardozo, Corporation Counsel of the City of New York, and Pillsbury Winthrop Shaw Pittman LLP, submits this memorandum pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, in support of the City's motion for entry of a judgment of default against defendant Mickalis Pawn Shop, LLC ("Mickalis Pawn").

**PRELIMINARY STATEMENT**

The indictment of Mickalis Pawn owner Larry Mickalis for knowingly selling a firearm to a felon[1] – the very conduct the City alleges is responsible for the creation of a public nuisance in New York City – convinced Mickalis Pawn to end its defense of this action. Mickalis Pawn did so fully aware that such a step, accompanied by the withdrawal of its counsel, would trigger a default and lead to entry of a default judgment.[2]

Mickalis Pawn's default was entered by the Clerk of the Court on April 2, 2008 (Document No. 627). All that remains now, then, is to fix the precise terms of the final default judgment and to specify the Court's findings of fact and conclusions of law in support thereof. To provide the City with adequate relief, those terms and findings should be embodied in an Order which:

- Finds that a public nuisance exists in the City of New York arising from the presence of illegally-possessed firearms;
- Finds Mickalis Pawn to have caused and/or contributed to that nuisance through its sales practices;

[1] *See United States v. Larry H. Mickalis,* 2:08-cr-00138-DCN (D.S.C.) (Ex. 15 to Proshansky Aff.).

[2] Mr. Mickalis has also suspended his retaliatory suit for defamation brought in South Carolina state court, although under South Carolina rules, that suit can be reinstated within one year of the date of suspension.

- Appoints a Special Master (i) to monitor sales practices at Mickalis Pawn for five years, (ii) to provide instruction on "best sales practices" to Mickalis Pawn employees involved in the sale of firearms and (iii) requires Mickalis Pawn to institute certain practices that will reduce the likelihood of illegal sales;
- Requires Mickalis Pawn to cooperate fully with the Special Master by, among other things, providing access to all documentation regarding firearms sales and inventory;
- Requires Mickalis Pawn to compensate the Special Master and reimburse his or her reasonable expenses;
- Requires Mickalis Pawn to post a $25,000 performance bond within 15 days of the entry of the Order; and
- Imposes monetary penalties if Mickalis Pawn again sells a firearm to a straw purchaser, or otherwise in violation of a Federal, State or local law or regulation concerning the sale of firearms, as determined by the Special Master.

## **PROCEDURAL BACKGROUND**

As more fully set forth in the annexed Affidavit of Eric Proshansky, sworn to on June 10, 2008 (the "Proshansky Aff."), the City commenced this action on May 15, 2006, against Mickalis Pawn and 14 other retail firearm dealers. Proshansky Aff ¶ 2. The City alleged that the defendant retailers had caused and contributed to a nuisance in New York City by negligently or intentionally engaging in certain sales practices known to permit the acquisition of firearms by persons who are prohibited by law from purchasing or possessing firearms.

The City's Complaint originally included claims for damages and injunctive relief, based on causes of action sounding in negligence and nuisance. *See* Complaint

(Document No. 1) ¶ 1 (seeking "damages, abatement costs and injunctive relief"), and ¶¶ 271-310 (causes of action). On August 29, 2007, the City filed an Amended Complaint (the "*Am. Compl.*"), asserting only public nuisance claims and seeking injunctive relief only. *See Am. Compl.* (Document No. 234) ¶ 1 ("injunctive relief"), and ¶¶ 71-73 (causes of action).

After Mickalis Pawn's two motions to dismiss for lack of personal jurisdiction were denied, but prior to Mickalis Pawn's default, the City and Mickalis Pawn engaged in extensive pre-trial discovery, which revealed many more guns sold by Mickalis Pawn and recovered in crimes in the City than had been shown by the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") data alone. Many of these guns were recovered between 2005 and 2007. In addition, testimony by former Mickalis Pawn employees revealed both intentional straw sales and a repeated failure to recognize straw sales. By obtaining direct evidence concerning Mickalis Pawn's sales practices through the depositions of three former Mickalis Pawn employees, and from Larry Mickalis himself, the City established what before had been a strong inference: that the disproportionately high number of traces and short times-to-crime of guns sold by Mickalis Pawn indicated that the store engaged in improper sales practices.[3]

Until March 27, 2008, Mickalis Pawn was represented in this action by three law firms: the Renzulli Law Firm LLP (White Plains, New York), Pierce, Herns, Sloan and McLeod (Charleston, South Carolina), and the Kahn Law Firm (Charleston, South Carolina). (Proshansky Aff. ¶ 17). On March 12, 2008, all three of those firms filed motions to withdraw as counsel for Mickalis Pawn, stating that Mickalis Pawn was "unable to continue with its defense

[3] The confirming testimony by Mickalis Pawn employees was mirrored by the facts set forth in Larry Mickalis' indictment, which describe yet another illegal sale, one that had not been identified by the Mickalis Pawn employees who had been deposed.

in this case" because its principal, Larry Mickalis, had recently been indicted by a Federal grand jury in South Carolina "for allegedly knowingly selling a firearm and ammunition to a convicted felon." *Id.* ¶ 18.

During a March 18, 2008, telephonic status conference with Magistrate Judge Cheryl Pollak, Scott Allan, Esq., one of Mickalis Pawn's attorneys at that time, confirmed that "Mickalis Pawn has decided that it does not intend to further defend this case in Brooklyn …. Mickalis Pawn is no longer going to defend. Whether the Court puts him [*sic*] in default is obviously an issue between the Court and the City, but yes, he [*i.e.*, Mr. Mickalis] understands that this is an obvious consequence of his decision to no longer defend." *Id.* ¶ 19. Mr. Mickalis was present throughout this teleconference. Magistrate Judge Pollak then specifically cautioned him, "if you do not have an attorney to represent Mickalis Pawn, then the City is going to move for a default and because corporations cannot appear in court without counsel, a default will enter." *Id.* ¶ 20. Later the same day, the Renzulli Law Firm confirmed, via a letter filed with the Court, that if the motions to withdraw were granted, "[Mickalis Pawn] will be without counsel and … the Court will enter default judgment against it." *Id.* ¶ 21; Document No. 609.

The motions of the three firms that had represented Mickalis Pawn were granted on March 27, 2008. The March 27th Order recognized that Mickalis Pawn had consented to the withdrawals and to the potential consequences: "The Court, having questioned Mr. Mickalis at the conference on March 18, 2008, has determined that he has made the decision to discontinue any defense of Mickalis Pawn in this case …. Mickalis Pawn is now in default." Proshansky Aff. ¶ 22; Document No. 623.

The Clerk accordingly entered a Notation of Default with respect to Mickalis Pawn on April 2, 2008 (Document No. 627).

## ARGUMENT

### I. THE CITY IS ENTITLED TO ENTRY OF A DEFAULT JUDGMENT AGAINST MICKALIS PAWN

Following the Clerk's entry of a default pursuant to Fed. R. Civ. P. 55(a), entry of a default judgment pursuant to Fed. R. Civ. P. 55(b) is both timely and appropriate.[4]

#### A. The Standard of Review

Entry of a default judgment is within the sound discretion of the district court. *Briarpatch Ltd., L.P. v. Geisler,* 513 F. Supp. 2d 1, 3 (S.D.N.Y. 2007). The following seven factors may be taken into account, each of which indisputably favors the entry of a default judgment here against Mickalis Pawn (*id.*):

- The amount of money potentially involved. The City does not seek any damages, but instead simply requires that Mickalis Pawn bear the cost of compliance with the injunctive relief discussed at Point II below.

- Whether material issues of fact or of substantial public importance are at issue. The safety of New York citizens and visitors from illegally-possessed guns, a matter of substantial public importance, is squarely at issue here; the pertinent facts are largely undisputed.

- Whether the default is largely technical. Mickalis Pawn's default is anything but technical. On the contrary, it is a knowing, fully-informed decision made in light of Mr. Mickalis's indictment on criminal charges.

---

[4] Rule 55 authorizes a default judgment "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). A failure to defend will be found where a corporate defendant fails to maintain counsel throughout a pending litigation. *See Shapiro, Bernstein & Co., Inc. v. Continental Record Co., Inc.*, 386 F.2d 426, 426 (2d Cir. 1967); *Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1308-10 (2d Cir. 1990); *Brock v. Unique Racquetball & Health Clubs, Inc.*, 786 F.2d 61, 62 (2d Cir. 1986); *International Brands USA, Inc. v. Old St. Andrews Limited*, 349 F. Supp. 2d 256 (D. Conn. 2004).

- Whether plaintiff has been substantially prejudiced by the delay involved. This suit was commenced in May 2006, seeking to remedy an ongoing threat to the safety of New York City residents and visitors. For nearly two years, Mickalis Pawn vigorously opposed the injunctive relief sought, with the nuisance continuing unabated as a result. Any further delay of the vital relief sought here ought not be countenanced.

- Whether the grounds for default are clearly established or are in doubt. Where Larry Mickalis has expressly stated his intention to default, the grounds for default are "clearly established."

- How harsh an effect a default judgment might have. The judgment sought here is an injunction consisting of specific measures that will secure Mickalis Pawn's compliance with firearms laws and regulations and promote best firearms' sales practices. The injunctive relief sought is not harsh in that it differs little from the relief that eleven (11) defendants in this action (and nine (9) others, in a related action) *voluntarily* entered into, after negotiation, and which this Court has approved.[5]

- Whether the default was caused by defendant's mistake or neglect. Mickalis Pawn's default was conscious and intentional.

**B. The Facts Establish Mickalis Pawn's Liability For Causing or Contributing To A Public Nuisance**

A defaulting defendant admits every well-pleaded allegation of the complaint, and the plaintiff is "entitled to all reasonable inferences from the evidence offered." *Trans World*

---

[5] The relief requested here goes further than that agreed upon through negotiations with the twenty (20) settling defendants, only in that Mickalis Pawn would be required to pay (a) the costs of the Special Master, and (b) more substantial penalties for violating the terms of the injunction. The monitorship would also remain in effect for five years, rather than the three years negotiated with the settling defendants. This relief is consistent with the relief sought in the Amended Complaint.

*Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir. 1971); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981); *Kingvision Pay-Per-View Ltd. v. Lalaleo*, 429 F.Supp.2d 506, 513 (E.D.N.Y. 2006) (after default, "the factual allegations in the complaint, except those relating to damages, are deemed true"); *International Brands USA, Inc. v. Old St. Andrews Ltd.*, 349 F. Supp. 2d 256, 259 (D. Conn. 2004) (same); *Chen v. Jenna Lane, Inc.*, 30 F.Supp.2d 622, 623 (S.D.N.Y. 1998) (same). "A default constitutes an admission that … the acts pleaded in a complaint violated the laws upon which a claim was based and caused injuries as alleged." *Lukaszuk v. Sudeen*, 2007 U.S. Dist. LEXIS 95919 at *4 (E.D.N.Y. Nov. 27, 2007); *see also Greyhound ExhibitGroup, Inc. v. ELUL Realty Corp.*, 973 F.2d 155 (2d Cir. 1992).

Where, as here, the parties have exchanged discovery, courts do not hesitate to rely on that evidence to support entry of a default judgment. In *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987), the Ninth Circuit, affirming a motion for default judgment, recognized that Rule 55(b)(2) permits entry of a default judgment based on allegations in a complaint alone, but found that a district court had exceeded "the requirements of the rule by taking extensive evidence on *all* the allegations in the complaint including damages." *See also International Brands USA, Inc*, 349 F. Supp. 2d at 258-59 (recognizing that its findings of fact in a default judgment were based, in part, on "extensive documentary evidence," including deposition transcripts); *Commodity Futures Trading Comm'n v. Brickell Key Fin., LLC*, 2006 U.S. Dist. LEXIS 97093, *11 (S.D. Fla. July 14, 2006) (citing deposition testimony in enumerated findings of fact for a default judgment); *Omne Servs. Group, Inc. v. T.R. Kraft, Ocean Exploration & Producing Corp.,* 1996 U.S. Dist. LEXIS 6540, *5-7 (E.D. Pa. May 9, 1996) (citing deposition testimony and documents obtained during discovery to support entry of default judgment on plaintiff's claims).

Here, the allegations of the Amended Complaint, now established as facts, and the evidence uncovered in discovery, are more than sufficient to find Mickalis Pawn liable for contributing to a public nuisance. To prove that cause of action, the City must demonstrate (1) the existence of a nuisance; and (2) conduct or omissions by a defendant that create, contribute to, or maintain that nuisance. *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 448 (E.D.N.Y. 2003); *City of New York v. Beretta USA Corp.*, 401 F.Supp.2d 244, 271, 285 (E.D.N.Y. 2005), *reversed in part on other grounds*, 524 F.3d 384 (2d Cir. 2008) (statutory nuisance, in New York Penal Law § 240.45, "is essentially a criminal codification of the common law doctrine of public nuisance"; hence the same conduct alleged to cause a public nuisance also states a claim for statutory nuisance).[6]

**(1) The Existence of a Nuisance**

A public nuisance is an offense against the State that "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all . . . in a manner such as to offend public morals, interfere with the use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus. Inc. v. Cons. Edison Co. of New York*, 41 N.Y. 2d 564, 568 (1977) (internal citations omitted). To constitute a public nuisance, the interference must be "substantial," *i.e.*, "real and appreciable, not imagined or petty." *NAACP*, 271 F. Supp. 2d at 484 (*citing New York Trap Rock Corp. v. Clarkstown*, 299 N.Y. 77 (1949)).

[6] The elements of statutory nuisance mirror those of public nuisance: "1) the existence of a public nuisance (*i.e.*, a condition 'endanger[ing] the safety or health of a considerable number of persons'); that is 2) caused or maintained by the defendants' unlawful or unreasonable conduct; and 3) defendant's knowledge or reckless disregard of the fact that the conduct causes the nuisance." *Beretta*, 401 F. Supp. 2d at 270.

The Amended Complaint (*Am. Compl.* ¶¶ 46-47) states, in an allegation of fact now deemed true, that although New York City has enacted its own comprehensive gun laws to try to remedy the possession of guns in the City, persons prohibited from owning or possessing handguns in the City still easily obtain them illegally from out-of-state sources such as Mickalis Pawn:

> During the 11 year period from 1995 to 2005, NYPD's ballistics analysis unit processed more than 70,000 handguns that had been recovered by NYPD or other law enforcement agencies, 5500 in 2005 alone. Virtually all of the firearms recovered in this 10 year period were recovered from individuals who were prohibited by law from possessing guns.
>
> …
>
> [I]llegally-possessed handguns originate principally from retail purchases that take place outside of New York State. Few guns fall into the hands of prohibited persons as a result of theft from lawful owners. Only about 15% of the handguns recovered in the City had been previously reported stolen.

*Id.* ¶¶ 48, 55.

The facts established by the Amended Complaint also demonstrate that illegal guns impair the health and safety of a considerable number of persons in the City. Virtually all of the 5,400 homicides attributable to gun violence in New York City between 1995 and 2004, as well as the tens of thousands of violent crimes connected to handguns during this same period, involved an illegally-possessed gun. *Id.* ¶¶ 49, 50. City employees are among those who suffer the impact of this nuisance most directly: "NYPD police officers are the victims of shootings that arise out of criminal activity generally and out of criminal activity that is specifically tied to the supply of illegal guns." *Id.* ¶ 53.

These facts more than sufficiently establish the substantial "damage to the public in the exercise of rights common to all . . . in a manner such as to offend public morals, interfere

with the use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons," that constitutes a public nuisance. *Copart*, 41 N.Y. 2d at 568. On the basis of facts comparable to those now established in the City's Amended Complaint, this Court has already found the existence of a public nuisance consisting of the easy availability of illegal guns. *See NAACP*, 271 F. Supp. 2d at 449 ("Plaintiff demonstrated that a public nuisance exists in New York in the form of widespread access to illegal firearms that causes harm to the population at large in that it endangers and injures the property, health, safety or comfort of a considerable number of persons.")

**(2) Conduct that Contributes to this Public Nuisance**

It is by now well-established that certain sales practices by firearms dealers favor the entry of guns into the illegal market. *City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 377-78, 379-81 (E.D.N.Y. 2007) (JBW) ("*A-1*"). A principal manner in which dealers feed the illegal firearms market is through straw sales, "a high-risk sales practice that is a well-recognized source of illegally trafficked guns." *Id*. at 377. As this Court has previously noted, straw purchases were "involved in half of the ATF's trafficking investigations and two-thirds of the ATF's investigations in the Northeast." *Id*. In addition, "[s]ales of multiple handguns at one time, to one purchaser, is another high-risk practice," *id*. at 378, as is the sale of certain brands of cheap handguns, such as Hi-Points and Lorcins, which "are more likely to give rise to public nuisance and public danger when they are in the hands of prohibited purchasers." *Id*. at 379.

The typically indirect evidence that a particular dealer engages in these practices takes the form of several key indicators that a dealer's guns are moving into the illegal market. The number of guns sold by a dealer that are later recovered in connection with crimes is "the principal indicator that a dealer is selling to prohibited persons." *Am. Compl.* ¶ 56. For example,

the average licensed firearms retailer has 0.67 guns per year traced. *Commerce in Firearms in the United States* at 23 (Ex. 9 to Proshansky Aff.). The larger the number of traces above that average, the greater the likelihood that the dealer is selling in a manner that favors the entry of guns into the criminal market. *See id.* at 25.

A second indicator of trafficking is "time-to-crime." *Id.* at ¶ 57.

> Time-to-crime is the time from the retail sale of a firearm to the time it is recovered at a crime scene or is traced. The average time-to-crime [for guns recovered nationwide] is six years." *Blaustein & Reich, Inc. v. Buckles,* 365 F.3d 281, 285 (4th Cir. 200), *cert. denied*, 543 U.S. 1052 (2005). According to ATF, a short time-to-crime suggests that a firearm was recently and illegally diverted from a retail outlet. *Crime Gun Trace Reports: National Report* (2000) at ix, 30. As to what constitutes a "short" time-to-crime:
>
>> [T]hree years is considered a short time to crime, and is considered an important trafficking indicator, suggesting rapid movement to the illegal gun market. Thus, by identifying those dealers that have ten traces or more per year with a short time to crime of three years or less, ATF can obtain a sense of which dealers tend to sell guns that are ultimately used in crimes.

*A-1*, 501 F. Supp. 2d at 378 (citing *Blaustein & Reich v. Buckles*, 220 F. Supp. 2d 535, 540 (E.D. Va. 2002) (citations omitted), *aff'd*, 365 F.3d 281 (4th Cir. 2004), *cert. denied*, 543 U.S. 1052 (2005)).[7]

A third indicator of a dealer's participation in the illegal firearms market is the prior occurrence at the dealer's store of straw sales, which can be evidenced by prosecutions of the dealers' customers. *A-1* at 377-78, 399-400. A straw purchase requires the participation, in one form or another, of the gun seller, so that it is self-evident that the prosecution of a dealer's customers indicates that the dealer's sales practices allow straw purchases to occur. Where the

[7] The time-to-crime in New York City has recently, risen to *thirteen* (13) years. Sarah Garland, "Gun Recoveries in 2007 Drop With Murder Rate," *N.Y. Sun*, Feb. 28, 2008 (quoting ATF officials) (Exhibit 10 to Proshansky Aff.).

evidence from prior prosecutions shows the straw sales to be of an obvious nature, inferences that the dealer bore some responsibility for the sale, whether as a matter of intentional or negligent conduct, are compelling.

**(3) Mickalis Pawn Shop Has Contributed to the Nuisance in New York City**

The facts in the Amended Complaint, as augmented and confirmed through discovery, prove through clear and convincing evidence, *NAACP*, 271 F. Supp. 2d at 482, *see also Benderson Dev. Co. v. Neumade Prods. Corp.*, 2005 U.S. Dist. LEXIS 14943 at *19 (W.D.N.Y. June 13, 2005), that Mickalis Pawn knowingly contributes to the illegal firearms nuisance in New York City. Mickalis Pawn is located more than 700 miles from New York City; recovery of a significant number of guns sold by Mickalis Pawn in the City would not be expected, absent a significant number of sales to persons that traffic those guns.

As the Amended Complaint establishes:

- Mickalis Pawn sold 49 guns between 1994 and October 2001 which were recovered in New York City, most from illegal possessors, many after use in crimes such as assault, robbery and burglary. *Am. Compl.* at ¶¶ 192-93.

- The average time between the sale by Mickalis Pawn and the recovery in New York City for these 49 guns was 3.7 years, compared to an average "time-to-crime" for all guns in New York City of 6 years.[8] Seventeen of the guns were recovered less than 2 years after purchase; 5 of those were recovered less than 6 months after purchase. *Id*. at ¶194.

- The serial numbers on some of the guns sold by Mickalis Pawn and recovered in New York City had been defaced. *Id*. at ¶ 195.

- Approximately 70% of the guns sold by Mickalis Pawn and recovered in New York City were the kind of cheap handguns favored by criminals, including Lorcins and Hi-Points. *Id*. at ¶ 196.

[8] The average time-to-crime in New York City is now *thirteen* (13) years. *See* n.6 above (Ex.10).

Discovery permitted the City to demonstrate that Mickalis' contribution to the nuisance is greater than had been revealed by the use of ATF trace data Thus, by matching the serial numbers and brands of guns produced by Mickalis Pawn during discovery to an NYPD database of guns recovered in the City, an additional 16 guns were identified. The total number of guns sold by Mickalis Pawn and recovered in the City in connection with crimes between 1994 and 2007 is thus 67. The time to crime for these guns is 4.5 years.[9] **REDACTED**

Documents produced by Mickalis Pawn showed that the store received trace requests nationwide from ATF between 2000 and 2006, or approximately per year, as compared with the average of 0.67 per year for all licensed retail dealers. *Commerce in Firearms in the United States* (Ex. 9) at 23. Dacey Zammetti testified that, during the time he was employed at Mickalis Pawn, he handled approximately 30-40 trace requests – often as many as two or three per day. *Zammetti Deposition Transcript* ("*Zammetti Tr.*") (Ex. 4 to Proshansky Aff.) at 100:15 – 101:9. This was significantly more than prior firearms retailers at which he had worked. *Id.* at 101:10-17 (double, triple, quadruple the amount).

Larry Mickalis was indifferent to, and did nothing as a result of, the high number of traces received by Mickalis Pawn:

> Q. Did you ever implement any changes in Mickalis's Pawn Shop sales operations as a result of Trace Requests that you've received? …
>
> A. No.
>
> Q. Did you ever implement any changes in Mickalis Pawn Shop's policies or practices as a result of any Trace Requests that you've received from the ATF?

---

[9] The time-to-crime of the most recent recoveries cannot be calculated, because Mickalis Pawn did not produce the necessary documentation. *See* n. 10. This distorts the time-to-crime analysis because many of these guns were recovered during a period in which the average time-to-crime for all guns recovered in the City is thirteen years. *See* n. 6.

A. No.

*Mickalis Deposition Transcript ("Mickalis Tr.")* (Ex. 1 to Proshansky Aff.) at 73:13 – 74:4.

Indeed, Larry Mickalis stated that he would not be concerned if he received up to thirty trace requests per month from ATF. *Id.* at 246. This was so despite the fact that ATF itself in an August 2006 Demand Letter to Mickalis Pawn expressed concern over the number of recovered crime guns sold by Mickalis Pawn.[10] ATF's demand letter was issued because "our records showed that your business had 15 or more crime guns traced through your licensed business with a time-to-crime of three years or less," which ATF referred to as "an unusually high number of traces of new crime guns with a relatively short time-to-crime ..." *Id.* at 75:16 – 76:4; *see also* Ex. 5 ( demand letters). **REDACTED**

Mr. Mickalis was indifferent to the ATF notification:

Q. Did it concern you when you received this letter that the ATF was stating that Mickalis Pawn Shop had an unusually high number of traces of new crime guns with a relatively short time-to-crime?

...

---

[10] In 1999, ATF determined that 1.2% of FFL dealers – approximately 1,000 of the then more than 80,000 dealers – accounted for more than half of all crime guns traced nationally. *Commerce in Firearms in the United States*, Ex. 8 at 23-24. ATF further determined that approximately 450 retailer FFL's were each the source of ten or more crime guns with times-to-crime of three years or less. *See J&G Sales, Ltd. v. Truscott*, 473 F.3d 1043, 1052 (9th Cir. 2007) (demand letter now requires fifteen or more traces). Based on this data, ATF began the practice of demanding additional sales information from the 450 FFL dealers identified by those criteria. *See Blaustein & Reich,* 365 F.3d at 285. The demands, now known as "ATF Demand Letters," imposed additional record-keeping requirements on these dealers. *See* 18 U.S.C. § 923(g)(5)(A) (2007). A dealer's receipt of a Demand Letter is a determination by an administrative agency with expertise in the subject area that the dealer's practices are associated with the recovery of a disproportionate number of crime guns. As the ATF Demand Letters themselves explain, "[ATF's] research ha[s] demonstrated that a high volume of gun traces with a short time-to-crime may indicate illegal firearms trafficking by an FFL dealer." *Blaustein & Reich,* 365 F.3d at 291.

A. No.

Q. And did it cause any changes in Mickalis Pawn Shop's policies or practices with respect to the sale or processing of firearms?

…

A. Other than complying with the demand letter, no.

*Mickalis Tr*. at 82:5-19.

**4) Mickalis Pawn's Sales Practices Facilitate The Movement of Guns into the Illegal Market**

Detective Peter Shanhai, with over ten years of experience in the ATF-NYPD Joint Firearms Task Force, testified that in his opinion straw sales are responsible for a very large number of guns being trafficked into the City. *Shanhai Deposition Transcript* (Ex. 8 to Proshansky Aff.) at 144:11 – 145:5.

Mickalis Pawn failed to recognize the City's simulated straw sale, conducted on or about April 20, 2006:

> Only the male investigator interacted with a Mickalis [Pawn] salesperson, discussing and selecting a Hi-Point handgun to purchase. When the salesperson asked the male investigator for his driver's license, the male investigator summoned the female investigator to give hers, which she did. After the male investigator said that he would take the gun and four boxes of ammunition, the salesperson again asked the male investigator if he had his license. The male investigator indicated that he did not. The salesperson then said, "she's going to have to do it then." The male investigator responded, "That's fine, she will do the paperwork." The salesperson then handed the forms to the female investigator and, addressing the male investigator, said "She's getting this for herself." The male investigator responded, "Right." The salesperson did not ask any questions of the female investigator, but rather accepted the paperwork and sold the gun. The male investigator paid for the gun.

*Am. Compl.* at ¶ 188.[11]

---

[11] After the male investigator said that he would take the gun and four boxes of ammunition, the salesperson again asked the male investigator if he had his license. The male investigator indicated that he did not. The salesperson then said, "she's going to have to do it then." The male investigator responded, "That's fine, she will do the paperwork." The salesperson then

No straw sale actually took place, because the female investigator was legally entitled to purchase the handgun from Mickalis Pawn and ownership was never transferred from the female investigator to another person. Nonetheless, the transaction bore the hallmarks of a straw sale, and Mickalis Pawn's participation in the sale strongly supports an inference that its employees permit straw purchases. Indeed, the City is "entitled to all reasonable inferences from the evidence offered." *Trans World Airlines,* 449 F.2d at 63.

Facts obtained during discovery confirm the inference that Mickalis Pawn's sales practices permit the movement of guns into the criminal market.

**Straw Sales** – Robert Jean-Charles, the now-former Mickalis Pawn employee who made the sale to City investigators during the simulated straw purchase, testified that sales resembling the City sale were "not uncommon at all" at Mickalis Pawn, and that he could not remember a time when he refused to make this type of sale during his tenure at Mickalis Pawn. *Jean-Charles Deposition Transcript* ("*Jean-Charles Tr.*") (Ex. 2 to Proshansky Aff.) at 151:12 – 153:23; *see also id*. at 95:1-19, 102:9 – 122:10. Mr. Jean-Charles' testimony was all the more significant for the fact that he found nothing out of the ordinary about the City's simulation, which had been designed as a classic straw purchase scenario, precisely as described by ATF and trade publications:[12]

> Q. Was there anything unusual about [the simulated straw] sale, in your opinion?

---

handed the forms to the female investigator and, addressing the male investigator, said "She's getting this for herself." The male investigator responded, "Right." The salesperson did not ask any questions of the female investigator, or the male investigator, but rather accepted the paperwork and sold the gun. The male investigator paid for the gun. *Am Compl.* ¶ 188.

[12] *See, e.g.*, Mark Kraft, *Firearms Trafficking 101 Or Where Do Crime Guns Come From?*, United States Attorneys' Bulletin, January 2002, at 7-8; National Shooting Sports Foundation, *Don't Lie for the Other Guy: A Retailer's Guide to Recognizing and Deterring Straw Purchases* (Exs. 11-12 to Proshansky Aff.).

A. To be honest, not so much, to be honest. No.

Q. Okay. So it wasn't unusual for a male and female to come into the store together to buy a gun?

A. No.

Q. And it wasn't unusual for the male customer to ask most of the questions about the gun, even though the female was purchasing the gun?

A. No, it's not. At the same time, it doesn't happen all the time, but it's nothing that's out of the ordinary.

Q. This certainly wasn't the only time you worked at Mickalis Pawn that this happened?

A. No.

Q. Okay. Which customer paid you for the gun?

A. I believe the gentleman did.

*Id.* at 116:16 – 117:10.

Even when questioned by his own counsel, it was clear that Mr. Jean-Charles was completely unconcerned about the key indicators of a straw purchase:

Q. Is there anything about this transaction that would ever have indicated to you anything unusual about the fact that this couple went into Mickalis Pawn Shop, and the gun was bought on her behalf?

A. No.

*Id.* at 174:5-10.

Mr. Jean-Charles evinced no conception whatsoever of his responsibility to question suspicious sales; as long as the buyer answered a pro forma question, the sale could proceed:

Q. The fact that [City investigator] Miss Reaves answered "yes" to question 11A on the form [4473], and signed the form stating that that answer was accurate, you believed

was sufficient as a seller to fulfill your obligation to make sure she was the actual purchaser of the handgun?

…

A. Yes, at the point in time.

…

Q. And do you feel differently sitting here now?

A.. No.

*Id.* at 176:13-25.

Consistent with Mr. Jean-Charles' attenuated view of the inquiry accompanying a questionable sale, he stated that in the past that he did not ask even the most routine inquiry that might permit the detection of a straw sale:

Q. Mr. Jean-Charles, I believe you testified that it was not uncommon for a man and a woman to come into the store together, for the woman to purchase the gun, for the man to, basically, take the lead in choosing the gun and asking the questions. Is that correct?

A. That's correct, yeah.

Q. In any of those situations, did you refuse to make the sale because you believed it was a straw purchase?

A. Not -- nothing that sticks out, no.

Q. And in those situations, would you ask the male customer if he was prohibited from purchasing a firearm?

A. No.

*Id.* at 151:12 – 152:1.

Mr. Jean-Charles' self-described "dripping blood" standard for denying a sale hardly breeds confidence:

Q. Okay. And how is it you get a feeling for whether someone is planning to do something illegal?

A. That's just – that's totally judgment call. I wouldn't be able to say, I get a feeling like this. I guess if somebody came in, you know, dripping blood, yeah, I tell you that looks illegal. But besides that, you can't really just go up and say; well, he looks wrong, or that's being prejudice [*sic*].

Q. So if someone came in dripping blood and asked to purchase a gun?

A. I would say no.

Q. You would say no?

A. Yeah.

*Id*. at 148:7-21.

Like Mr. Charles, Jeffrey Loffredo, another former Mickalis Pawn employee, testified to the fact that he repeatedly sold guns in straw purchase scenarios. Asked if he "[c]ould remember any circumstances where [he] sold the gun even though it was a suspicious sale," Mr. Loffredo responded by describing a sale very similar to the simulated straw purchase described in the Amended Complaint. *Loffredo Deposition Transcript* ("*Loffredo Tr*.") (Ex. 3 to Proshansky Aff.) at 140:17 – 141:5. While he could not remember exactly how many times that occurred, he testified that it certainly happened on more than one or two occasions. *Id*. at 142:6-14.[13]

---

[13] Mr. Loffredo also testified that he was personally convicted of a felony during the course of his employment at Mickalis Pawn, a fact which, standing alone, should have disqualified him both from working in a pawn shop at all and from selling firearms in particular. *Loffredo Tr*. at 25:20-21, 29:13 – 31:17. He testified that Larry Mickalis continued to permit him to sell firearms, but would falsify the Form 4473 by having an employee other than Mr. Loffredo execute the form as the seller. *Id*. at 29-31. Mr. Mickalis attempted to excuse, but did not deny, this fact. *Mickalis Tr*. at 200:2-6. Mr. Loffredo also testified that another person who worked selling firearms at Mickalis had a felony conviction, of which Larry Mickalis had been informed. *Loffredo Tr*. at 34-36.

Mr. Loffredo testified that straw purchases in connection with guns redeemed from pawn "was a general practice of Mickalis Pawn."[14] If a customer attempting to redeem a pawned gun failed the mandatory background check:

> Now, Mr. Mickalis would sometimes speak with the customers and tell them, kind of say; listen, I can't give you this gun back, you know, but if you want to give it to a family member, they can come and pick it up, but they can't give it back to you.

*Id*. at 55:3-7.

Mr. Loffredo testified about one customer, William Dixon, who would repeatedly pawn his gun and, when he paid the money to redeem it, would have "one of two females" fill out the Form 4473 and undergo the background check. *Id*. at 59:6. Loffredo fully advised Mr. Mickalis as to the illegality of the practice:

> Q. Okay. Did you ever speak with Mr. Mickalis about these transactions?
>
> A. I did.
>
> Q. And what did he say?
>
> …
>
> A.. Don't tell him how to run his business. I mean, I would tell – I had a conversation with him about Mr. Dixon pawning the gun, saying that I thought we would get in trouble, because it's obvious he's not supposed to have the gun. And then somebody else is picking it up for him. And that we're – and it's obvious, she's giving it back to him because he's repawning it. I was saying, you know, if I figured if we ever get audited by ATF, that that would be a problem.
>
> Q. And "we" being Mickalis Pawn Shop?

---

[14] The procedure for redeeming a gun from pawn is no different than for the purchase of a gun. *See* ATF website, available at <http://www.atf.gov/firearms/faq/faq2.htm>;18 U.S.C. § 922(t); 27 C.F.R. §§ 478.102(a), 478.124 - .125. The person redeeming the gun must pass the NICS background check and must fill out a Form 4473. *Id*.; *see also Mickalis Tr*. at 129:6-14, 206:21 – 207:12. "We NICS everyone that comes to redeem the pawn ticket and if they don't pass, they don't get the firearm." *Mickalis Tr*. at 126:14-16.

A. Correct.

Q. And how did Mr. Mickalis respond?

MR. RENZULLI: Objection as to form. Asked and answered, but you may answer.

A. Don't tell him how to run his business.

Q. Don't tell Mr. Mickalis?

A. Correct.

Q. Okay. And after you spoke with Mr. Mickalis, did Mr. Dixon come into the store?

A. Yes.

MR. RENZULLI: Objection as to form.

Q. Did he pawn a gun again?

A. Yes.

Q. And did he come back to reclaim it with the women?

A. With the women, yes.

Q. Okay. Did you ever discuss Mr. Dixon's – these Mr. Dixon's transactions with any other store employees?

A. Yes. Mostly Brian Campbell, Angie Morales and Tony Zammetti. We all had the same opinion on Mr. Dixon.

Q. And what was that opinion? …

A. That there was a problem with us giving his gun back, because we knew that the person picking the gun up was giving it back to him.

Q. Okay. Do you recall any other customers that this occurred with?

MR. RENZULLI: Objection as to form.

A. We had another customer, he was an older gentleman, Mr. Varner. I believe the same situation happened with him. He would – he came in and pawned the gun, and then a woman would come in and reclaim it.

*Loffredo Tr.* at 63:14 – 65:16.

Consistent with the testimony that straw transactions were "a general practice of Mickalis Pawn," (*id.* at 55:2-3), Dacey Zammetti, another former Mickalis Pawn employee, confirmed the straw purchases by William Dixon, *Zammetti Tr.* at 56:13 – 57:7, 62:1 – 66:25, and also testified to another such transaction with an individual named Stevie Lamont Campbell. *Id.* at 71:8 – 73:24, 75:2 – 78:1. Campbell was later prosecuted for firearms offenses connected with the Mickalis Pawn transaction (*See* Ex. 14 to Proshansky Aff.). Larry Mickalis' indictment in the District of South Carolina alleges his participation in yet another straw purchase, with an individual named Jesse O'Conner (*See* Ex. 15 to Proshansky Aff.).

**Saturday Night Specials** – Three former Mickalis employees testified that sales of cheap Hi-Points dominated at Mickalis Pawn. *Loffredo Tr.* at 38:17 – 39:22 (identifying Hi-Points as "definitely [Mickalis'] best seller…We sold way more Hi-Points than anything else."); *See Zammetti Tr.* at 45:1-:12 (describing Hi-Point 9mm as a "big, big seller for Mickalis"), 45:24 – 46:6 (no other gun compares in sales volume); 46:14-46:18 (estimating 70% of firearms sold by Mickalis during the time Zammetti worked there were Hi-Points); *Jean-Charles Tr.* at 53:1-6 (Q. "And from your experience, was there any particular handgun that was the best seller at Mickalis? A. Yes, there was a few .... A lot of the people get the Hi-Points."). Mickalis Pawn had a banner outside of the store for at least two years advertising Hi-Points. *Mickalis Tr.* at 123:2-10.

**REDACTED**

According to sales data produced in discovery, % of the handguns sold by Mickalis were Saturday Night Specials, mostly High Points. *See* Mickalis Pawn's Amended Second Supplemental Responses to Plaintiff's First Set of Interrogatories (Ex. 6 to Proshansky

Aff.). Seventy per cent of the handguns sold by Mickalis Pawn and recovered in the City were Saturday Night Specials.

Larry Mickalis was indifferent to the fact that most of the guns for which Mickalis Pawn received its already high number of trace requests were Hi-Points:

> Q. Sitting here today going through these, does it concern you at all that the majority of the Trace Requests that we just went through relate to Lorcins and Hi-Points?
>
> . . .
>
> A. No.

*Mickalis Tr.* at 70:14-20.

**REDACTED**

**Multiple Sales** - Mickalis Pawn's discovery responses indicate that at least guns were sold as part of multiple sales from 2000-2006 (Ex. 6 at 12). Guns sold as part of a multiple sale by Mickalis were regularly recovered in crimes outside of South Carolina, frequently in the same city. For example, an excerpt from the National FOIA trace data, referenced by the City in its opposition to Mickalis Pawn and other defendants' motions to dismiss (Ex. BB to the City's opposition, *see* Document No. 202, reformatted and attached as Ex. 13 to Proshansky Aff.), shows an August 6, 1993 purchase of six Hi-Points on the same date, three of which were recovered in New York City. An October 2, 1995 purchase of two Lorcins from Mickalis similarly led to the recovery of both guns New York City. *Id.*

**Prior Prosecutions** – There have been three (3) prior prosecutions of Mickalis customers for straw purchasing at the store: *United States v. Campbell*, 2:06cr970 (DCN) (D.S.C.), about which Dacey Zammetti testified, *see Zammetti Tr.* at 71:8 – 73:24, 75:2 – 78:1; *United States v. Hardin* et al., 2:01cr559 (DCN) (D.S.C.); and *United States v. Cooper*, 90cr267

(CWH) (D.S.C.), *see* 1992 U.S. App. LEXIS 20656 (4th Cir. 1992) (copies of relevant court documents from these three prosecutions are attached as Exhibit 14 to Proshansky Aff.).[15]

## II. THE CITY IS ENTITLED TO PERMANENT INJUNCTIVE RELIEF AGAINST MICKALIS PAWN

### A. The Applicable Legal Standard

"Once the court determines that a judgment by default should be entered, it will determine the … character of the recovery that should be awarded." *Chen v. Jenna Lane, Inc.*, 30 F.Supp.2d at 623, *quoting* 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil 3d* § 2688 at 63. Here, the detailed facts set forth in the City's Amended Complaint, together with the facts provided above, clearly entitle the City to permanent injunctive relief against Mickalis Pawn for contributing to a public nuisance.

"A court may issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the issuance of an injunction." *Kingvision Pay-Per-View*, 429 F. Supp. 2d at 516 (quoting *MainEvents/Monitor Prods. v. Batista*, No 96-CV-5089, 1998 WL 760330 (E.D.N.Y. 1998) (internal quotation marks omitted)). The City has satisfied both criteria.

First, injunctive relief is clearly appropriate to abate a public nuisance. *See Copart*, 41 N.Y. 2d at 568 (internal citations omitted) (defining a public nuisance as "an offence

[15] The following description of a straw purchase from Mickalis Pawn is from *United States v. Cooper*, 1992 U.S. App. LEXIS 20656 at *2-3 (4th Cir. Aug. 27, 1992): "Evidence presented at Cooper's trial by pawn shop owner Larry Mikalis [*sic*] illustrated that Cooper and his brother, Donald, had come into Mikalis's shop on the day of the August 1985 offense, handled a particular gun, then later returned with [Herbert] Ford, who quickly selected that gun and filled out the necessary paperwork for the purchase. Mikalis [*sic*] also testified that Cooper and his brother had been in the store approximately five times in the thirty days preceding this incident to pick out handguns which someone else would then buy."

against the State [that] is subject to abatement or prosecution on application of the proper government agency"); *see also New York State Nat'l Org. of Women v. Terry*, 886 F.2d 1339, 1361-62 (2d Cir. 1989) (injunction appropriate when protestor's conduct constituted a public nuisance by "endanger[ing] the safety and welfare of City residents"); *New York Trap Rock Corp. v. Clarkstown*, 299 N.Y. 77 (1949) (recognizing municipality's right to "restrain a public nuisance which has allegedly injured the health of its citizens"); *State v. Waterloo Stock Cars Raceway, Inc.*, 96 Misc. 2d 350, 359 (Sup. Ct. Seneca Co. 1978) (injunction is proper remedy to mitigate a public nuisance where "the injury to the public is serious and permanent and no adequate remedy exists at law.").

Second, the City meets both of the prerequisites for a permanent injunction, namely, irreparable harm and the absence of an adequate remedy at law. *Beacon Theatres v. Westover*, 359 U.S. 500, 507-08 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies"). Irreparable harm is essentially self-evident with respect to illegal gun possession and use in New York City – to which Mickalis Pawn's unlawful sales contribute – in the form of individual injuries and deaths, substantial law-enforcement and public-health costs, and the pervasive undermining of the effectiveness of, and respect for, New York's firearms' laws and regulations. The absence of an adequate remedy at law is obvious from the forward-looking nature of the relief sought. The legal remedy of money damages would not "remedy prospectively [Mickalis Pawn's] creation of and contribution to a public nuisance existing in the City of New York." *Am. Compl.* ¶ 1. Rather, to abate the handgun nuisance, Mickalis Pawn must alter its behavior and "cease selling handguns through straw purchases." *Id.* ¶ 25.

Courts in similar contexts have imposed injunctions to restrain public nuisances. *See, e.g.*, *People v. Terry*, 45 F.3d 17, 18, 23 (2d Cir. 1995) (Court of Appeals affirmed district court's entrance of an injunction barring defendant from contributing to a public nuisance by, *inter alia*, trespassing or obstructing facilities in New York City at which abortion services are performed); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1037 (2d Cir. 1985) (Court of Appeals upheld district court's entrance of an injunction requiring that defendants abate the public nuisance they contributed to by removing hazardous waste); *City of New York v. Ring*, 34 A.D.3d 218, 218-19 (1st Dep't 2006) (trial court properly enjoined defendants from further contributing to a public nuisance by selling counterfeit goods).

**B. The Permanent Injunction Sought**

The City seeks a permanent injunction against Mickalis Pawn on terms similar to those already voluntarily agreed to by the eleven settling defendants in this action (and by 9 settling defendants in the related *Bob Moates* litigation).[16] The City's proposed permanent injunction is set forth in the proposed conclusions of law accompanying this memorandum of law. The City's proposed permanent injunction complies with Fed. R. Civ. P. 54(c), which provides that a default judgment shall not differ in kind, or exceed in amount, what is demanded in the pleadings.

A permanent injunction containing these terms would adequately mitigate the risk of Mickalis Pawn's continuing to supply firearms to unauthorized purchasers, and thereby reduce Mickalis Pawn's contribution to the firearms-related nuisance in New York City.

---

[16] *The City of New York v. Bob Moates' Sport Shop, Inc., et al.*, 06-CV-6504 (JBW) (CLP) (E.D.N.Y., filed December 7, 2006).

## CONCLUSION

For the foregoing reasons, the City respectfully requests that this Court grant the City's motion for entry of a default judgment against Mickalis Pawn and in support thereof make the findings of fact and conclusions accompanying this memorandum of law.

Dated: New York, New York
June 10, 2008

MICHAEL A. CARDOZO
Corporation Counsel of the
City of New York
*Attorney for Plaintiff the*
*City of New York*
100 Church Street, Rm 2099
New York, New York 10007
(212) 788-1324

By: ______________________
Eric Proshansky

Of Counsel:
Gail Rubin
Richard J. Costa
Melanie C.T. Ash
Ari Biernoff
Assistant Corporation Counsels

PILLSBURY WINTHROP SHAW
PITTMAN, LLP
*Attorneys for Plaintiff the*
*City of New York*
1540 Broadway
New York, New York 10036
(212) 858-1000

Of Counsel: Kenneth W. Taber
Maria Galeno
John Pritchard
Bryan Dunlap
J. Portis Hicks
Susan Greenberg
Sangita Shah
James Wheaton
Kenneth Newby
Greg Lembrich
Angie Kim
Elizabeth Husa
Ryan Kriger